COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Cathy Hershcopf
Jeffrey L. Cohen
Alex R. Velinsky

Proposed Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                                  :

**In re**                                             :     **Chapter 11**
                                                  :

**METROPARK USA, INC.,**                    :
                                                  :     **Case No. 11-22866 (RDD)**

             **Debtor.**                     :
                                                  :

-------------------------------------------------------------- x

**EMERGENCY MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER PURSUANT TO
SECTIONS 105, 363, 364, 365 AND 554 (I) APPROVING ASSUMPTION OF AGENCY
AGREEMENT, (II) APPROVING STORE CLOSING SALES, (III) APPROVING BREAK-UP
FEE, (IV) AUTHORIZING THE DEBTOR TO ABANDON PROPERTY,
<u>AND (V) GRANTING RELATED RELIEF</u>**

TO THE HONORABLE ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:

        Metropark USA, Inc., as debtor and debtor in possession (the "<u>Debtor</u>", the

"<u>Company</u>" or "<u>Metropark</u>"),[1] by and through its undersigned counsel, through this motion (the

"<u>Motion</u>") respectfully requests entry of an order (the "<u>Approval Order</u>"), pursuant to sections

105(a), 363, 364, 365 and 554 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (i)

authorizing (a) the assumption of that certain Agency Agreement (the "<u>Agency Agreement</u>"),

annexed hereto as **Exhibit A**, dated May 2, 2011, between the Debtor, on the one hand, and,

on the other hand, a joint venture comprised of SB Capital Group, LLC and Tiger Capital Group,

LLC (collectively, the "<u>Stalking Horse Bidder</u>"), or (b) alternatively, the entry into that certain

agreement by and between the Debtor and the successful purchaser to be identified at the

---

[1] The last four digits of the Debtor's federal tax identification number are 6659.

Auction (defined below) (the "Successful Bidder"), on terms substantially similar to the Agency Agreement; (ii) authorizing the Debtor to conduct going-out-of-business, store closing sales (the "Store Closing Sales") at the retail store locations identified on Exhibit 1 to the Agency Agreement (collectively, the "Closing Stores") and distribution center in accordance with the terms of the Store Closing Sale Guidelines (the "Sale Guidelines"), which are attached as Exhibit 8.1 to the Agency Agreement, with such sales to be free and clear of all liens, claims and encumbrances; (iii) approving the Break-Up Fee (defined below), (iv) authorizing the Debtor to abandon property, and (v) granting such other requested relief as may be appropriate. In support of this Motion, the Debtor relies upon and incorporates by reference the Declaration of Cynthia Harriss (the "Harriss Declaration"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

As discussed more fully in the Harriss Declaration, the Debtor currently does not have sufficient cash resources or committed financing to operate its business and service its existing debt obligations. The Debtor conducted an extended marketing process prepetition in an effort to identify a going concern purchaser, a partner and/or equity investor. While doing so, the Debtor's financial condition continued to deteriorate to the point that it can no longer operate in the ordinary course without immediate access to additional financing. Unfortunately, the Debtor's assets cannot adequately collateralize additional financing, thus, in order sustain further operations (including payment of payroll and May rent), the Debtor is left with no choice but to immediately commence going out of business sales at all of its retail locations by no later than May 5, 2011, absent entry into a committed transaction with an alternative lender prior to the hearing on this Motion. The Debtor is in active negotiations with one party who proposed alternative financing as a means to credit bid for substantially all of the assets of the Debtor.

In an abundance of caution, the Debtor seeks authorization from this Court to assume the annexed Agency Agreement which provides for, among other things, the immediate

commencement of going out of business sales and sufficient financing to support the Debtor through the duration of the sale process. The Agency Agreement will be subject to higher or otherwise better bids at an auction to be held between the date of this filing and the hearing date. The Debtor will seek approval of the highest or otherwise best bid, on terms substantially similar to those contained in the annexed Agency Agreement.

As of the filing of this Motion, potential financial investors continue to conduct due diligence on a going concern acquisition of Metropark. In the event this interest materializes into a committed transaction prior to the hearing on this Motion, the Debtor expects to proceed with this Motion -- albeit on a smaller scale -- as any going concern purchaser is likely to require the closure of underperforming stores prior to closing on a transaction. The Debtor will **not** seek approval of a going concern transaction at the hearing on this Motion, but rather approval of "store closing sales" for specified retail locations. Any going concern transaction will be subject to a separate motion and appropriate notice and hearing, under the circumstances.

## BACKGROUND

### General

1. On the date hereof (the "Petition Date"), the Debtor commenced with this Court a voluntary case under the Bankruptcy Code. The Debtor is authorized to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in this chapter 11 case.

### The Debtor's Business

2. Metropark was founded in 2004 to capitalize on the large Gen Y segment (the 25-35 year old customer) who had moved on from teen retailers, but were still looking for fashion-forward apparel and accessories. Through a multi-channel sales strategy, including sales through brick-and-mortar stores and e-commerce, Metropark caters to trendsetting young

3

adult customers by offering a unique and highly differentiated merchandise assortment introducing a "Fashion, Music, Art" philosophy into the marketplace.

3.      Since its founding in 2004, Metropark has grown rapidly from its four original store locations to approximately 70 stores in 21 states, in addition to its newly redesigned online retail presence at www.metroparkusa.com.  Metropark offers its customers a unique mix of premium quality apparel and accessories geared toward the 25-35 year old trendsetter.  The Metropark retail stores provide a truly unique experiential lifestyle shopping environment including, style consultants, in-store events (e.g. live art installations, fashion shows and DJ performances) and a carefully edited inventory assortment of highly sought after brands with a strong offering of up and coming, fashion forward designer talent to deliver an authentic and culturally relevant mix of diverse brands to the customer.

