COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Cathy Hershcopf
Jeffrey L. Cohen
Alex R. Velinsky

Proposed Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------- x
                                                  :
In re                                             :
                                                  :    Chapter 11
METROPARK USA, INC.,¹                             :
                                                  :    Case No. 11-22866 (RDD)
              Debtor.                             :
                                                  :
-------------------------------------------------------------------- x
```

<u>**NOTICE OF FILING FORM OF STALKING HORSE AGREEMENT**</u>

    **PLEASE TAKE NOTICE** that on May 12, 2011 Metropark USA, Inc. (the "<u>Debtor</u>") filed

its Motion of the Debtor for Order (A) Setting (1) Date to Conduct Auction of Debtors Interests in

Certain Real Property Leases and Intellectual Property, and (2) Sale Hearing Date; (B)

Approving Bidding Procedures and Terms of Auction; (C) Establishing Cure Amounts; (D)

Authorizing Debtor to Enter Into Lease Termination Agreements; (E) Approving and Authorizing

Sale of Leases and Intellectual Property to Highest or Otherwise Best Bidder Free and Clear of

All Liens, Interests, Claims and Encumbrances Pursuant to § 363 of the Bankruptcy Code; (F)

Waiving the Requirements of Rule 6004 of the Federal Rules of Bankruptcy Procedure and

Local Bankruptcy Rule 6004-1 and (G) Granting Related Relief (Doc. No. 88).

---

¹ The Debtor's tax identification number is 81-0636659.

**PLEASE TAKE FURTHER NOTICE** that on May 20, 2011, the Debtor filed a form of stalking horse Designation Rights Agreement attached hereto as <u>Exhibit A</u> with respect to certain of the Debtor's leases.

Dated: May 20, 2011
      New York, New York

By:    <u>/s/ Cathy Hershcopf</u>
      Cathy Hershcopf

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Cathy Hershcopf
Jeffrey L. Cohen
Alex R. Velinsky

*Proposed Attorneys for Debtor and Debtor in Possession*

**EXHIBIT A**

# DESIGNATION RIGHTS AGREEMENT

This Designation Rights Agreement (the "Agreement") is made as of the __th day of May, 2011, by and between Metropark USA, Inc. ("Seller"), and The Cotton On Group ("Purchaser").

## RECITALS

WHEREAS, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (hereinafter defined) on May 2, 2011 (the "Petition Date"). Seller's chapter 11 case (the "Bankruptcy Case") is currently pending before the United States Bankruptcy Court for the District of Southern District of New York (Case No. 11-22866 (RDD)) (the "Bankruptcy Court").

WHEREAS, Purchaser desires to purchase, and Seller desires to sell, the Designation Rights (hereinafter defined) upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in reliance upon the representations and warranties contained herein, the parties hereto covenant and agree as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the designated meanings set forth below.

1.1     "Additional Lease" means the Lease identified on Schedule 1.1 to this Agreement.

1.2     "Agency Agreement" means that certain Agency Agreement, dated as of May 4, 2011, between Seller and Agent.

1.3     "Agent" means, collectively, Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC.

1.4     "Agreement" means this Designation Rights Agreement, including any exhibits and schedules attached hereto.

1.5     "Alternative Transaction" any transaction undertaken by Seller with respect to the Designation Rights for any Lease, the Leases or any of the Leased Premises with any Person other than Purchaser or a Purchaser Affiliate.

1.6     "Applicable Lease Marketing Period" has the meaning set forth in Section 2.2(b).

1.7     "Approval Order" means an order of the Bankruptcy Court acceptable to Purchaser approving this Agreement and the transactions contemplated thereby.

1.8    "Arrearage Amount" means with respect to the Leases that are assumed and assigned pursuant to this Agreement the amount necessary to satisfy any and all rental arrearage and other payment obligations of any kind under a particular Lease, whether accrued prior or subsequent to the Petition Date, and to otherwise satisfy the requirements of Section 365 of the Bankruptcy Code, but excluding Occupancy Expenses (as defined in the Agency Agreement) payable by Agent under the Agency Agreement.

1.9    "Auction" shall have the meanings set forth in the Bid Protections Order.

1.10    "Authorized Officer" of any Person means the chief executive officer, chief restructuring officer, the president, any vice president or any secretary of such Person.

1.11    "Bankruptcy Case" has the meaning set forth in the recitals hereof.

1.12    "Bankruptcy Code" means Title 11 and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

1.13    "Bankruptcy Court" has the meaning set forth in the recitals hereof.

1.14    "Bid Protections Order" means an order of the Bankruptcy Court acceptable to Purchaser approving, among other things, the Break-Up Fee.

1.15    "Break-Up Fee" means (a) with respect to the Additional Lease, an amount equal to (i) ten percent (10%) of the Initial Payment Allocation for the Additional Lease, plus (ii) any Real Estate Occupancy Expenses paid by Purchaser on account of the Additional Lease prior to the entry of the Approval Order, and (b) with respect to the Bulk Leases, an amount equal to (i) seven and one-half percent (7.5%) of the Initial Payment Allocation for the Bulk Leases, plus (ii) any Real Estate Occupancy Expenses paid by Purchaser on account of the Bulk Leases prior to the entry of the Approval Order.

1.16    "Bulk Leases" means the Leases identified on Schedule 1.16 of this Agreement.

1.17    "Closing" has the meaning set forth in Section 3.1 hereof.

1.18    "Closing Date" means the first business day following the entry of the Approval Order.

1.19    "Deposit" means the deposit in the amount of ten percent (10%) of the Initial Payment previously delivered by Purchaser to Seller in accordance with the Letter of Intent.

1.20    "Designation Period" has the meaning set forth in Section 2.2.

1.21    "Designation Rights" has the meaning set forth in Section 2.2.

1.22    "Designee" means Purchaser's designee for each Leased Premises (it being understood that Purchaser retains the right to designate itself, a Purchaser Affiliate or the applicable landlord).

1.23    "Dropout Lease" has the meaning set forth in Section 2.2(c).

1.24    "Effective Date" has the meaning set forth in Section 3.5.

1.25    "FF&E" shall mean any removable furniture, fixtures and equipment owned by Seller and located at any of the Leased Premises, but excluding all components of energy management systems, HVAC systems and mechanical, electrical and plumbing systems.

1.26    "Initial Payment" has the meaning set forth in Section 3.1.

1.27    "Initial Payment Allocation" has the meaning set forth in Section 3.1.

1.28    "Lease Assumption Procedures Order" means an order mutually acceptable to Seller and Purchaser setting forth Lease assumption and assignment procedures to facilitate the implementation of the transactions contemplated by this Agreement.