4.      As a result of several internal and external factors, the Debtor faced extraordinary liquidity constraints in the first quarter of 2011.  Because of this reality, the Debtor spent the better part of the first quarter of 2011 trying to identify a financial partner to provide an equity infusion, debt investment or otherwise stabilize the financial wherewithal of the Company. Unfortunately, a transaction in the best interest of the Company, its creditors and its shareholders was not available outside of chapter 11 and the Company has reached the end of its liquidity runway.  Accordingly, the Debtor has determined that the commencement of this case would provide the sole opportunity to, among other things, sell substantially all of the assets of the Debtor as a going concern or liquidation and, if successful in identifying a going concern buyer, right-size the Debtor's business through (i) the evaluation and elimination of liabilities that serve as a drain on the Debtor's profitability, and (ii) operational improvements.

5.      The Debtor's primary assets include inventory, intellectual property rights, and accounts receivable for goods sold.  In addition, the Debtor leases approximately 70 retail stores located in 21 states and 1 location in Los Angeles, California wherein the Debtor's headquarters, distribution center and e-commerce operations are located.

4

## JURISDICTION

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7.     By this Motion, the Debtor, pursuant to sections 105(a), 363, 365 and 554

of the Bankruptcy Code, seeks a final order:

- Authorizing the Debtor's assumption of the Agency Agreement (and each of the transactions contemplated thereby) as submitted herewith or as improved and accepted as the highest or otherwise best bid at the Auction, on terms substantially similar to those in the Agency Agreement;[2]

- Authorizing the Debtor to commence the Store Closing Sales in accordance with the Agency Agreement and Sale Guidelines, with such sales to be free and clear of all liens, claims and encumbrances;

- Approving the Break-Up Fee;

- Authorizing the Debtor to abandon unsold Merchandise or Owned FF&E (collectively, the "Assets") at the Closed Stores following the conclusion of the Store Closing Sales; and

- Granting such other related relief as may be appropriate.

## BACKGROUND REGARDING SALE PROCESS

### A.  The Debtor's Prepetition Solicitation Efforts

8.     As set forth more fully in the Harriss Declaration, prior to the Petition

Date, the Debtor, in consultation with its advisors and Wells Fargo, determined that the value of

its assets was quickly declining.   The Debtor undertook an extensive marketing process,

whereby it solicited interest from both strategic, going concern purchasers (each, a "Going

Concern Bidder") as well as nationally-recognized asset disposition firms (each, a "Liquidation

Agent").   Specifically, the Debtor contacted over 60 potential asset purchasers or disposition

---

[2]     To the extent the Stalking Horse Bidder is not the Successful Bidder, the Debtor will seek approval of the Agency Agreement pursuant to section 363 of the Bankruptcy Code.

1717443 v3/NY

firms, 15 of which executed non-disclosure agreements. Of those who executed non-disclosure agreements, approximately 7 were potential strategic, going concern purchasers.

9.　　Contemporaneously with the solicitation of going concern bids, the Debtor undertook a process to solicit bids for the liquidation of its inventory and owned fixtures, furniture and equipment ("FF&E"). On April 27, 2011, the Debtor provided bid packages to Liquidation Agents, the Debtor provided a form agency agreement on April 29, 2011, requested bids by Saturday, April 30, 2011 at 12:00 noon Eastern, and has invited all to attend the Auction which will be held on Tuesday, May 3, 2011, at 10:30 a.m. (ET) at the offices of Debtor's counsel in New York, New York (the "Auction").

10.　　As a result of the solicitation efforts for the liquidation of the Debtor's inventory and FF&E, the Debtor received 3 potential bids to conduct liquidation sales. The Debtor contacted those bidders to discuss the terms of each bid and engaged in extensive negotiations as to specific terms related to their offers. After conducting the preliminary negotiations among various parties, the Debtor, in consultation with its advisors and Wells Fargo,[3] selected a joint venture comprised of SB Capital Group, LLC and Tiger Capital Group, LLC as the Stalking Horse Bidder, as the party with the highest or otherwise best bid. The Debtor determined that entering into the Agency Agreement with the Stalking Horse Bidder, which will be subject to higher or otherwise better offers at the Auction, is in the best interest of the Debtor's estate and creditors.

---

[3] Wells Fargo and the Second Lien Lender (defined below) are party to that certain Subordination Agreement dated as of March 21, 2011 ("Subordination Agreement"), pursuant to which, among other things, the subordinate liens provided to Bricoleur Capital Partners, LP, in its capacity as agent for the holders of a second lien against substantially all of the Debtor's tangible personal property (the "Second Lien Lender") pursuant to that certain Security Agreement, dated March 21, 2011, are subordinated to the senior liens of Wells Fargo and subject in right and time of payment to the security interest of Wells Fargo. Under Section 2.3(d) of the Subordination Agreement, in the event Metropark filed for bankruptcy, the Second Lien Lender agreed that, among other things, that the Second Lien Lender would not object to or oppose a sale or other disposition of any property securing all or any part of the senior obligations free and clear of security interests under section 363 of the Bankruptcy Code. Capitalized terms used in this footnote but not defined shall have the meanings ascribed to them in the *Motion of the Debtor for (I) Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*. Nothing herein shall be deemed to modify the Subordination Agreement.

1717443 v3/NY

## B. **The Agency Agreement**

11.     Pursuant to the Agency Agreement, the Agent will advise the Debtor with respect to the sale of the Debtor's merchandise at its retail stores (collectively, the "Merchandise") and certain furniture, fixtures and equipment as set forth more fully below and in the Agency Agreement (i.e., the Owned FF&E).

12.     Certain of the significant terms of the Agency Agreement are as follows:[4]

a.  Services.  The Agent will serve as the Debtor's exclusive agent for the limited purpose of conducting the Sale and disposing of the Debtor's Assets, in accordance with the terms and conditions of the Agency Agreement.

b.  Guaranteed Amount. Agent will guarantee to Company a minimum recovery of fifty-five percent (55%) of the aggregate Cost Value of the Merchandise.[5]  To the extent that the Proceeds of the Sale exceed the sum of the Guaranteed Amount, Expenses of the Sale, and five percent (5%) of the aggregate Cost Value of the Merchandise (the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold will be shared fifty percent (50%) to the Company and fifty percent (50%) to the Agent (the excess above the Sharing Threshold referred to as the "Recovery Amount").  In addition to the Guaranteed Amount, Agent will pay to the Debtor four percent (4%) of the net proceeds of the sale of Additional Agent Merchandise, subject to the terms of the Agency Agreement (the "Augment Recovery Amount").

c.  Compensation to Agent. As its compensation for services rendered to the Company, Agent shall be entitled to all Proceeds of the Sale after payment in full of the Guaranteed Amount, the Recovery Amount, the Augment Recovery Amount, and the Expenses. Subject to the terms of the Agency Agreement, any Merchandise remaining after the Sale Termination Date shall become the property of the Agent, free and clear of all liens, claims, and encumbrances, and the proceeds received by the Agent from disposition of the unsold Merchandise shall be considered Proceeds of the Store Closing Sales.