1.29    "Lease Closing" has the meaning set forth in Section 3.2.

1.30    "Lease Closing Conditions" means, collectively, with respect to each Lease Closing, (i) the execution and delivery of the closing documents required to be executed and delivered pursuant to this Agreement, each in form and substance reasonably satisfactory to each of Purchaser and Seller; (ii) that, at the time of such Lease Closing, the representations of Seller contained in Article VI of this Agreement as to the applicable Lease are true and correct; (iii) the entry of a Lease Sale Order approving the assignment and assumption of such Lease, (iv) payment by Purchaser of the Arrearages Amount applicable to such Lease.

1.31    "Lease Closing Date" means, with respect to the assignment of any Lease, as soon as reasonably practicable on or after the first (1st) business day following the date that the Lease Sale Order approving such assignment has been entered; provided that the Lease Sale Order contains protections and findings under Section 363(m) of the Bankruptcy Code for the benefit of Designee(s) and shall be in full force and effect and shall not have been amended, reversed, vacated, modified or stayed, but not later than the fifth (5th) day following the entry of such Lease Sale Order (or such other date as Seller and Purchaser may agree).

1.32    "Lease Dropout Notice" has the meaning set forth in Section 2.2(c).

1.33    "Leased Premises" means the real property demised by each Lease including, without limitation, and along with, any improvements located thereon or forming a part thereof (notwithstanding whether Seller leases or owns such improvements).

1.34    "Lease Marketing Period Termination Date" means with respect to each Lease the earliest to occur of (a) the fifth (5th) day following the date upon which Purchaser delivers to the Seller a Lease Dropout Notice with respect to such Lease (the "Dropout Effective Date"), (b) if Purchaser has delivered to Seller a Lease Assumption Notice with respect to such Lease, the date upon which a Lease Sale Order has been entered with respect to such Lease, (c) the expiration of the Designation Period, (d) one business day (which period shall in no event be less than 24 hours) after Seller's delivery of a Vacate Notice if Purchaser does not deliver a Notice

Not to Reject, and (e) the effective date of rejection for such Lease to which the applicable landlord has agreed in writing.

1.35    "Leases" means the interest of Seller, as tenant, subtenant or otherwise, in, collectively, the Bulk Leases and Additional Lease.

1.36    "Lease Sale Order" means an order or orders of the Bankruptcy Court which may be entered from time to time approving the assumption and assignment of a Lease to a Designee containing terms mutually satisfactory to Purchaser and Seller.

1.37    "Letter of Intent" means the Letter of Intent dated May 18, 2011 delivered by Purchaser to Seller and agreed to and accepted by Seller.

1.38    "Liens" has the meaning set forth in Section 6.4.

1.39    "Non-Disturbance Agreement" means a recognition agreement, non-disturbance agreement, subordination, non-disturbance and attornment agreement or similar agreement.

1.40    "Notice Not to Reject" has the meaning set forth in Section 2.2(b).

1.41    "Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust, union, association, court, agency, government, tribunal, instrumentality, or other entity or authority.

1.42    "Purchaser Affiliate" means a Person controlling, controlled by, under common control with or affiliated with Purchaser or any member of Purchaser; "control," as so used, shall mean the ability to control the voting rights or management rights of such Person.

1.43    "REA" means a reciprocal easement agreement, an operating agreement, an agreement containing a first refusal or recapture right or a similar agreement (other than a Lease).

1.44    "Real Estate Occupancy Expenses" means, with respect to each Lease, the lesser of the per location, per diem costs related to the applicable Leased Premises set forth in Exhibit 2.2(c) and the obligations actually incurred by Seller relating to such Leased Premises with respect to the applicable period.

1.45    "Seller Party REAs" means any REA for or affecting any of the Leased Premises known to Seller and to which Seller is a party.

1.46    "Successful Bidder" shall have the meanings set forth in the Bid Protections Order.

1.47    "Vacate Notice" has the meaning set forth in Section 2.2(b).

**ARTICLE II**
**THE TRANSACTION**

2.1     Purchase and Sale of Designation Rights.

(a)     On the terms and subject to the conditions contained in this Agreement, on the Closing Date, Purchaser shall purchase from Seller, and Seller shall sell, convey, assign, transfer and deliver to Purchaser, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Designation Rights in respect of the Leases free and clear of all Liens to the fullest extent permissible pursuant to the Bankruptcy Code.

2.2     Designation Rights.

(a)     Designation Period. During the Designation Period, Purchaser shall have the sole, exclusive, and continuing right to select, identify and designate (on one or more occasions): (i) which Leases shall be assumed and assigned in connection with an assumption and assignment, and the Designee to whom such assignment shall be made (including an assignment to a landlord under a Lease which may, at Purchaser's election, involve a consensual agreement with the applicable landlord to waive prepetition rejection damages termination of a Lease in lieu of assigning the Lease to such landlord and, as to which, Seller shall, upon such election by Purchaser, take such actions as may be reasonably required to effectuate such termination) and (ii) which Leases shall become Dropout Leases as provided for in Section 2.2(c) (all of which rights are referred to herein as the "Designation Rights"). The parties agree that the sale of the Designation Rights provided for herein shall not effect a conveyance of the Leases to Purchaser except for those Leases that Purchaser will specifically designate for itself in accordance with Section 2.2(e) herein.  For the avoidance of doubt, subject to the terms and provisions of this Agreement, Purchaser shall have the right to designate as the Designee with respect to any particular Lease itself, any Purchaser Affiliate or any other party or Person.  Purchaser's Designation Rights shall commence immediately upon entry of the Approval Order and shall terminate sixty (60) days thereafter, subject to earlier termination with respect to individual Lessees as provided for herein (the "Designation Period").  For the avoidance of doubt, the Designation Period shall continue past the Sale Termination Date under the Agency Agreement, and the Applicable Lease Marketing Period of any Lease may continue past the Vacate Date under the Agency Agreement applicable to the Leased Premises subject to such Lease, with Purchaser responsible for all Real Estate Occupancy Expenses with respect to such Leases for the duration of the Designation Period, as provided in paragraph 2.2(c) below.

(b)     Designation Procedure.  Promptly upon Seller's receipt of a notice to vacate any Lease pursuant to Section 6.2 of the Agency Agreement, Seller may provide written notice to Purchaser of its intention to reject such Lease (a "Vacate Notice").  Within one business day of receipt of a Vacate Notice, Purchaser shall provide Seller with written notice requesting that Seller not reject such Lease (a "Notice Not to Reject").  If Purchaser fails to provide a Notice Not to Reject to Seller, Purchaser shall be deemed to accept Seller's treatment of such Lease as a Dropout Lease, in accordance with subsection (d) below.