---

[4] The following description of certain of the significant terms of the Agency Agreement is a summary of the terms of the Agency Agreement.  Capitalized terms used but not defined in this Motion shall have the meaning ascribed to them in the Agency Agreement. This summary does not purport to contain all essential terms of the Agency Agreement or a complete description of each category of terms included. To the extent that anything contained in this Motion differs in any way from the terms set forth in the Agency Agreement, the terms of the Agency Agreement shall control.

[5] To the extent the Cost Factor is greater than 45.5%, the Debtor and the Agent will mutually agree on an appropriate adjustment to the Guaranteed Amount to account for such difference.

d. <u>Payment</u>. On the first business day following entry of the Approval Order, but in no event earlier than the Sale Commencement Date, Agent shall pay Wells Fargo and, in the event that Wells Fargo is repaid in full, the Second Lien Lender, eighty-five percent (85%) of the Estimated Guaranteed Amount. Agent will pay the balance of the Guaranteed Amount, if any, to the Lender as part of the Final Reconciliation. Agent will pay the Lender the Augment Recovery Amount as part of the weekly reconciliation conducted pursuant to the Agency Agreement. Agent will pay the Recovery Amount to the Lender on the first business day after the completion of the Final Reconciliation.

e. <u>Security</u>. To secure Agent's payment of the balance of any unpaid portion of the Guaranteed Amount, Recovery Amount, and Augment Recovery Amount, if any, Agent will deliver to the Lender an irrevocable standby letter of credit in the original face amount equal to fifteen percent (15%) of the Estimated Guaranteed Amount, naming the Lender, as the Debtor's designee, as the beneficiary.

f. <u>Store Closing Expenses</u>. Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term. To secure payment of the Expenses, Agent shall deliver to Lender an irrevocable and unconditional standby letter of credit, naming Lender as beneficiary, in the original face amount equal to two (2) weeks' estimated Expenses.

g. <u>Sale of Owned FF&E</u>. The Agent will, at the request of the Debtor, sell the Owned FF&E located at the Closing Stores, in exchange for providing the Agent with a commission, equal to twenty percent (20%) of the net proceeds from the sale of such Owned FF&E, net of expenses incurred in connection with the disposition thereof in accordance with a budget to be mutually agreed upon, subject to the terms and conditions of the Agency Agreement.

h. <u>Employees</u>. The Agent shall have the right to use the Debtor's store-level employees during the Sale Term and will reimburse the Debtor for actual payroll, and Employee Benefits up to an agreed upon cap based upon a percentage of the aggregate base payroll. The Agent may also elect to pay, as an expense, a retention bonus to certain retained employees. The employees will remain the Debtor's employees at all times.

i. <u>Sale Term</u>. Subject to the Approval Order, the Sale shall commence at the Closing Stores on the first day after entry of the Approval Order. The Store Closing Sales will continue until June 30, 2011 or such later date as mutually agreed between the Agent and the Debtor.

j. <u>Sale Guidelines</u>. The Store Closing Sales shall be conducted in accordance with the Sale Guidelines attached to the Agency Agreement as Exhibit 8.1. The Agent shall be authorized to advertise and promote the sales as a "going out of business," "store closing," "bankruptcy liquidation" or similar themed sale.

13.     Importantly, the Stalking Horse Agreement has been shared with the Debtor's key constituents, including (a) Wells Fargo, (b) counsel for the Debtor's largest landlords, (c) the Debtor's 30 largest unsecured creditors and (d) the Debtor's largest landlords. Moreover, in light of the compressed timeframe and absence of an official committee of unsecured creditors, the Debtor's have invited certain of the Debtor's largest landlords and the Debtor's 30 largest unsecured creditors to attend the Auction, either in person or by telephone.[6]

## APPLICABLE AUTHORITY

**I.    THIS COURT SHOULD AUTHORIZE THE DEBTOR TO SELL SUBSTANTIALLY ALL OF ITS ASSETS**

### A. Approval of Store Closing Sales Under Section 363 is Warranted

14.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." See 11 U.S.C. § 363(b)(1); see also In re Ames Dept. Stores, Inc. (Ames I), 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)); Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

15.     The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor. See, e.g., In re Chateaugay Corp., 973 F.2d 141, 145 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),

---

[6]     Any party-in-interest is welcome to join the Auction by telephone.  While the Debtor will file a "Notice of Auction" on the docket, the dial-in information is as follows: 1-888-453-4412, Passcode: 392422.  If a party experiences any difficulty in joining the Auction by telephone, please contact Alex R. Velinsky, Esq. at avelinsky@cooley.com. The Auction is currently scheduled to commence at 10:30 a.m. (ET) on May 3, 2011.

722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company," and has continued applicability in bankruptcy) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.") (citation omitted).

16.     When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Integrated Res., Inc., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." Id. (citations omitted).

17.     Prior to the Petition Date, the Debtor extensively marketed its assets in an effort to identify a going concern partner and/or equity investment in Metropark.  While doing so, the Debtor's financial condition continued to deteriorate to the point that it can no longer operate in the ordinary course without immediate access to additional financing.  Unfortunately, the Debtor's assets cannot adequately collateralize additional financing, thus, in order sustain further operations (including payment of payroll and May rent), the Debtor is left with no choice

but to immediately commence going out of business sales at all of its retail locations by no later than May 5, 2011.