(c)     Parties Respective Obligations During Designation Period.

(i)     To the extent the Agent is not required to pay such expenses as an Occupancy Expense under the Agency Agreement, Purchaser shall reimburse

Seller for all actual Real Estate Occupancy Expenses paid by Seller under the Leases attributable to the period from the Closing Date through the applicable Lease Marketing Period Termination Date (as to each Lease, the "Applicable Lease Marketing Period"), on a per location, per diem basis limited to the categories and amounts set forth on Exhibit 2.2(c) hereto.  Purchaser shall pay any such Real Estate Occupancy Expenses on each Wednesday of each week during the Applicable Lease Marketing Period.  Except as expressly provided for in this Section 2.2(c)(i), Purchaser shall have no further obligation or liability with respect to any Lease (including any obligation to continue to pay any Real Estate Occupancy Expenses with respect thereto) upon the occurrence of the applicable Lease Marketing Period Termination Date.

(ii)     As security for the payment of obligations provided for in this Section 2.2(c)(i) (i.e., the payment of the Real Estate Occupancy Expenses), Purchaser shall deposit $_____ (the "Security Deposit") by wire transfer of immediately available funds to Kelley, Drye & Warren LLP (the "Escrow Agent") on or before the Closing.  The Escrow Agent shall hold the Security Deposit in a segregated account pursuant to an escrow agreement in form and substance mutually agreeable to the Purchaser and the Seller (the "Escrow Agreement").  Funds held pursuant to the Escrow Agreement shall be free and clear of all encumbrances, except for encumbrances pursuant to the Escrow Agreement and this Agreement.

(iii)     If Purchaser fails to pay Seller or any lessor on account of any payment obligations hereunder and such failure continues for five (5) days after written notice of such failure is given by Seller to Purchaser, then Seller may demand payment by the Escrow Agent of the Security Deposit in the amount due (and such draw shall immediately cure such failure) by delivering to the Escrow Agent and the Purchaser an officer's certificate stating that such amounts are due and payable and unpaid under this Agreement and that any required notice of default has been given and any applicable grace or cure periods have expired.  Any amount so paid shall be immediately applied to the payment obligations hereunder.  Purchaser shall immediately replenish the Security Deposit in the amount so paid.  If Purchaser fails to replenish the Security Deposit within five (5) days after receipt of written demand to do so from Seller, then for so long as the Security Deposit remains unreplenished, Seller may immediately reject any and all Leases that have not been transferred pursuant to this Agreement, Purchaser waives any right to object to or contest any such rejections, and Purchaser shall have no further right in or to any such Lease that has been so rejected.

(iv)     During the Designation Period, Seller agrees to cooperate reasonably with Purchaser to arrange for the sale of Seller's interests in those Leases designated by Purchaser as provided for herein, and cooperate with Purchaser, its agents and any potential assignees of any of the Leases and provide reasonable access to Leased Premises subject thereto.

(d)    Dropout Rights.  At any time prior to the expiration of the Applicable Lease Marketing Period, Purchaser shall have the right, which right may be exercised at any time and from time to time in Purchaser's sole and absolute discretion, to provide written notice to the Seller (each such notice, a "Lease Dropout Notice") of Purchaser's election to discontinue its efforts to market and attempt to sell the subject Lease (a "Dropout Lease"). Upon delivery by Purchaser of a Lease Dropout Notice, upon the occurrence of the applicable Lease Marketing Period Termination Date, except as specifically provided for in Section 2.2(c)(i), Purchaser shall have no further obligation or liability with respect to the subject Dropout Lease (including any obligation to continue to pay any Real Estate Occupancy Expenses with respect thereto), and the Seller shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with the subject Leased Premises. Upon Purchaser's delivery of a Lease Dropout Notice, Seller may dispose of such Lease, and the Leased Premises subject thereto, in such manner as Seller may elect, and all proceeds realized upon a disposition of same shall be the exclusive property of Seller.  The legal costs and expenses of the rejection at any time of any one or more Leases subject to a Dropout Notice, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same, shall be borne solely by Seller and its bankruptcy estate.

(e)    Lease Assumptions.

(i)    As used in this Agreement, the term "commercially reasonable efforts" shall expressly require Seller or its bankruptcy estate to expend or incur fees, costs and expenses for the payment of attorneys and other professionals whose services may reasonably be required by Purchaser in connection with the prosecution of any motion seeking the entry of any order contemplated by this Agreement.

(ii)    A motion for approval of the Lease Assumption Procedures Order shall be filed by Seller as soon practicable following the execution of this Agreement, and Seller shall use all commercially reasonable efforts to obtain the entry of such an order.

(iii)    At any time during the Designation Period prior to the expiration of the Applicable Lease Marketing Period for each Lease, Purchaser shall have the right, which right may be exercised at any time and from time to time, to provide written notice to the Seller (each such notice, a "Lease Assumption Notice") of Purchaser's election to require the Seller to use all commercially reasonable efforts in accordance with the Lease Assumption Procedures Order to assume the Lease(s) identified in the subject Lease Assumption Notice(s) and assign same to Purchaser's Designee.  Following the date Purchaser delivers a Lease Assumption Notice to Seller, Seller shall, at no additional cost or expense to Purchaser, take all requisite actions (including, without limitation, actions required under section 365 of the Bankruptcy Code) to assume and assign the subject Lease(s) to the Designee identified by Purchaser in such Lease Assumption Notice(s) and obtain a Lease Sale Order.  Without limiting the generality of the foregoing, upon receipt of a Lease Assumption Notice, Seller

shall use all commercially reasonable efforts to obtain the entry of a Lease Sale Order approving the assumption of the subject Lease(s) and the assignment of such Lease(s) to the specified Designee within ten (10) days, subject to the availability of the Court.

(f)     Designation Proceeds. The parties agree that Purchaser shall pay to Seller ten percent (10%) of the proceeds it receives on account of the assumption and assignment of Leases to any non-Purchaser Affiliate, and shall be entitled to retain any and all other proceeds it receives on account of the assumption and assignment of Leases; provided, however, that the amounts payable by landlords specified in Exhibit 2.2(f) shall remain the property of Seller.

2.3     Alternative Designees. To the extent any of the Designees fail to close on the assignment of any Lease, for any reason, including, without limitation, because the Bankruptcy Court shall have sustained an objection to the assignment of a Lease as provided for herein, Purchaser shall have the right to direct Seller to use commercially reasonable efforts to assume and assign or sublease in connection with an assumption and assignment such Lease directly to an alternate Designee and Purchaser shall retain all of its respective Designation Rights under this Agreement.