18. Moreover, the Debtor has been unable to purchase new inventory for an extended period of time prior to the Petition Date. Thus, the Debtor has ceased supplying the Closing Stores, and delays in the liquidation process could cause portions of the inventory to become less valuable, not only due to lack of replenishment, but also due to changes in the quality of the inventory mix due to ongoing sales. The realization of fair value for the assets as promptly as possible will inure to the benefit of all parties in interest. Time is of the essence to preserve and maximize the value of the Debtor's assets before the Merchandise declines in value, and to reduce ongoing administrative expenses.

19. Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. See Ames Dept. Stores, Inc. (Ames I), 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); see also In re Ames Dept. Stores, Inc. (Ames II), Ch. 11 Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving store closing sales and agency agreement on first day). Bankruptcy Courts have approved similar requests by debtors to conduct store closing sales, finding the debtor's requested relief consistent with applicable provisions of the Bankruptcy Code. See, e.g., The Great Atlantic & Pacific Tea Co., Inc., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Mar. 10, 2011); In re Blockbuster Inc., Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011); In re Movie Gallery, Inc., Ch. 11 Case No. 10-30696 (Bankr. E.D. Va. Feb. 4, 2010); In re Finlay Enters., Inc., Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009); In re Goody's LLC, Ch. 11 Case No. 09-10124 (Bankr. D. Del. Jan. 21, 2009) (authorizing debtors' assumption of prepetition agency agreement and to conduct store closing sales); In re Circuit City Stores, Inc., Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); In re Linens Holding Co., Ch 11 Case No. 08-10832 (Bankr. D. Del. May 30, 2008) (approving store closing sales of certain closing locations), (Bankr. Del. Oct.

16, 2008) (approving store closing sales for all remaining store locations); <u>In re Sharper Image Corp.</u>, Ch. 11 Case No. 08-10322 (Bankr. D. Del. Mar. 14, 2008); <u>In re Steve & Barry's Manhattan LLC</u>, Ch. 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008).

### i. **Expedited Approval of the Motion is Warranted**

20.     In order for the Debtor to conclude the Store Closing Sales as quickly and efficiently as possible, and thereby minimize any unnecessary administrative expenses, it is essential that the Debtor be permitted to perform pursuant to the Agency Agreement by no later than May 5, 2011.

21.     First and foremost, without the receipt of immediate payment of the "Guaranteed Amount" from the Successful Bidder, the Debtor will lack the financial wherewithal to satisfy its payroll and May rent obligations.  Next, given the limited inventory levels remaining in the store locations, it is imperative that the Successful Bidder take advantage of as many weekends in May and June 2011 as possible – as the vast majority of retail transactions are consummated during weekend hours.  Moreover, in order to maximize value of the Debtor's assets during this process, the Successful Bidder will have to immediately implement cost savings measures, which might include the immediate closure of underperforming and/or under-inventoried locations.

22.     Finally, in order to address all of the above, the Stalking Horse Bidder has required that it be permitted to commence the Store Closing Sales by no later than May 5, 2011. In furtherance thereof, pursuant to Section 2.2 of the Agency Agreement, the Debtor agreed to apply to this Court for entry of the Approval Order as soon as practicable after its execution of the Agency Agreement.  In addition, consistent with Sections 10(d) and 16.10, the Agency Agreement may be terminated if the Approval Order is not entered within 5 days of the anticipated Sale Commencement Date.

1717443 v3/NY

23.    Accordingly, the Debtor will suffer substantial, immediate, and irreparable harm if the relief requested herein is not approved and an Approval Order entered so that the Store Closing Sales may commence by May 5, 2011 and culminate on or before June 30, 2011.

24.    As a result of the foregoing provisions and to enable the Debtor to obtain the highest and best possible recovery for the sale of its assets and to avoid immediate and irreparable harm, assumption of the Agency Agreement is warranted, on an expedited basis pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**B. The Debtor's Assets Should be Sold Free and Clear of Liens, Claims and Encumbrances**

25.    The Debtor requests approval to sell assets subject to the Agency Agreement on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if anyone subsection is met).

26.    As an initial matter, Wells Fargo, the Debtor's prepetition lender, has consented to the Store Closing Sales and, particularly, to the sale of the Assets free and clear of

their liens, claims and encumbrances, with all such obligations to attach to the proceeds of the Store Closing Sales with the same validity and priority that such liens, claims, encumbrances, or interests had against the assets.  See also *supra* note 3.

28. With respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtor anticipates that it will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the assets pursuant to the terms and conditions of the Agency Agreement, the Debtor proposes that any liens, claims, and encumbrances asserted against the Assets be transferred to and attach to the amounts payable to the Debtor under the Agency Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto.

28. Accordingly, the Debtor submits that, to the extent applicable, the Court should authorize the Debtor to sell the Assets free and clear of any liens, claims, encumbrances, or other interests that may exist, with any of the same to be transferred and attached to the net proceeds of the sale, with the same validity and priority that such liens, claims, encumbrances, or interests had against the Assets.

## C. The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

29. Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9

(S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 at 147).  See also

Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides

that good faith transfers of property will not be affected by the reversal or modification on appeal

of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re

Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m),

good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay

pending appeal").

30.     The selection of the Successful Bidder will be the product of arm's-length,

good-faith negotiations in an anticipated competitive purchasing process.  The Debtor intends to

request at the Sale Hearing a finding that the Successful Bidder is a good-faith purchaser

entitled to the protections of section 363(m) of the Bankruptcy Code.

### D.  The Auction Process is Appropriate

31.     In addition to the extensive discussions and negotiations that the Debtor

already conducted, the Debtor has determined, in an exercise of its business judgment that

conducting a final auction to select the Successful Bidder is in the best interests of its estate. As

such, the Debtor will conduct the Auction on Tuesday, May 3, 2011 beginning at 10:30 AM

(EST) at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, New York, 10036.

The successful bidder at the auction will be deemed to be the Successful Bidder.  The Debtor is

providing notice of the Auction to all key constituencies.  Specifically, the Debtor has invited its

largest landlords to attend the auction in person, and, contemporaneously with the filing of this

Motion, has sent notice of the Auction to its 30 largest unsecured creditors and has invited them

to participate in the Auction telephonically.   In addition, the Debtor has served notice of this

Motion on all creditors as set forth more fully below.