2.4     Arrearage Costs. In the event Purchaser exercises its right to cause the assumption and assignment of a Lease pursuant to Section 2.2(e), Purchaser shall pay the Arrearage Amount, if any, to the applicable landlord.

**ARTICLE III**
**THE CLOSING**

3.1     Time and Place of Closing; Consideration.

(a)     The consummation of the sale and transfer of the Designation Rights provided for in this Agreement (the "Closing") shall occur on the Closing Date, subject to satisfaction or waiver (by the party entitled to waive the conditions) of all the conditions to Closing set forth in Article IV and Article V of this Agreement.

(b)     At the Closing, Purchaser shall deliver to Seller a payment in the amount of $525,000 (the "Initial Payment") allocated as follows (the "Initial Payment Allocation") (i) $350,000 with respect to the Bulk Leases and (ii) $175,000 with respect to the Additional Lease, less the Deposit, in immediately available funds.  The Initial Payment shall at all times remain severable and subject to the Initial Payment Allocation.  Seller shall be obligated to deliver the Initial Payment only with respect to the Leases for which it is determined to be the Successful Bidder at Auction, subject to Bankruptcy Court approval (e.g. if Purchaser is the Successful Bidder with respect only to the Bulk Leases, Purchaser's obligation hereunder shall be limited to $350,000, subject to increase at auction).  Further, any and all bid protection provided herein, is likewise subject to the Initial Payment Allocation (e.g. if Purchaser is entitled to the Breakup Fee and is not deemed the Successful Bidder with respect to only the Additional Lease, Purchaser will be entitled to a breakup fee in the amount of $17,500, subject to Bankruptcy Court approval).  The payments specified in this Section 3.1 and in Section 2.2(f) above shall be the sole payments due to Seller on account of the Designation Rights being

conveyed to Purchaser hereunder, excluding Real Estate Occupancy Expenses which may from time to time be reimbursed to the Debtor in lieu of direct payment to a particular lessor.

3.2    Time and Place of Lease Closings. The consummation of the sale and assignment of each Lease (each a "Lease Closing") shall occur on the applicable Lease Closing Date, provided, however, that such occurrence shall be subject to satisfaction of all the Lease Closing Conditions for such Lease unless any such Lease Closing Conditions are waived, in writing, by Purchaser.  Seller shall use commercially reasonable efforts to cause all of the Lease Closing Conditions with respect to each Lease Closing to be satisfied as of the applicable Lease Closing Date.  Each Lease Closing shall occur at such location as Seller and Purchaser shall agree.

3.3    Deliveries by Seller. At each Lease Closing, Seller shall deliver to Purchaser or its Designee(s) the following:

(a)    an executed assumption and assignment agreement for the applicable Lease being assigned;

(b)    an executed bill of sale conveying title to any personal property or fixtures owned by Seller that remains at the applicable Leased Premises as of the Lease Closing Date, and has not been otherwise transferred pursuant to the Agency Agreement;

(c)    a Lease Sale Order entered by the Bankruptcy Court with respect to such Lease; and

(d)    all other documents (including assignments of operating agreements affecting the applicable Leased Premises and closing statements), affidavits, instruments and writings reasonably required to be executed by Seller at or prior to the Lease Closing Date pursuant to this Agreement or otherwise required by law, or reasonably requested by Purchaser in connection herewith.

All such documents shall be, in form and substance, reasonably satisfactory to each of Seller and Purchaser. The provisions of this Section 3.3 shall survive the Closing.

3.4    Deliveries by Purchaser.  At each Lease Closing, Purchaser or Designee shall deliver to Seller:

(a)    executed counterparts of the instruments referred to in Section 3.3 which are to be executed by Designee;

(b)    all other documents (including assumptions of operating agreements affecting the applicable Leased Premises and closing statements), instruments and writings reasonably required to be delivered by Purchaser or its Designee(s) at or prior to the Lease Closing Date pursuant to this Agreement or otherwise required by law, or reasonably requested by Seller in connection herewith;

(c)    payment in full of the applicable Arrearage Amount, or waiver of any such amounts by the applicable landlord.

All such documents shall be, in form and substance, reasonably satisfactory to each of Seller and Purchaser.  The provisions of this Section 3.4 shall survive the Closing.

3.5     Closing Costs, Preparation of Documents.  Purchaser shall prepare and deliver to Seller for execution by Seller, the assignments, bills of sale, deeds, transfer tax declarations and other closing documents to be delivered in connection with each Lease Closing, all in a form reasonably acceptable to Seller, provided, however, that Seller shall, at Purchaser's sole cost and expense, reasonably cooperate with Purchaser in such preparation.

## ARTICLE IV
## CONDITIONS TO SELLER'S OBLIGATIONS

Seller's obligations to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing Date of the following conditions:

4.1     Representations and Warranties.  All representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date and Purchaser shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or on the Closing Date in all material respects.

4.2     No Injunction.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

4.3     Approval Order.  The Bankruptcy Court shall have entered the Approval Order, and the Approval Order shall be in full force and effect, and shall not have been amended, reversed, vacated, modified or stayed.

Each of the preceding conditions may be waived by Seller (except that Seller may not waive the condition requiring the entry of the Approval Order set forth in Section 4.3, above), but only if such waiver is set forth in a writing executed by Seller.

## ARTICLE V
## CONDITIONS TO PURCHASER'S OBLIGATIONS

Purchaser's obligation to consummate the transactions contemplated by this Agreement is subject, in the discretion of Purchaser, to the satisfaction at or prior to the Closing Date of each of the following conditions:

5.1     Representations and Warranties. All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date and Seller shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or on the Closing Date in all material respects.

5.2    Approval Order.  The Bankruptcy Court shall have entered the Bid Protections Order and the Approval Order, and each of the Bid Protections Order and the Approval Order shall be in full force and effect, and shall not have been amended, reversed, vacated, modified or stayed.

5.3    No Injunction. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

5.4    Agency Agreement. The Agency Agreement shall be in full force and effect.

**ARTICLE VI**
**REPRESENTATIONS, WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser as follows:

6.1    Due Incorporation, Etc.  Subject to any required approval of the Bankruptcy Court, Seller has the power and authority and all necessary governmental approvals to enter into this Agreement and all of the transactions contemplated thereby.