32.     The Debtor submits that the foregoing process is fair, transparent and will

derive the highest and best bids for the Closing Store assets. The Debtor also believes that

going forward on an expedited basis will in no way impair recoveries because (a) all of the

nationally-recognized potential liquidators (the only parties that can effectuate a transaction of this magnitude) have been directly involved in the process, (b) all of the potential strategic purchasers who may be interested in purchasing the Debtor's assets have been given notice of the Auction and an opportunity to participate in the Debtor's prepetition sale process, (c) the foregoing parties were provided all necessary diligence and have expertise in quickly formulating and executing such bids, (d) the solicitation process run by the Debtor's advisors was routine for such situations and the form of agency agreement used is mostly customary, and (e) Wells Fargo, the Debtor's prepetition lender, has had direct input in the process.

### E. The Court Should Approve the Successful Bidder

33. The Debtor seeks authority to dispose of the assets under the terms of the Agency Agreement, as modified at the Auction. Proceeding in this fashion will provide the Debtor with several benefits. *First*, allowing a professional liquidator to liquidate the assets will enable the Debtor to maximize sale proceeds. *Second*, it is more cost effective for the Debtor to allow a Liquidation Agent to conduct the Store Closing Sales than to conduct such sales on its own because, among other reasons, the Agent will reimburse the Debtor for expenses of the Store Closing Sales. Moreover, liquidation agents generally have extensive knowledge, expertise and experience in conducting store closing sales. Therefore, the Debtor's decision to retain a liquidation agent to conduct the Store Closing Sales is an exercise of sound business judgment.

34. Pursuant to the arrangement proposed herein, the Agent will have the right to use the Closing Stores and the Debtor's related services, FF&E and other assets located in the Closing Stores in conducting the Store Closing Sales. In addition, pursuant to the Agency Agreement, the Agent will also have a right to establish and implement advertising, signage and promotion programs consistent with "store closing", "going out of business" or similar theme. Importantly, counsel representing many of the Debtor's most significant landlords

was consulted regarding landlord specific issues reflected in the Sale Guidelines governing the conduct of the Store Closing Sales.

35.     This Court, as well as others, in numerous chapter 11 cases, have approved the similar use of a liquidator to conduct store closing sales. See, e.g., In re The Great Atlantic & Pacific Tea Company, Inc., Case No. 10-25459 (RDD) (Bankr. S.D.N.Y. Mar. 10, 2011) In re Borders Group, Inc., Ch. 11 Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011); In re Blockbuster Inc., Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011); In re Goody's LLC, Ch. 11 Case No. 09-10124 (Bankr. D. Del. Jan. 21, 2009); In re Circuit City Stores, Inc., Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008); In re Linens Holding Co., Ch. 11 Case No. 08-10832 (Bankr. Del. May 30, 2008 and Oct. 16, 2008) (order, respectively, approving liquidator's store closing sales of certain closing locations and approving liquidator's store closing sales for all remaining store locations); In re Sharper Image Corp., Ch. 11 Case No. 08- 10322 (Bankr. D. Del. Mar. 14, 2008); In re Steve & Barry's Manhattan LLC, Ch. 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008).

**F.  The Court Should Approve the Assumption of the Agency Agreement, As Modified at the Auction**

36.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard. See, e.g., Trak Auto Corp. v. Ramco-Gershenson (In re Trak Auto Corp.), 2002 Bankr. LEXIS 938 (Bankr. E.D. Va. Jan. 9, 2002) ("The traditional test courts use to evaluate a debtor's decision to assume an unexpired lease is that of business judgment." (citing N.L.R.B. v. Bildisco, 465 U.S. 513 (1984))); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).

1717443 v3/NY

37.     In applying the "business judgment" standard, courts show great deference to the debtor's decision to assume or reject.  See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course"); In re Trak Auto Corp., 2002 Banta. LEXIS 938 at *4 ("While review of debtor's proposal is highly deferential to debtor's wishes, the Court must also consider all of the circumstances surrounding any particular fl assumption or rejection.").

38.     Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). In addition, consideration is given to (1) the effect of debtor's proposed assumption or rejection upon debtor's estate; (2) how the [counterparty] is impacted by the assumption or rejection of its [agreement]; (3) whether any benefit or harm to the unsecured creditors arises from the assumption or rejection of the subject [agreement]; and (4) the significance of the [agreement] to debtor's overall reorganization efforts.  In re Trak Auto Corp., 2002 Bankr LEXIS 938 at *8-9; see In re Washington Capital Aviation & Leasing, 156 B.A. 167, 171 (Bankr. E.D. Va. 1993).

39.     In this instance, as set forth above, in the event that the Stalking Horse Bidder is the Successful Bidder (or another Liquidation Agent overbids the Stalking Horse Bidder on substantially similar terms), this Court should find that the Debtor has exercised its reasonable business judgment in seeking to assume the Agency Agreement. The Debtor believes that the Agency Agreement will provide the Debtor and its stakeholders with several benefits.  First, allowing the Agent to sell the Assets in the manner described herein will enable the Debtor to maximize returns in a short time frame.  In addition, as noted above, it is generally more cost-effective for a liquidation agent, with its substantial experience, to conduct these

sales, rather than the Debtor.  Finally, the Agency Agreement will provide the Debtor with a guaranteed return for the Merchandise while allowing for even more potential recovery through the sharing formula contained therein. This arrangement will minimize the Debtor's risk, while motivating the Agent to maximize proceeds from the Store Closing Sales.

40.     The Debtor was free to deal with any other party interested in liquidating some or all of the Debtor's assets. Neither the Stalking Horse Bidder nor the Liquidation Agents are an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between the Stalking Horse Bidder or the Liquidation Agents and the Debtor.

41.     Because the Agency Agreement was negotiated at arm's-length and in good faith after other qualified parties and their qualifications and proposals were considered, this Court should find that the Stalking Horse Bidder or Successful Bidder, as applicable, has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code. See *supra* section I.C.

42.     Based on the foregoing, the Debtor (a) believes that entering into the Agency Agreement is in its best interests and the best interests of the Debtor's stakeholders, and (b) respectfully requests authorization to assume the Agency Agreement pursuant to its terms.