6.2    Authorization, No Conflicts Etc.  Subject to the entry and effectiveness of the Approval Order, this Agreement has been duly and validly executed and delivered by Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser and upon receipt of any required approval of the Bankruptcy Court) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditor's rights generally from time to time in effect and to general equitable principles.  To Seller's knowledge, subject to any required approval of the Bankruptcy Court, neither the execution and delivery of this Agreement and all documents contemplated hereunder to be executed by Seller, nor the performance of the obligations of Seller hereunder or thereunder will result in the violation of any law or any provision of the organizational documents of Seller or will conflict with any order or decree of any court or governmental instrumentality of any nature by which Seller is bound.

6.3    Consents and Approvals.  To Seller's knowledge, no consent, approval or authorization of, or declaration, filing, or registration with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except (a) for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) for consents, approvals, authorizations, declarations, filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the transactions contemplated by this Agreement.

6.4    Leases and Real Estate.

(a)    Subject to entry of the Approval Order by the Bankruptcy Court, to Seller's knowledge, Seller has with respect to the Leases, leasehold title, and valid leases as to all of the Leased Premises, free and clear of all liens, claims, mechanics liens and encumbrances to the extent permitted by the Bankruptcy Code (but excluding liens, claims,

mechanics liens and encumbrances that were created by order of the Bankruptcy Court or will be released at Closing or the applicable Lease Closing by (i) payment by Seller, (ii) to the extent authorized by order of the Bankruptcy Court, by establishment, by Seller, of an escrow for any cure thereof in an amount reasonably agreed upon between the applicable landlord and Seller or as otherwise ordered by the Bankruptcy Court, or (iii) otherwise pursuant to the Approval Order, a Lease Sale Order or any other order of the Bankruptcy Court) (collectively "Liens").

(b)     Complete and correct copies of the Leases have been made available for inspection by Purchaser and none of the Leases have been modified in any material respect except to the extent that such modifications are disclosed by the copies delivered to or made available for inspection by Purchaser.

6.5     Insurance.  To Seller's knowledge, Seller currently maintains fire and other casualty insurance upon each of the Leased Premises as required by the Leases (which Leases may permit self-insurance by Seller).

6.6     Litigation.  There is no action, suit, inquiry, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission pending, or, to the best knowledge of Seller, threatened against Seller which questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby; nor, to the best knowledge of Seller, is there any basis for any such action, proceeding or investigation.  To the best of Seller's knowledge, there are no circumstances or facts that would prevent Seller from engaging in the transactions contemplated in this Agreement.

6.7     Prepetition Rental Arrearages.  To the best of Seller's knowledge, Exhibit 6.7 correctly lists all known unpaid rent payments, tax payments and other payment obligations accrued prior to the Petition Date with respect to each Lease.  Exhibit 6.7 does not include any obligations accrued or due and owing subsequent to the Petition Date.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

7.1     Due Incorporation, Etc.  Each organization comprising Purchaser is duly organized, validly existing and in good standing under the laws of the State or Country of its formation.

7.2     Authorization, No Conflicts. Etc.  Purchaser has the power and authority, to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby have been duly authorized by all requisite (and to the extent applicable to Purchaser) corporate, partnership or limited liability company action.  This Agreement has been duly and validly executed and delivered by Purchaser and, subject to the entry and effectiveness of the Approval Order (assuming this Agreement constitutes a valid and binding obligation of Seller), this Agreement constitutes the valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable

bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditor's rights generally from time to time in effect and to general equitable principles. Neither the execution and delivery of this Agreement and all documents contemplated hereunder to be executed by Purchaser, nor the performance of the obligations of Purchaser hereunder or thereunder will result in the violation of any law or any provision of the organizational documents of Purchaser or will conflict with any order or decree of any court or governmental instrumentality of any nature by which Purchaser is bound.

7.3     Consents and Approvals. To Purchaser's knowledge, no consent, approval or authorization of, or declaration, filing, or registration with, any United States federal or state Governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except (a) for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; and (b) for consents, approvals, authorizations, declarations, filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the transactions contemplated by this Agreement.

7.4     Litigation. There is no action, suit, inquiry, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission pending, or, to the best knowledge of Purchaser, threatened against Purchaser which questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby; nor., to the best knowledge of Purchaser, is there any basis for any such action, proceeding or investigation.  To the best of Purchaser's knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement.

## ARTICLE VIII
## COVENANTS

8.1     Affirmative and Negative Covenants.

(a)     Seller covenants and agrees that, after the date of this Agreement, it shall, unless otherwise agreed with Purchaser, do each of the following:

(i)     Affirmative Covenants Pending Lease Closing.

(A)     Maintenance. Until the applicable Vacate Date under the Agency Agreement, Seller shall, and shall cause the Agent to, maintain the subject Leased Premises in the same condition as it is today, subject only to ordinary wear and tear, and keep and perform all of its obligations under the applicable Lease, consistent with the terms of the Agency Agreement.

(B)     Court Orders. Seller shall use all commercially reasonable efforts to obtain the Approval Order.  Seller shall also use all commercially reasonable efforts to obtain the Lease Assumption Procedures Order and all Lease Sale Orders approving the

assumption and assignment of Leases to any Designees, as provided for in Section 2.2(e).

(ii)    <u>Negative Covenants Pending Lease Closing</u>. Except as expressly permitted herein (including pursuant to this Section 8.1(a)), Seller shall not, from and after the date hereof, prior to the applicable Lease Marketing Period Termination Date, do any of the following with respect to the applicable Lease without the consent of Purchaser (whose consent shall not be unreasonably withheld or delayed):

(A)    <u>Leases</u>.  Renew, terminate or amend such Lease, enter into new leases or subleases or grant or voluntarily terminate any other interests in the subject Leased Premises.

(B)    <u>REAs</u>.  Renew, terminate or amend any existing REAs with respect to or affecting the subject Leased Premises or enter into new REAs with respect to or affecting the subject Leased Premises.

(C)    <u>Non Disturbance Agreements</u>. Renew, terminate or amend any existing Non-Disturbance Agreements with respect to or affecting the subject Leased Premises or enter into new Non-Disturbance Agreements with respect to or affecting the subject Leased Premises.

(D)    <u>Encumbrances</u>.  Encumber, sublease or otherwise grant any Liens or other rights with respect to the subject Leased Premises.

(E)    <u>Contracts</u>.  Enter into any contracts or agreements affecting the Leased Premises which will be binding on Purchaser (or its Designee), in any case, from and after the execution of this Agreement.

(b)    Purchaser covenants and agrees that it shall, from and after the date hereof (unless otherwise agreed with Seller), with respect to each Lease, use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance of the applicable Lease by Purchaser or its Designee.  Purchaser agrees that it will promptly take, and/or cause its Designee to take, all actions reasonably required by Seller or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of the Approval Order and each additional Lease Sale Order, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to be interviewed by Seller's counsel and to testify before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Designees under the Leases.