### G.  The Court Should Approve of the Grant of a Security Interest to the Successful Bidder

43.     Pursuant to the Agency Agreement, the Debtor will grant the Agent a first priority security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of the Debtor and the Agent thereunder (the "Agent Security Interest").  The Debtor submits that the Agent Security Interest provided in the Agency Agreement should be properly perfected without the need for further filings or further documentation. Without in any way diminishing the foregoing, the Debtor shall execute all such documents and take all such other

actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest. The liens, claims and security interests and other protections granted to the Agent hereunder shall continue (including in any successor case) and shall maintain their priority until all of Debtor's obligations to Agent shall have been indefeasibly paid in full.

44.     The Agent's extension of credit under, and the other financial accommodations of Agent set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of this Court's authorization to consummate the transactions contemplated by the Agency Agreement should not affect the validity of such transactions, unless such authorization and consummation are properly stayed pending appeal.

45.     The Debtor submits that the consideration provided by the Agent pursuant to the Agency Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and under the laws of the United States, any state or territory, possession or the District of Columbia.

## H.  The Debtor and/or the Agent Should Be Granted Authority To Implement the Retention Programs for Store-Level Employees

46.     Section 363(c) of the Bankruptcy Code permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c).

47.     Pursuant to the Agency Agreement and in order to administer the Store Closing Sales as effectively and efficiently as possible the Agent may, in its discretion, elect to pay, as an Expense, a Retention Bonus, up to a maximum of approximately ten percent (10%) of base payroll, for retained store-level employees who do not voluntarily leave employment and are not terminated "for cause." Subject only to a limitation of approximately ten percent (10%) of base payroll, the actual amount to be paid shall be in an amount to be determined by Agent, in

its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through the Company's payroll system.

48.     The Debtor believes that payment of the proposed bonuses to eligible employees who remain in the employ of the Debtor through completion of the Store Closing Sales at a particular store constitute an ordinary course business transaction authorized by section 363(c) of the Bankruptcy Code.  Nevertheless, out of an abundance of caution, and so that employees will be reassured that such bonuses will be available should the Agent elect to pay them, the Debtor specifically requests the authority, but not the direction, for the Debtor and/or the Agent to pay bonuses to store-level employees upon the completion of the Store Closing Sales notwithstanding any restriction set forth in section 503(c)(3).

49.     Even if this Court finds that the Retention Bonuses do not constitute an ordinary course business practice within the scope of section 363(c) of the Bankruptcy Code, this Court also has authority, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to authorize the Debtor, by and through the Agent, to pay the Retention Bonuses. Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of a debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) (stating that "[s]ection 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code").

50.     Similarly, the payment of bonuses outside of the ordinary course of business should be approved when there is a sound business purpose that justifies such action. See In re Martin, 91 F.3d at 395; In re Montgomery Ward Holding Corp., 242 B.R. at 153. Payment of the Retention Bonuses in connection with the Store Closing Sales will accomplish a sound business purpose and aid in maximizing the value of the Debtor's estate for the benefit of creditors and other parties in interest by inducing employees who are needed to manage and

complete the Store Closing Sales at the store-level to remain in the employ of the Debtor and to maximize the return from such sales.

51.    The Debtor requests the authority, but not the direction, to pay the Retention Bonuses, in an amount not to exceed approximately ten percent (10%) of store-level employee base payroll, to store-level employees who remain in the employ of the Debtor during the Store Closing Sales within the Agent's discretion, should the Agent determine that providing the Retention Bonuses will motivate employees during the Store Closing Sales to maximize the return from these Store Closing Sales and will enable the Debtor to retain those employees necessary to successfully complete the Store Closing Sales.

**I.    The Debtor and/or the Agent Should Be Granted Authority to Continue Certain Customer Programs**

52.    Pursuant to the Agency Agreement, the Agent and the Debtor propose to continue certain existing customer programs and seek approval pursuant to sections 105(a), 363, 365, 507(a)(7), 1107 and 1108 of the Bankruptcy Code in order to ensure and maintain customer satisfaction and loyalty without interruption during the Store Closing Sales, to the extent so provided in the Agency Agreement.

53.    As set forth in the Agency Agreement, all state and federal laws relating to implied warranties for latent defects shall be complied with during the Store Closing Sales and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales." The Agent will accept return of any Merchandise during the first fifteen (15) days of the Sale Term, subject to the conditions set forth in the Agency Agreement.

54.    Gift cards and merchandise credits issued by the Debtor prior to the Sale Commencement Date will be accepted and honored by the Agent during the Sale Term as provided in the Agency Agreement.

1717443 v3/NY

### J. The Store Closing Sales Do Not Require Appointment of a Consumer Privacy Ombudsman

55.     Under section 363(b)(1), a debtor may sell or lease its consumer customer list so long as it complies with the debtor's privacy policy.  11 U.S.C. § 363(b)(1)(A).  If a sale is inconsistent with the debtor's privacy policy, section 332 governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 332(b)(1).

56.     The full text of the Debtor's privacy policy is available at www.metroparkusa.com.  Here, should the Debtor sell its customer list as a result of the Auction or permit the Successful Bidder to use such list for a limited period of time, the Debtor will ensure that the sale is consistent with the Debtor's current privacy policy.   Therefore, the appointment of a consumer privacy ombudsman is unnecessary at this time.  Should the Debtor propose to sell its customer list other than in compliance with its privacy policy, it will promptly notify the Court and seek the appointment of a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code.

### K. The Break-Up Fee Should Be Approved

57.     The Agency Agreement contemplates that if the Stalking Horse Bidder is not the Successful Bidder at the Auction, then in consideration of the Stalking Horse Bidder conducting its due diligence, entering into the Agency Agreement, and agreeing to subject its bid to the Auction, subject to Section 16.13 of the Agency Agreement, the Stalking Horse Bidder will receive a break-up fee of $50,000[7] (the "Break-Up Fee").  The Debtor hereby respectfully requests that the Court approve the Break-Up Fee.