(c)    Except as provided herein, until the applicable Lease Marketing Period Termination Date, Seller shall not, without the prior consent of Purchaser, file a lease rejection notice or motion with respect to any Lease.

8.2    <u>Title Insurance</u>.  Designees may obtain title insurance for any or all of the Leased Premises at their own discretion and at their sole cost and expense.

8.3    <u>Consents and Further Actions</u>.  Subject to the terms and conditions herein provided, Seller and Purchaser covenant and agree to use their good faith efforts to take, or cause to be taken, all reasonable action, or do, or cause to be done, all reasonable things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including without limitation, satisfying all Closing conditions and Lease Closing Conditions to be satisfied.

8.4    <u>Further Transfers and Assurances</u>.  Seller and Purchaser will execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the assignment to Designees of the Leases.

8.5    <u>Taxes, Recording Charges</u>.  If the disposition of any Lease is not found to be exempt under section 1146(a) of the Bankruptcy Code, then all transfer, documentary, sales, use, stamp, registration, conveyance, income, gains, value added or other taxes and fees arising out of the assignment of the Leases and all charges for or in connection with the recording of any document or instrument contemplated hereby shall be paid by Purchaser.  Seller and Purchaser or Designee, as required by local law, will file all necessary tax returns and other documentation in connection with the taxes and fees encompassed in this Section 8.5 relating to the assignment of Leases.

8.6    <u>Insurance</u>.  Without the prior written consent of Purchaser, Seller will not cancel any insurance policy relating to any Leased Premises or permit any such policy to expire prior to the applicable Lease Marketing Period Termination Date.

8.7    <u>Access and Cooperation</u>.  During the Designation Period, Seller shall provide Purchaser with reasonable access to such documents and information as Purchaser shall reasonably request related to the Leases, and the Leased Premises subject thereto, in connection with Purchaser's efforts to market the Leases.  Without limiting the generality of the foregoing, Seller shall provide Purchaser with (i) access to Seller's data room, (ii) all landlord and other relevant contact information for each Lease, and (iii) access to all correspondence, notices, reports and other communications concerning the Leases and the Leased Premises, currently and on a continuing basis.

8.8    <u>Extension Options</u>.  Between the date of the Closing and the applicable Lease Marketing Termination Date for each Lease, Seller shall give Purchaser at least ten business days advanced notice of the last date upon which any and all renewal and/or extension rights exercisable fur such Lease are exercisable, which notice shall indicate whether or not Seller is exercising the applicable option.

# ARTICLE IX
## EVENTS OF DEFAULT, TERMINATION

9.1 <u>Events of Default</u>. The material breach of any representation, warranty or covenant herein shall constitute a breach of this Agreement.

9.2 <u>Termination; Other Remedies</u>.

(a) This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(i) by the mutual consent of Purchaser and Seller;

(ii) by Purchaser, if the Bid Protections Order shall not have been approved by the Bankruptcy Court by no later than May [23], 2011;

(iii) by Purchaser or Seller, provided such party is not in default hereunder, if either (A) the Approval Order shall not have been approved by the Bankruptcy Court by no later than May [31], 2011, or (B) the Closing does not occur within ten (10) day after the Closing Date;

(iv) by Purchaser, if there has been a breach by Seller of any material representation, warranty or covenant in this Agreement that (a) is not curable or, if curable, has not been cured within five (5) business days following receipt by Seller of written notice of such breach from Purchaser, and (b) is not waived by Purchaser in its sole discretion;

(v) by Seller, if there has been a breach by Purchaser of any material representation, warranty or covenant in this Agreement that (a) is not curable or, if curable, has not been cured within five (5) business days following receipt by Purchaser of written notice of such breach from Seller, and (b) is not waived by Seller in its sole discretion; or

(vi) by Purchaser, upon the approval by the Bankruptcy Court of an Alternative Transaction for the Bulk Leases or the Additional Lease, as applicable, i.e., if the Bankruptcy Court approves an Alternative Transaction for the Bulk Leases, the Purchaser may terminate this Agreement and abandon the transaction contemplated for the Bulk Leases, and if the Bankruptcy Court approves an Alternative Transaction for the Additional Lease, the Purchaser may terminate this Agreement and abandon the transaction contemplated for the Additional Lease.

(b) In the event that this Agreement is terminated pursuant to Section 9.2(a)(i-iv) above, Seller shall immediately return the Deposit (and all interest accrued thereon) to Purchaser, as Purchaser's sole remedy in the event of such termination. In the event that this Agreement is terminated pursuant to Section 9.2(a)(v), Seller shall retain the Deposit, as Seller's sole remedy in the event of such termination. In the event that this Agreement is terminated pursuant to Section 9.2(a)(vi), Seller shall immediately return the Deposit (and all

interest accrued thereon) to Purchaser and pay the applicable Break-Up Fee to Purchaser, as Purchaser's sole remedy in the event of such termination.

(c)     Upon the termination of this Agreement pursuant to Section 9.2(a), other than as set forth in Section 9.2(b), neither Seller nor Purchaser shall have any further liability to the other hereunder.  This Section 9.2(c) shall survive the termination of this Agreement.

### ARTICLE X
### LEASE ASSIGNMENT

10.1    Post-Closing Lease Expenses.  Except as otherwise provided in this Agreement, all obligations with respect to each Lease assigned to Designees shall be the sole responsibility of Designee from and after the Lease Closing Date with respect to such Lease.  Notwithstanding anything to the contrary in the foregoing sentence, or in any other provision of this Agreement, Designees shall not be liable for any monetary obligations or monetary liabilities relating to the Leased Premises which are attributable in any way to, or were incurred during, the period prior to the applicable Lease Closing Date, unless such Designee agrees with the Purchaser to pay the applicable Arrearage Amounts, provided however, that Designee shall be liable for any and all year-end adjustments relating to the Leased Premises whether incurred prior to or after the Lease Closing Date.

10.2    Conditions to Assignment.  It shall be a condition to assignment of any Lease to any Designee that Purchaser shall have paid the applicable Arrearage Amount; provided, however, that Purchaser shall not be obligated to pay any portion of the Arrearage Amount that is in dispute as of the Lease Closing Date if an escrow or other commercially reasonable arrangement with respect thereto shall have been established at or following the applicable Lease Closing pursuant to an order of the Bankruptcy Court.

### ARTICLE XI
### MISCELLANEOUS

11.1    Successors and Assigns.  This Agreement is made solely and specifically by and for the benefit of the parties hereto, and their respective successors and assigns.