58.     Courts in the Second Circuit analyze the appropriateness of bidding incentives such as the Break-Up Fee under the "business judgment rule" standard, and it is well

---

[7]     In addition, if the Stalking Horse Bidder is not the Successful Bidder, the Debtor will reimburse the Stalking Horse Bidder for the actual amount expended by the Stalking Horse Bidder in procuring and shipping signs and banners to the Closing Stores in an amount up to $75,000.  If the Stalking Horse Bidder is not the Successful Bidder, such signs and banners will be turned over to the Debtor.

established in this district that courts consider whether (a) the relationship of the parties who negotiated the break-up fee is devoid of taint by self-dealing or manipulation, (b) the fee encourages, rather than hampers, bidding, and (c) the amount of the fee is reasonable relative to the proposed purchase price. See Integrated Res., 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing, and in the exercise of honest judgment); see also In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bid protections because, among other factors, "the stalking horse bid brings value to the estate by setting a floor on the price and providing a structure for potential competing bids . . . [and] would provide comfort to the Debtor's employees and customers that the company was entering the auction with a locked-in bid.").

59.     The Debtor, in its business judgment, has concluded that the Break-Up Fee is reasonable and appropriate under the circumstances.

60.     The Debtor and the Stalking Horse Bidder extensively negotiated the inclusion of the Break-Up Fee and its amount, which negotiations resulted in the Stalking Horse Bidder's agreement to reduce the fee to its current level.  Based on those discussions, the Debtor believes that the Stalking Horse Bidder would not proceed with the sale without the Break-Up Fee. It is the result of good faith, arms-length negotiations, and provides a price floor and bidding structure for potential competing bids.  The Debtor believes the Break-Up Fee will incentivize competitive bidding thereby maximizing recovery to the Debtor and its estate in the Store Closing Sales.  Moreover, the Break-Up Fee is well below the range of break-up fees and expense reimbursements approved by courts in this district.[8]   Finally, and importantly, the Break-Up Fee has been approved by Wells Fargo, the Debtor's prepetition lender.

---

[8] See e.g., In re BearingPoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No. 369] (approving a break-up fee of approximately 3% of the purchase price and expense reimbursement up to $5,000,000); In re Silicon Graphics, Inc., No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) [Docket No. 55] (approving break-up fee of approximately 2.8% of the purchase price and expense reimbursement up

61.     Accordingly, the Debtor respectfully requests that the Court approve the Break-Up Fee and authorize the Debtor to pay it immediately in accordance with the Agency Agreement.

## II.     WAIVER OF CONTRACTUAL RESTRICTIONS AND EXEMPTION OF FAST PAY LAWS AND LAWS RESTRICTING STORE CLOSING SALES

62.     The Debtor respectfully requests waiver of certain contractual or applicable law restrictions that could otherwise inhibit or prevent the Debtor's ability to maximize recovery through the Store Closing Sales, and which are customarily waived in sales such as these.

### A.     Waiver of Contractual Restrictions

63.     The Debtor requests that the Court override or invalidate any provisions in the Debtor's agreements restricting store closing sales (the "Contractual Restrictions") that may impair the Debtor's ability to close stores and conduct the Store Closing Sales. The stores subject to the Store Closing Sales are located on properties that are leased by the Debtor.  In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of such leases, subleases, or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions.

64.     Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors.  Such sales are consistently approved by courts despite provisions of

---

to $750,000); In re Steve & Barry's Manhattan LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) [Docket No. 369] (approving break-up fee of 2% of the purchase price and expense reimbursement up to $2 million); In re Fortunoff Fine Jewelry and Silverware, LLC, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) [Docket No. 190] (approving break-up fee of approximately 2.8% of the purchase price); In re Bally Total Fitness of Greater New York, Inc., No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] (approving break-up fee of 4.3% of the purchase price and expense reimbursement of up to 2.1% of the purchase price); In re Solutia Inc., No. 03-17949 (PCB) (Bankr. S.D.N.Y. Oct. 19, 2005) [Docket No. 2611] (approving break-up fee of approximately 2.9% of the purchase price and expense reimbursement up to $2 million).

recorded documents or agreements purporting to forbid such sales. Indeed, other such restrictive provisions in contracts have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See In re Blockbuster Inc., Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) at ¶¶ 7, 8; In re Finlay Enters., Inc., Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) at ¶ 14; In re Steve & Barry's Manhattan LLC, Ch. 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) at ¶¶ 32, 33; In re Bradlees Stores, Inc., Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 4, 2001) (authorizing debtor to conduct GOB sales notwithstanding state rules or statutes governing closing, liquidation, or "going-out-of-business" sales and notwithstanding provision in leases restricting debtor's ability to conduct such sales); In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provision unenforceable against debtor that sought to conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); Ames Dep't Stores, Inc. (Ames I), 136 B.R. at 359 (finding that "to enforce the anti-GOB sale clause of the [l]ease would contravene overriding federal policy requiring debtors to maximize estate assets by imposing additional constraints never envisioned by Congress"); see also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable).

65.     The Court should ensure that no Contractual Restriction is an impediment to the Store Closing Sales, closures of Closing Stores, or the activities in connection therewith. To the extent such Contractual Restrictions exist, they should not be permitted to interfere with, or otherwise restrict the Debtor from conducting, the Store Closing Sales or the closing of any Closing Stores.

**B.  Exemption From Applicable Law Restrictions**

66.     Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other

inventory clearance sales, including (but not limited to) state, and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws.

67.     The Debtor, therefore, requests that the Court authorize the Debtor to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws. Because the Debtor and its assets are subject to this Court's jurisdiction, see 28 U.S.C. § 1334, this Court will be able to supervise the Store Closing Sales. The Store Closing Sales are legitimate methods by which the Debtor can maximize the return from the sale of the Merchandise for the benefit of its estate and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

68.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtor submits that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code. In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. See, e.g., Aloe v. Shenango Inc. (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."). While preemption of state law is not always

appropriate, as when the protection of public health and safety is involved, <u>see</u> <u>Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)</u>, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. <u>Id.</u> at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws. <u>See</u> 11 U.S.C. § 105(a).