11.2    Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission, or mailed, by certified or registered mail, return receipt requested, first class postage prepaid, or by Federal Express or some other nationally reputable overnight carrier (or when delivery is rejected or refused), to the parties at the following addresses and facsimile numbers:

If to Purchaser:

Michael Hardwick
The Cotton On Group
Tel: [              ]
E-mail: michael.hardwick@cottonon.com.au

With a copy to:

Robert L. LeHane, Esq
Kelley Drye & Warren LLP
Tel: 212-808-7573
E-mail: rlehane@kelleydrye.com

With copies to:


If to Seller:

Richard Hicks
Metropark USA
Tel: 323-622-3620
E-mail: rhicks@metroparkusa.com


with copies to:

Cathy Hershcopf, Esq.
Jeffrey L. Cohen, Esq.
Cooley LLP
Tel: (212) 479-6000
email address: chershcopf@cooley.com
                              jcohen@cooley.com

or to such other place and with such other copies as any party may designate by written notice to all of the other parties provided in the manner set forth herein.

      11.3   <u>Expenses</u>. Each party shall bear its own legal, appraisal and title costs with respect to the drafting of the agreements involved in these transactions and the closing of such transactions.

      11.4   <u>Brokerage Commissions and Fees</u>.  Purchaser warrants and represents that no brokerage commissions or fees are due any real estate broker(s) as a result of Purchaser's acts or omissions in connection with the transactions contemplated by this Agreement, and Purchaser agrees that should any claim be made for commissions or fees by any broker(s) against Seller, Purchaser will indemnify and hold Seller free and harmless from and against any and all such claims in connection therewith to the extent the same are based upon any acts or omissions of Purchaser or its agents.  Seller warrants and represents that no brokerage commissions or fees are due any real estate broker(s) as a result of Seller's acts or omissions in connection with the transactions contemplated by this Agreement and Seller agrees that should any claim be made for commissions or fees by any broker(s) against Purchaser, unless otherwise authorized by prior order of the Bankruptcy Court, Seller will indemnify and bold Purchaser free and harmless from

and against any and all such claims in connection therewith to the extent the same are based upon any acts or omissions of Seller or its agents.

11.5    Casualty and Condemnation.  If any particular Leased Premises is materially destroyed or materially damaged, or if condemnation proceedings are commenced against all or substantially all of such particular Leased Premises, all proceeds of insurance or condemnation awards shall be paid to, and retained by, Seller and such affected Leased Premises shall be excluded from this Agreement.  In the event of non-material damage or non-material condemnation to any particular Leased Premises, which damage Seller is unwilling to repair prior to the applicable Lease Closing, the applicable Lease Closing shall be unaffected thereby and any proceeds of insurance or condemnation awards shall be used to repair the Leased Premises to the same condition that the Leased Premises was in immediately prior to such casualty or condemnation.

11.6    Entire Agreement.  This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and this Agreement, including the schedules and exhibits hereto, and other documents to be delivered in connection herewith (together with such confidentiality letter), contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

11.7    Waiver.  Except as otherwise specifically provided for in this Agreement, any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an Authorized Officer of such party.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach on a future occasion.  A waiver hereunder shall be effective without an order of the Bankruptcy Court, or notice to the Bankruptcy Court or any third party, in relation to such waiver.

11.8    Amendment.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of each of the parties hereto.

11.9    Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

11.10   Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof.  The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

11.11   <u>Headings, Gender, Etc</u>.  The headings used in this Agreement have been inserted for convenience, do not modify the terms of this Agreement and do not constitute matter to be construed or interpreted in connection with this Agreement.  Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement, and (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation."  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent and no rule of strict construction shall be applied against any Person.

11.12   <u>Continuing Jurisdiction</u>.  The parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

11.13   <u>Choice of Law</u>.  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of New York without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation or limited liability company which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction of incorporation or organization of such entity shall govern.  In the event of any litigation concerning this Agreement, proper venue shall be the Bankruptcy Court and the parties hereto consent to the jurisdiction of such court.

11.14   <u>No Partnership or Joint Venture</u>.  Nothing contained in this paragraph or elsewhere in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of Seller and Purchaser between the parties hereto.

11.15   <u>No Third Party Beneficiaries</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, firm or corporation, other than the parties hereto, their affiliates and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

11.16   <u>Employees</u>.  Purchaser and its Designees shall not be deemed an employer with Seller or any of its affiliates or subsidiaries and Purchaser and its Designees shall have no obligation to pay wages or benefits (or to fund any pension plan) or to employ any employee of Seller or any affiliates or subsidiaries other than as part of the Real Estate Occupancy Expenses. All WARN Act or similar obligation shall be Seller's sole obligation.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK)**