69.     Here, section 363 of the Bankruptcy Code, which requires the Debtor to operate its business in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws because the Liquidation Sale Laws constrain the Debtor's ability to marshal and maximize assets for the benefit of creditors. Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. <u>See</u>, <u>e.g.</u>, <u>In re Blockbuster Inc.</u>, Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) at ¶¶ 9, 10; <u>In re Finlay Enters., Inc.</u>, Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) at ¶ 11; <u>In re Steve & Barry's Manhattan LLC</u>, Ch 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) at ¶ 36.

70.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales. The Debtor only requests that this Court authorize the Debtor to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sales as store closings or similar type sales, or transferring merchandise from the Distribution

28

Center to the Closing Stores. The Debtor fully intends to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

71. The Debtor also requests that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of Store Closing Sales, in the manner set forth in the proposed Approval Order.

## C. Exemption From State "Fast Pay" Laws and Regulations

72. Many states in which the Debtor operates have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with his or her termination.[9] In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The sweeping nature of the Store Closing Sales contemplated by this Motion will result in a substantial numbers of employees being terminated during the Store Closing Sales. The Debtor's payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

73. As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies. Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

74. Under ordinary circumstances, the Debtor was often able to pay individual store-level employees from the register at a store location upon termination and reconcile the payment amount after-the-fact. However, given the number of employees that will be terminated during the Store Closing Sales, this will be impossible. Thus, it will be necessary to

---

[9] For example, California Labor Code § 201(a) provides, in pertinent part, that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

have the Debtor's payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the scale necessitated by the Store Closing Sales, this process could easily take several days.

75.     To be clear, the Debtor intends to pay its terminated employees as expeditiously as possible and under normal payment procedures. However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances. If the Debtor is required to comply with these state laws and regulations, its efforts to wind down their operations and stem unnecessary payroll costs will be hampered tremendously. Indeed, if forced to comply, the Debtor will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Sale while payroll is prepared or (b) staging terminations to the detriment of the Debtor's estate. Both of these choices will provide no benefit to the Debtor's estate and will only increase the administrative costs of conducting the Store Closing Sales.

76.     Accordingly, the Debtor respectfully submits that in this instance, Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtor should be granted relief from their requirements. See In re Linens Holding Co., Ch. 11, Case No. 08- 10832 (Bankr. D. Del. Oct. 28, 2008) (waiving "fast pay" laws and regulations in connection with approval of store closing sales).

## III.    AUTHORITY TO ABANDON UNSOLD PROPERTY FOLLOWING STORE CLOSING SALES

77.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, the trustee, and therefore the debtor in possession, "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." See Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than

the cost of asserting that claim"); In re Grossinger's Assoc., 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995). See also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S. 494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards . . . This exception to the abandonment power . . . is a narrow one."); In re Bryson, 53 B.R. 3, 4-5 (Bankr. M.D. Tenn. 1985) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court.").

78.     Under the Agency Agreement, any Merchandise remaining at the Closing Stores following the Store Closing Sales can be sold by the Agent, with the proceeds thereof treated as Proceeds for purposes of compensation computation. To the extent, however, that the Agent does not sell any Merchandise or Owned FF&E, the Debtor requests that it be authorized upon the conclusion of the Store Closing Sales to abandon the same without incurring liability to any person or entity. The Debtor submits that if it is unable to sell or dispose of any such assets following the Store Closing Sales, it would be costly and burdensome to the estate to retain them.

79.     Notwithstanding the foregoing, the Debtor and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and .credit or debit card number) in any of the Debtor's hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

IV.     **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

80.     Pursuant to Bankruptcy Rule 6004(h), unless a court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for 14 days after entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Fed. R. Bankr. P. 6004(h) advisory committee note.

81.     In order to maximize value from the Store Closing Sales, the Debtor requests that any order approving the Motion be effective immediately by providing that the 14-day stay under Bankruptcy Rules 6004(h) is waived. As discussed above, the Agent requires the ability to commence the Store Closing Sales right away and no later than May 5, 2011. Moreover, the Debtor faces severe prejudice each day that the Closing Stores continue to operate, as those locations are unprofitable, drain liquidity, and are being quickly depleted of inventory which will not be replenished.

## V.    COMPLIANCE WITH LOCAL RULE 6004-1

82.     The Debtor submits that, given the description of the Store Closing Sales provided herein, the requirements of Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") have been satisfied. Alternatively, to the extent the Court finds that the Debtor has not met any applicable provisions of Local Bankruptcy Rule 6004-1, the Debtor respectfully requests that the Court waive such requirements with respect to this Motion.

## NOTICE

83.     The Debtor has served notice of this Motion on: (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel for Wells Fargo, (iii) counsel for Bricoleur Capital Partners, LP, (iv) all entities known to have expressed an interest in acquiring or disposing of any of the Debtor's assets, including the Stalking Horse Bidder, the Liquidation Agents and the Going Concern Bidders, (v) all parties known to be asserting a lien on any of the Debtor's assets, (vi) all known vendors, suppliers, lenders, contract, license and lease counterparties, (vii) the U.S. Attorney's office, (viii) all state attorney generals in states in which

the Debtor does business, (ix) various federal and state agencies and authorities asserting jurisdiction over the Debtor's assets, including the Internal Revenue Service, (x) all federal, state and local taxing authorities with jurisdiction over the Debtor's business, (xi) all regulatory authorities that have a reasonably known interest in the relief requested herein, and (xii) all known creditors of the Debtor.  In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

84.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as is just and appropriate.

Dated: May 2, 2011
        New York, New York

                                        Respectfully submitted,


                                        By:     /s/ Cathy Hershcopf


                                        COOLEY LLP
                                        1114 Avenue of the Americas
                                        New York, New York 10036
                                        Telephone: (212) 479-6000
                                        Facsimile: (212) 479-6275
                                        Cathy Hershcopf (CH 5875)
                                        Jeffrey L. Cohen (JC 2556)
                                        Alex R. Velinsky (AV 1012)

                                        Proposed Attorneys for Debtor and Debtor in
                                        Possession

1717443 v3/NY

**E**XHIBIT **A**