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be duly executed as of the date first above written.

**SELLER:**

**METROPARK USA, INC.**

By:_____
      Name: Richard Hicks
      Title: Chief Financial Officer

**PURCHASER:**

**THE COTTON ON GROUP**

By:_____
      Name: Ashley Harwick
      Title: Director

## Schedule 1.1
## Additional Lease

| Store No. | Location | Street | City | State | Zip |
|-----------|----------|--------|------|-------|-----|
| 52 | Aventura Mall | 19575 Biscayne Blvd. Space 1019 | Aventura | FL | 33180 |

# Schedule 1.16
## Bulk Leases

| Store No. | Location | Street | City | State | Zip |
|---|---|---|---|---|---|
| 13 | Washington Square | 9681 SW Washington Square Road | Tigard | OR | 97223 |
| 45 | Danbury Fair Mall | 7 Backus Avenue, Space G207 | Danbury | CT | 6810 |
| 53 | Smith Haven Mall | 142 Smith Haven Mall | Lake Grove | NY | 11755 |
| 3 | Oakridge Mall | 925 Blossom Hill Road, Space V22 | San Jose | CA | 95123 |
| 6 | Mall of America | 108 N Garden, Bloomington | Bloomington | MN | 55425 |
| 7 | Galleria at Tyler | 2045 Galleria at Tyler | Riverside | CA | 92503 |
| 8 | Irvine Spectrum | 83 Fortune Drive, Suite 233 | Irvine | CA | 92618 |
| 9 | Fresno Fashion Fair | 639 E Shaw Avenue, Suite 173 | Fresno | CA | 93710 |
| 10 | Fashion Show | 3200 Las Vegas Blvd S, Suite 2290 | Las Vegas | NV | 89109 |
| 11 | Northpark Center | 8687 N Central Expy, Suite 2120 | Dallas | TX | 75225 |
| 12 | Beachwood Place | 26300 Cedar Road, Space 2250 | Beachwood | OH | 44122 |
| 16 | Del Amo Fashion Center | 3525 Carson Street, Suite 82 | Torrance | CA | 90503 |
| 20 | Freehold Raceway Mall | 3710 Route 9, Space G214 | Freehold | NJ | 07728 |
| 22 | San Francisco Centre | 845 Market Street, Space 309 | San Francisco | CA | 94103 |
| 24 | Baybrook Mall | 500 Baybrook Mall, Space 1192 | Friendswood | TX | 77546 |
| 25 | Walden Galleria | One Walden Galleria, Space TH150 | Buffalo | NY | 14225 |
| 27 | Town Square | 6551 Las Vegas Bvld., | Las Vegas | NV | 89119 |
| 34 | The Shops at Willow Bend | 6121 W Park Blvd, Space B105 | Plano | TX | 75093 |
| 38 | Stonestown Galleria | 3251 20th Avenue, Space 212 | San Francisco | CA | 94132 |
| 39 | Westfarms | 500 Westfarms Mall, Space E107 | Farmington | CT | 6032 |
| 40 | South Center | 657 Southcenter Mall, Space 1525 | Seattle | WA | 98188 |
| 43 | Burlington Mall | 75 Middlesex Turnpike, Space 1303 | Burlington | MA | 1803 |
| 44 | Alderwood Mall | 3000 184th Street SW, Space 592 | Lynwood | WA | 98037 |
| 46 | Scottsdale Fashion Square | 7014 E Camelback Road | Scottsdale | AZ | 85251 |
| 47 | Ala Moana Center | 1450 Ala Moana Blvd, Space 2316 | Honolulu | HI | 96814 |
| 49 | Victoria Gardens | 7825 Kew Avenue, Space 5010 | Rancho Cucamonga | CA | 91739 |
| 50 | Menlo Park | 55 Parsonage Road, Space 2415 | Edison | NJ | 8837 |
| 55 | Willowbrook Mall, NJ | 1830 Willowbrook Mall | Wayne | NJ | 7470 |
| 60 | Garden State | One Garden State Plaza Space I-5 | Paramus | NJ | 7652 |
| 63 | Roosevelt Field | 630 Old Country Rd. Space 1073A | Garden City | NY | 11530 |
| 65 | Santa Anita | 400 S. Baldwin Ave | Arcadia | CA | 91007 |
| 67 | Memorial City | 303 Memorial City Space 255 | Houston | TX | 77024 |

| Store No. | Location | Street | City | State | Zip | Per Diem |
|---|---|---|---|---|---|---|
| 13 | Washington Square | 9681 SW Washington Square Road | Tigard | OR | 97223 | $ 822.14 |
| 45 | Danbury Fair Mall | 7 Backus Avenue, Space G207 | Danbury | CT | 6810 | 689.52 |
| 53 | Smith Haven Mall | 142 Smith Haven Mall | Lake Grove | NY | 11755 | 819.78 |
| 3 | Oakridge Mall | 925 Blossom Hill Road, Space V22 | San Jose | CA | 95123 | 635.99 |
| 6 | Mall of America | 108 N Garden, Bloomington | Bloomington | MN | 55425 | 1,136.82 |
| 7 | Galleria at Tyler | 2045 Galleria at Tyler | Riverside | CA | 92503 | 585.55 |
| 8 | Irvine Spectrum | 83 Fortune Drive, Suite 233 | Irvine | CA | 92618 | 528.72 |
| 9 | Fresno Fashion Fair | 639 E Shaw Avenue, Suite 173 | Fresno | CA | 93710 | 594.84 |
| 10 | Fashion Show | 3200 Las Vegas Blvd S, Suite 2290 | Las Vegas | NV | 89109 | 1,085.90 |
| 11 | Northpark Center | 8687 N Central Expy, Suite 2120 | Dallas | TX | 75225 | 709.18 |
| 12 | Beachwood Place | 26300 Cedar Road, Space 2250 | Beachwood | OH | 44122 | 685.56 |
| 16 | Del Amo Fashion Center | 3525 Carson Street, Suite 82 | Torrance | CA | 90503 | 564.33 |
| 20 | Freehold Raceway Mall | 3710 Route 9, Space G214 | Freehold | NJ | 07728 | 719.62 |
| 22 | San Francisco Centre | 845 Market Street, Space 309 | San Francisco | CA | 94103 | 1,197.46 |
| 24 | Baybrook Mall | 500 Baybrook Mall, Space 1192 | Friendswood | TX | 77546 | 629.97 |
| 25 | Walden Galleria | One Walden Galleria, Space TH150 | Buffalo | NY | 14225 | 579.60 |
| 27 | Town Square | 6551 Las Vegas Bvld., | Las Vegas | NV | 89119 | 615.59 |
| 34 | The Shops at Willow Bend | 6121 W Park Blvd, Space B105 | Plano | TX | 75093 | 577.37 |
| 38 | Stonestown Galleria | 3251 20th Avenue, Space 212 | San Francisco | CA | 94132 | 653.72 |
| 39 | Westfarms | 500 Westfarms Mall, Space E107 | Farmington | CT | 6032 | 769.38 |
| 40 | South Center | 657 Southcenter Mall, Space 1525 | Seattle | WA | 98188 | 672.92 |
| 43 | Burlington Mall | 75 Middlesex Turnpike, Space 1303 | Burlington | MA | 1803 | 909.75 |
| 44 | Alderwood Mall | 3000 184th Street SW, Space 592 | Lynwood | WA | 98037 | 622.20 |
| 46 | Scottsdale Fashion Square | 7014 E Camelback Road | Scottsdale | AZ | 85251 | 1,030.02 |
| 47 | Ala Moana Center | 1450 Ala Moana Blvd, Space 2316 | Honolulu | HI | 96814 | 1,206.67 |
| 49 | Victoria Gardens | 7825 Kew Avenue, Space 5010 | Rancho Cucamonga | CA | 91739 | 585.03 |
| 50 | Menlo Park | 55 Parsonage Road, Space 2415 | Edison | NJ | 8837 | 851.83 |
| 55 | Willowbrook Mall, NJ | 1830 Willowbrook Mall | Wayne | NJ | 7470 | 750.48 |
| 60 | Garden State | One Garden State Plaza Space I-5 | Paramus | NJ | 7652 | 1,322.77 |
| 63 | Roosevelt Field | 630 Old Country Rd. Space 1073A | Garden City | NY | 11530 | 1,303.74 |
| 65 | Santa Anita | 400 S. Baldwin Ave | Arcadia | CA | 91007 | 694.64 |
| 67 | Memorial City | 303 Memorial City Space 255 | Houston | TX | 77024 | 547.11 |
| 52 | Aventura Mall | 19575 Biscayne Blvd., Space 1019 | Aventura | FL | 33180 | 1,197.21 |