**<u>EXHIBIT B</u>**


(REDLINE SHOWING CHANGES FROM FORM OF ORDER FILED WITH BIDDING PROCEDURES MOTION)

COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Cathy Hershcopf
Jeffrey L. Cohen
Alex R. Velinsky

Proposed Attorneys for Debtor and Debtor in Possession
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                              :
IN RE                                                         :        CHAPTER 11
                                                              :
METROPARK USA, INC.,[1]                                       :
                                                              :        CASE NO. 11-22866 (RDD)
              DEBTOR.                                         :
                                                              :
------------------------------------------------------------- X

**ORDER (A) SETTING (1) DATE TO CONDUCT AUCTION OF DEBTOR'S INTERESTS IN CERTAIN REAL PROPERTY LEASES AND INTELLECTUAL PROPERTY, (2) HEARING DATE FOR APPROVAL OF AUCTION AND (3) RELATED OBJECTION DEADLINES; (B) APPROVING BIDDING PROCEDURES AND TERMS OF AUCTION; (C) ESTABLISHING CURE AMOUNTS; AND (DC) GRANTING RELATED RELIEF**

Upon consideration of the Motion[2] for Order (A) scheduling the following dates with respect to the relief requested herein (1) an auction (the "Auction") to sell the Debtor's interests in each of its unexpired nonresidential leasehold interests (the "Leases")[3] and the Intellectual Property for May 26, 2011 at 10:00 AM (ET) in the offices of the Debtor's bankruptcy counsel, Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036, (2) a deadline of May 27, 2011 at 5:00 PM (ET) for landlords or other parties in interest to file and serve objections to the Court's approval of the proposed adequate assurance of future performance associated with the

---

[1] The Debtor's tax identification number is 81-0636659.

[2] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Motion.

[3] A schedule of the properties comprising the Leases is annexed hereto as Exhibit A.

Leases, (3) a deadline of May 27, 2011 at 5:00 PM (ET) for landlords or other parties in interest to file and serve objections to the Court's approval of the sale of Intellectual Property and the disposition of the Leases as a result of the Auction, (4) a deadline of May 25, 2011 at 5:00 p.m. for landlords to file and serve objections to the Debtor's proposed cure amounts set forth on Exhibit A hereof, and (5) a sale hearing (the "Sale Hearing") for May 31, 2011; (B) approving the bidding procedures and the terms and conditions of the Auction; (C) establishing the cure amounts for the Leases; (D) authorizing the Debtor to enter into lease termination agreements with landlords when appropriate; (ED) approving and authorizing the sale of the Leases and Intellectual Property pursuant to the terms and conditions stated herein; (FE) waiving the automatic fourteen-day stay provided for under Bankruptcy Rules 6004(h) and 6006(d); and (GF) granting related relief; and due and adequate notice of the Motion having been provided and a hearing been held to consider approval of the Motion to the extent set forth herein; upon the Debtor's request at the hearing to enter into (i) the proposed Designation Rights Agreement between the Debtor and The Cotton On Group ("Cotton On") annexed hereto as Exhibit B (the "Cotton On Agreement"), pursuant to which the Debtor proposes to sell to Cotton On the "Designation Rights" (as defined in the Cotton On Agreement) with respect to each of the Leases, and (ii) the proposed Agreement of Assumption and Assignment of Leases between the Debtor and Perry Ellis Menswear, LLC ("Perry Ellis," together with Cotton on the "Stalking Horse Bidders") annexed hereto as Exhibit C (the "Perry Ellis Agreement," together with the Cotton On Agreement, the "Stalking Horse Agreements"), pursuant to which the Debtor proposes to assume and assign to Perry Ellis certain of the Leases (as set forth on Exhibit A to the Perry Ellis Agreement); and after due deliberation, and sufficient cause appearing for granting the relief requested in the Motion and for the reasons stated therein; it is herebyand after due deliberation, and sufficient cause appearing for granting the relief requested in the Motion and for the reasons stated therein;

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A. This Court has jurisdiction over this matter and over the property of the Debtor and their bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).

B. Notice of the hearing on the Motion and proposed entry of this Order has been provided to (i) the United States Trustee for the Southern District of New York; (ii) counsel to the Official Committee of Unsecured Creditors (the "Committee"); (iii) counsel to the Debtor's prepetition secured lenders, (iv) all parties entitled to notice pursuant to Bankruptcy Rule 2002; (v) landlords and all known parties having an interest in the Leases; and (vi) each party that previously expressed an interest in acquiring the Leases or any Designation Rights. Under the circumstances and in light of the relief requested in the Motion, requisite notice of the Motion and the relief requested thereby and this Order has been provided in accordance with Bankruptcy Rules 4001(c) and (d) and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, section 102(1) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion or this Order is necessary or required.

C. The Debtor has articulated good and sufficient reasons for, and the best interests of its estate will be served by, this Court granting the relief requested in the Motion, including approval of the bidding procedures annexed hereto as Exhibit D (the "Bidding Procedures"), and authorizing the Debtor to enter into the Stalking Horse Agreements.

D. The Debtor has articulated good and sufficient reasons for, and the best interests of its estate will be served by, this Court scheduling the Auction and considering approval of the Stalking Horse Agreements and the transfer of the Designation Rights to Cotton On, and the assumption and assignment to Perry Ellis of those certain Leases set forth on Exhibit A to the Perry Ellis Agreement (or one or more higher bidders following the Auction (each, a

"Successful Bidder")) free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever (collectively, "Encumbrances") pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

E.   The applicable Break-Up Fees (as defined in each of the Stalking Horse Agreements) to be paid to each of the Stalking Horse Bidders under the circumstances described in the Bidding Procedures and in the respective Stalking Horse Agreements, are: (i)  actual and necessary costs and expenses of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtor's estate by each of the Stalking Horse Bidders; (iii) reasonable and appropriate in light of the size and nature of the proposed sales contemplated under the Stalking Horse Agreements; and (iv) necessary to induce each of the Stalking Horse Bidders to continue to pursue the transactions contemplated under the respective Stalking Horse Agreements.

F.   Moreover, the each of the Break-Up Fees is an essential inducement and condition relating to the each of the Stalking Horse Bidder's entry into, and continuing obligations under, the respective Stalking Horse Agreements.  The Break-Up Fees have induced the Stalking Horse Bidders to submit bids that will serve as a minimum or floor bid on which the Debtor, its creditors, and other bidders can rely.  Each Stalking Horse Bidder has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible price for all of the Debtor's Leases and the IP will be received.  Accordingly, each Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtor's estate.

**IT IS HEREBY ORDERED** that**THAT**:

1.      The Motion is hereby approved to the extent and on the terms and conditions set forth herein.

2.      The Bidding Procedures ~~attached hereto as~~ ~~Exhibit B~~are hereby approved and incorporated by reference herein as if fully set forth, and the bid deadline set forth therein ~~are~~is hereby approved.

3.      The Debtor is authorized~~, but not directed,~~ to enter into ~~an agreement to pay a break-up fee consistent with the Bidding Procedures, provided, however, that the payment of a break-up fee shall be subject to final Court approval at the hearing to be held on May 31, 2011 at __:00 _M (ET), or such other date and time as may be approved by the Court~~each of the Stalking Horse Agreements, and to pay each Break-Up Fee consistent with the respective Stalking Horse Agreements and the Bidding Procedures.  Article IX of the Cotton On Agreement is hereby approved and shall be binding on the Debtor and its estate. Paragraph E of the Perry Ellis Agreement is hereby approved and shall be binding on the Debtor and its estate.  The Debtor is hereby authorized and directed to pay to each Stalking Horse Bidder, without further order of the Court, the applicable Break-Up Fee in the event that such Break-Up Fee is payable under the terms of the applicable Stalking Horse Agreement.  The Debtor's obligation to pay each Break-Up Fee shall survive termination of the applicable Stalking Horse Agreement.  Each Break-Up Fee shall constitute an expense of its bankruptcy estate pursuant to sections 503(b) and 507 of the Bankruptcy Code, and shall be paid directly to a Stalking Horse Bidder entitled thereto from the proceeds of each transaction with a Successful Bidder involving the subject assets of the applicable Stalking Horse Agreement until such Break-Up Fee is paid in full, and not be subject to any Encumbrances.

4.      In the event that for any reason a Break-Up Fee is not payable under the terms of any Stalking Horse Agreement, the Debtor nevertheless shall, immediately following the closing of a transaction involving any Lease, pay directly to a Stalking Horse Bidder from the proceeds of such transaction any per diem costs related to such Lease paid directly or indirectly

~~1719861~~1724296 v~~3~~1/NY

by such Stalking Horse Bidder until the Stalking Horse Bidder shall be fully reimbursed for all such amounts paid, and such payment by the Debtor shall not be subject to any Encumbrances.

5. 4. The Any objections to the Cure Amounts set forth on Exhibit A to this Order must be filed and served so as to be received by the Debtor's counsel on or before 5:00 PM (ET) on May 25, 2011 and if no such objections are received, such cure amounts shall constitute the only amounts deemed owing under the corresponding Leases relating to the period prior to the assignment, provided that the Debtor shall pay all postpetition rent due and owing under the Leases arising and accruing from the Petition Date through the date of assignment or termination, absent waiver by the respective landlord.

6. 5. Upon the failure to consummate a sale of a Lease and/or Intellectual Property because of a breach or failure on the part of the any Stalking Horse Bidder or Successful Bidder with respect to such Lease and/or Intellectual Property, the Debtor is authorized to, and shall, retain the applicable Deposit as liquidated damages, and the next highest or otherwise best Qualified Bidder, with respect to such Lease and/or Intellectual Property, shall be deemed the Successful Bidder and shall consummate the sale of the Lease and/or Intellectual Property without further order of the Court.

7. 6. The Debtor is authorized to enter into a lease termination agreement with the Landlords for any Lease and may submit a separate order approving any such agreement. In the event of a timely objection to a lease termination agreement, such objection shall be heard at the Sale Hearing provided that the lease termination agreement has been noticed before the Auction or is selected as the successful bid at the Auction.

8. 7. Any objections to an assignee's ability to provide adequate assurance of future performance must be filed and served so as to be received by the Debtor's counsel on or before 5:00 PM (ET) on May 27, 2011.

6

9. ~~8.~~ Any objections to ~~the sale of Intellectual Property or proposed assumption and assignment of a Lease~~any of the sales contemplated by the Stalking Horse Agreements must be filed and served so as to be received by the Debtor's counsel on or before 5:00 PM (ET) on May 27, 2011 (the "Objection Deadline").

10. ~~9.~~ Any and all objections as contemplated in the Bidding Procedures and this Order must: (1) be in writing; (2) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Southern District of New York; (3) be filed with the Clerk of the Bankruptcy Court for the Southern District of New York; and (4) be served so as to be received on or before the Objection Deadline by: (i) counsel for the Debtor, Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, Attn: Cathy Hershcopf, Esq. and Jeffrey L. Cohen, Esq.; (ii) Metropark USA, Inc., 5750 Grace Place, Los Angeles, California 90022, Attn: Rick Hicks; (iii) counsel to the Official Committee of Unsecured Creditors; (iv) counsel to Wells Fargo Bank, N.A., the Prepetition Lender: Riemer & Braunstein, LLP, Three Center Plaza, Boston, Massachusetts 02108, Attn: Donald E. Rothman, Esq.; (v) counsel to the Second Lien Agent, Solomon Ward Seidenwurm & Smith, LLP, 401 B Street, Ste. 1200, San Diego, CA 32101 (Attn: Michael D. Breslauer, Esq.); ~~and (vi~~(vi) counsel to Cotton On, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: Robert L. LeHane, Esq.; (vi) counsel to Perry Ellis, Greenberg Traurig LLP, 200 Park Avenue, New York, New York 10166, Attn: Allen G. Kadish, Esq; and (vii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Susan Golden, Esq.).

11. ~~10.~~ A final sale hearing shall be held on May 31, 2011 at __:00 _M (ET) to consider the disposition of the Leases and Intellectual Property pursuant to the terms and conditions set forth in the Motion.

Date:  White Plains, New York
_____, 2011

7

_____

Robert D. Drain
United States Bankruptcy Judge

**<u>Exhibit A</u>**

**Schedule of Leases and Cure Amounts**

| Store No. | Location Name | Lessor | Location (Address) | City | ST | Zip | Cure Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | March | April | May 1-4 | Total |
| 1 | Glendale Galleria | Glendale II Mall Associates, LLC | 2107 Glendale Galleria | Glendale | CA | 91210 | $29,297.96 | $29,297.96 | $3,780.38 | $62,376.30 |
| 3 | Oakridge Mall | Oakridge Mall LP | 925 Blossom Hill Road | San Jose | CA | 95123 | $19,344.78 | $19,344.78 | $2,496.10 | $41,185.66 |
| 4 | Valley Fair Mall | VF MALL LLC | 2855 Stevens Creek Blvd | Santa Clara | CA | 95050 | $ - | $ - | $4,108.05 | $4,108.05 |
| 5 | Barton Creek Square | SIMON PROPERTY GROUP (TEXAS), L.P. | 2901 Capital of Texas Hwy | Austin | TX | 78746 | $ - | $16,374.37 | $3,425.35 | $19,799.72 |
| 6 | Mall of America | MOAC MALL HOLDINGS LLC | 108 N Garden, Bloomington | Bloomington | MN | 55425 | $34,578.39 | $34,578.39 | $4,461.73 | $73,618.51 |
| 7 | Galleria at Tyler | Tyler Mall Limited Partnership | 2045 Galleria at Tyler | Riverside | CA | 92503 | $17,810.50 | $17,810.50 | $2,298.13 | $37,919.13 |
| 8 | Irvine Spectrum | THE IRVINE COMPANY | 83 Fortune Drive, Suite 233 | Irvine | CA | 92618 | $ - | $16,082.04 | $2,075.10 | $18,157.14 |
| 9 | Fresno Fashion Fair | Macerich Fresno Limited Partnership | 639 E Shaw Avenue, Suite 173 | Fresno | CA | 93710 | $ - | $ - | $2,334.58 | $2,334.58 |
| 10 | Fashion Show | Fashion Show Mall, LLC | 3200 Las Vegas Blvd S, Suite 2290 | Las Vegas | NV | 89109 | $33,029.37 | $33,029.37 | $4,261.85 | $70,320.59 |
| 11 | Northpark Center | NorthPark Partners, LP | 8687 N Central Expy, Suite 2120 | Dallas | TX | 75225 | $ - | $ - | $2,783.33 | $2,783.33 |
| 12 | Beachwood Place | Beachwood Place Limited Partnership | 26300 Cedar Road | Beachwood | OH | 44122 | $20,852.36 | $20,852.36 | $2,690.63 | $44,395.35 |
| 13 | Washington Square | PPR Washington Square LLC | 9681 SW Washington Square Road | Tigard | OR | 97223 | $ - | $25,006.77 | $3,226.68 | $28,233.45 |
| 14 | Los Cerritos Center | Macerich Cerritos, LLC | 243 Los Cerritos Center, Space D23 | Cerritos | CA | 90703 | $ - | $ - | $2,859.86 | $2,859.86 |
| 15 | Miracle Mile Shops | Boulevard Invest LLC | 3663 Las Vegas Blvd, Suite 415 | Las Vegas | NV | 89109 | $ - | $ - | $3,204.89 | $3,204.89 |
| 16 | Del Amo Fashion Center | Simon Property Group | 3525 Carson Street, Suite 82 | Torrance | CA | 90503 | $ - | $8,323.34 | $2,214.82 | $10,538.17 |
| 17 | Houston Galleria | HG Galleria I, II, III, L.P. | 5015 Westheimer Road, Space A-3441 | Houston | TX | 77056 | $ - | $ - | $3,656.56 | $3,656.56 |
| 18 | Lenox Square | General Growth Properties | 3393 Peachtree Road NE, Space 2036A | Atlanta | GA | 30326 | $ - | $ - | $3,285.39 | $3,285.39 |
| 20 | Freehold Raceway Mall | Freemall Associates, LLC | 3710 Route 9, Space G214 | Freehold | NJ | 07728 | $ - | $ - | $2,824.30 | $2,824.30 |
| 21 | Willowbrook Mall | GGP-Willowbrook, L.P. | 2000 Willowbrook Mall, Space 1130 | Houston | TX | 77070 | $17,816.16 | $17,816.16 | $2,298.86 | $37,931.18 |
| 22 | San Francisco Centre | Emporium Development, L.L.C. | 845 Market Street, Space 309 | San Francisco | CA | 94103 | $36,422.60 | $36,422.60 | $4,699.69 | $77,544.89 |

| Store | Location | | Location | City | ST | Zip | Cure Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | March | April | May 1-4 | Total |
| 23 | Topanga Plaza | Westfield Topanga Owner LP | 6600 Topanga Canyon Blvd, Space 2036 | Canoga Park | CA | 91303 | $ - | $24,919.16 | $3,215.38 | $28,134.54 |
| 24 | Baybrook Mall | Baybrook Mall, L.P. | 500 Baybrook Mall, Space 1192 | Friendswood | TX | 77546 | $19,161.45 | $19,161.45 | $2,472.45 | $40,795.35 |
| 25 | Walden Galleria | Pyramid Management Group, Inc. | One Walden Galleria, Space TH601 | Buffalo | NY | 14225 | $ - | $ - | $2,274.78 | $2,274.78 |
| 27 | Town Square | TURNBERRYICEN TRA SUB, LLC | 6551 Las Vegas Bvld., | Las Vegas | NV | 89119 | $18,724.13 | $18,724.13 | $2,416.02 | $39,864.28 |
| 31 | Brea Mall | THE RETAIL PROPERTY TRUST (Simon Property Group) | 1014 Brea Mall | Brea | CA | 92821 | $ - | $ - | $2,597.30 | $2,597.30 |
| 33 | Cherry Creek Mall | Taubman Cherry Creek Shopping Center, L.L.C. | 3000 E First Avenue, Space 178 | Denver | CO | 80206 | $25,025.00 | $25,025.00 | $ 3,229.03 | $53,279.03 |
| 34 | The Shops at Willow Bend | Willow Bend Shopping Center Limited Partnership | 6121 W Park Blvd, Space B105 | Plano | TX | 75093 | $ - | $ - | $2,266.03 | $2,266.03 |
| 35 | Woodfield Mall | Woodfield Mall LLC | 5 Woodfield Shopping Center, Space L1705 | Schaumburg | IL | 60173 | $30,413.04 | $30,413.04 | $3,924.26 | $64,750.34 |
| 37 | Twelve Oaks | Twelve Oaks Mall, LLC | 27924 Novi Road, Space E205 | Novi | MI | 48377 | $ - | $18,056.41 | $2,329.86 | $20,386.27 |
| 38 | Stonestown Galleria | Stonestown Shopping Center, L.P. | 3251 20th Avenue, Space 212 | San Francisco | CA | 94132 | $19,883.92 | $19,883.92 | $2,565.67 | $42,333.51 |
| 39 | Westfarms | WEST FARMS MALL, LLC | 500 Westfarms Mall, Space E107 | Farmington | CT | 6032 | $ - | $23,401.87 | $3,019.60 | $26,421.47 |
| 40 | South Center | WEA Southcenter LLC | 657 Southcenter Mall, Space 1525 | Seattle | WA | 98188 | $ - | $20,468.08 | $2,641.04 | $23,109.12 |
| 41 | Kenwood Towne Center | Kenwood Mall L.L.C. | 7875 Montgomery Road, Space R014 | Cincinnati | OH | 45236 | $21,429.57 | $21,429.57 | $2,765.11 | $45,624.25 |
| 43 | Burlington Mall | Bellwether Props of Massachusetts Ltd Partnership | 75 Middlesex Turnpike, Space 1303 | Burlington | MA | 1803 | $ - | $15,287.08 | $3,570.51 | $18,857.59 |
| 44 | Alderwood Mall | Alderwood Mall LLC | 3000 184th Street SW, Space 592 | Lynwood | WA | 98037 | $18,925.15 | $18,925.15 | $2,441.95 | $40,292.25 |
| 45 | Danbury Fair Mall | Danbury Mall, LLC | 7 Backus Avenue, Space G207 | Danbury | CT | 6810 | $ - | $20,972.81 | $2,706.17 | $23,678.98 |
| 46 | Scottsdale Fashion Square | Scottsdale Fashion Square LLC | 7014 E Camelback Road | Scottsdale | AZ | 85251 | $ - | $31,329.81 | $4,042.56 | $35,372.37 |

| Store | Location | | Location | City | ST | Zip | Cure Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | March | April | May 1-4 | Total |
| 47 | Ala Moana Center | GGP Ala Moana L.L.C. | 1450 Ala Moana Blvd, Space 2316 | Honolulu | HI | 96814 | $ - | $15,287.08 | $3,570.51 | $18,857.59 |
| 48 | Mandalay Place | MGM MIRAGE | 3930 Las Vegas Blvd, Space 132B | Las Vegas | NV | 89119 | $- | $23,368.51 | $3,015.29 | $26,383.80 |
| 49 | Victoria Gardens | Forest City Commercial Management, Inc | 7825 Kew Avenue, Space 5010 | Rancho Cucamonga | CA | 91739 | $ - | $17,794.69 | $2,296.09 | $20,090.78 |
| 50 | Menlo Park | Shopping Center Associates (General Growth Properties) | 55 Parsonage Road, Space 2415 | Edison | NJ | 8837 | $ - | $17,450.59 | $3,343.19 | $20,793.77 |
| 51 | Tucson Mall | GGP-Tucson Mall L.L.C. | 4500 N Oracle Road, Space 291A | Tucson | AZ | 85705 | $19,025.98 | $19,025.98 | $2,454.97 | $40,506.93 |
| 52 | Aventura Mall | Turnberry Aventura Mall Company. Ltd. | 19575 Biscayne Blvd. Space 1019 | Aventura | FL | 33180 | $ - | $36,415.00 | $4,698.71 | $41,113.71 |
| 53 | Smith Haven Mall | Mall At Smith Haven, LLC | 142 Smith Haven Mall | Lake Grove | NY | 11755 | $ - | $14,630.72 | $3,217.42 | $17,848.14 |
| 55 | Willowbrook Mall, NJ | Willowbrook Mall, LLC | 1830 Willowbrook Mall | Wayne | NJ | 7470 | $22,827.05 | $22,827.05 | $2,945.43 | $48,599.53 |
| 56 | Brandon Town Center | Brandon Shopping Center Partners, Ltd. | 853 Brandon Town Ctr Mall | Brandon | FL | 33511 | $15,615.00 | $15,615.00 | $2,014.84 | $33,244.84 |
| 57 | Century City | Century City Mall, LLC | 10250 Santa Monica Blvd, Suite 1240 | Los Angeles | CA | 90067 | $35,607.07 | $35,607.07 | $4,594.46 | $75,808.60 |
| 58 | Mainplace | MainPlace Shoppingtown LLC | 2800 N. Main Street Ste 308 | Santa Ana | CA | 92705 | $ - | $15,300.85 | $1,974.30 | $17,275.15 |
| 59 | The Shops @ La Cantera | THE SHOPS AT LA CANTERA PHASE II | 15900 La Cantera Pkwy Space 191010 | San Antonio | TX | 78256 | $4,145.55 | $4,145.55 | $534.91 | $8,826.01 |
| 60 | Garden State | Westland Garden State Plaza Limited Partnership | One Garden State Plaza Space I-5 | Paramus | NJ | 7652 | $ - | $40,234.35 | $5,191.53 | $45,425.88 |
| 61 | Northshore | MALL AT NORTHSHORE, LLC | 210 Andover St. Space W169A | Peabody | MA | 1960 | $ - | $11,639.07 | $2,917.13 | $14,556.19 |
| 62 | Bridgewater Commons | Bridgewater Commons Mall II, LLC | 400 Commons Way Space 275 | Bridgewater | NJ | 8807 | $26,663.76 | $26,663.76 | $3,440.49 | $56,768.01 |
| 63 | Roosevelt Field | The Retail Property Trust (Simon Property Group) | 630 Old Country Rd. Space 1073A | Garden City | NY | 11530 | $ - | $26,384.86 | $5,116.84 | $31,501.70 |
| 65 | Santa Anita | Santa Anita Shoppingtown LP | 400 S. Baldwin Ave | Arcadia | CA | 91007 | $21,129 | $21,129 | $2,726 | $44,983 |

| Store | Location | | Location | City | ST | Zip | Cure Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | March | April | May 1-4 | Total |
| 66 | Bay Street | Madison Bay Street, LLC | 5616 Bay St. Space 5644 | Emeryville | CA | 94608 | $12,552.15 | $12,552.15 | $1,619.63 | $26,723.93 |
| 67 | Memorial City | Memorial City Mall, LP | 303 Memorial City Space 255 | Houston | TX | 77024 | $ - | $ - | $2,147.27 | $2,147.27 |
| 68 | Cherry Hill | Cherry Hill Center, LLC | 2000 Route 38 Space 1720 | Cherry Hill | NJ | 8002 | $16,712.93 | $16,712.93 | $2,156.51 | $35,582.37 |
| 71 | Tyson's Corner | Tysons Corner Holdings LLC | 1961 Chain Bridge Rd | McLean | VA | 22102 | $ - | $24,063.41 | $3,104.96 | $27,168.37 |
| | Home Office | Warland | 5750 Grace Place | Los Angeles | CA | 90022 | $ - | $ - | $39,672.00 | $39,672.00 |

4

## EXHIBIT B

## Cotton On Agreement

# DESIGNATION RIGHTS AGREEMENT

This Designation Rights Agreement (the "Agreement") is made as of the 22nd day of May, 2011, by and between Metropark USA, Inc. ("Seller"), and The Cotton On Group ("Purchaser").

## RECITALS

WHEREAS, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (hereinafter defined) on May 2, 2011 (the "Petition Date"). Seller's chapter 11 case (the "Bankruptcy Case") is currently pending before the United States Bankruptcy Court for the District of Southern District of New York (Case No. 11-22866 (RDD)) (the "Bankruptcy Court").

WHEREAS, Purchaser desires to purchase, and Seller desires to sell, the Designation Rights (hereinafter defined) upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in reliance upon the representations and warranties contained herein, the parties hereto covenant and agree as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the designated meanings set forth below.

1.1     "Additional Lease" means the Lease identified on Schedule 1.1 to this Agreement.

1.2     "Agency Agreement" means that certain Agency Agreement, dated as of May 4, 2011, between Seller and Agent.

1.3     "Agent" means, collectively, Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC.

1.4     "Agreement" means this Designation Rights Agreement, including any exhibits and schedules attached hereto.

1.5     "Alternative Transaction" any transaction undertaken by Seller with respect to the Designation Rights for any Lease, the Leases or any of the Leased Premises with any Person other than Purchaser or a Purchaser Affiliate.

1.6     "Applicable Lease Marketing Period" has the meaning set forth in Section 2.2(b).

1.7     "Approval Order" means an order of the Bankruptcy Court acceptable to Purchaser approving this Agreement and the transactions contemplated thereby.

1.8 "Arrearage Amount" means with respect to the Leases that are assumed and assigned pursuant to this Agreement the amount necessary to satisfy any and all rental arrearage and other payment obligations of any kind under a particular Lease, whether accrued prior or subsequent to the Petition Date, and to otherwise satisfy the requirements of Section 365 of the Bankruptcy Code, but excluding Occupancy Expenses (as defined in the Agency Agreement) payable by Agent under the Agency Agreement.

1.9 "Auction" shall have the meanings set forth in the Bid Protections Order.

1.10 "Authorized Officer" of any Person means the chief executive officer, chief restructuring officer, the president, any vice president or any secretary of such Person.

1.11 "Bankruptcy Case" has the meaning set forth in the recitals hereof.

1.12 "Bankruptcy Code" means Title 11 and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

1.13 "Bankruptcy Court" has the meaning set forth in the recitals hereof.

1.14 "Bid Protections Order" means an order of the Bankruptcy Court acceptable to Purchaser approving, among other things, the Break-Up Fee.

1.15 "Break-Up Fee" means (a) with respect to the Additional Lease, an amount equal to (i) ten percent (10%) of the Initial Payment Allocation for the Additional Lease, plus (ii) any Real Estate Occupancy Expenses paid by Purchaser on account of the Additional Lease prior to the entry of the Approval Order, and (b) with respect to the Bulk Leases, an amount equal to (i) seven and one-half percent (7.5%) of the Initial Payment Allocation for the Bulk Leases, plus (ii) any Real Estate Occupancy Expenses paid by Purchaser on account of the Bulk Leases prior to the entry of the Approval Order.

1.16 "Bulk Leases" means the Leases identified on Schedule 1.16 of this Agreement.

1.17 "Closing" has the meaning set forth in Section 3.1 hereof.

1.18 "Closing Date" means the first business day following the entry of the Approval Order.

1.19 "Deposit" means the deposit in the amount of ten percent (10%) of the Initial Payment previously delivered by Purchaser to Seller in accordance with the Letter of Intent.

1.20 "Designation Period" has the meaning set forth in Section 2.2.

1.21 "Designation Rights" has the meaning set forth in Section 2.2.

1.22 "Designee" means Purchaser's designee for each Leased Premises (it being understood that Purchaser retains the right to designate itself, a Purchaser Affiliate or the applicable landlord).

1.23 "<u>Dropout Lease</u>" has the meaning set forth in Section 2.2(c).

1.24 "<u>Effective Date</u>" has the meaning set forth in Section 3.5.

1.25 "<u>FF&E</u>" shall mean any removable furniture, fixtures and equipment owned by Seller and located at any of the Leased Premises, but excluding all components of energy management systems, HVAC systems and mechanical, electrical and plumbing systems.

1.26 "<u>Initial Payment</u>" has the meaning set forth in Section 3.1.

1.27 "<u>Initial Payment Allocation</u>" has the meaning set forth in Section 3.1.

1.28 "<u>Lease Assumption Procedures Order</u>" means an order mutually acceptable to Seller and Purchaser setting forth Lease assumption and assignment procedures to facilitate the implementation of the transactions contemplated by this Agreement.

1.29 "<u>Lease Closing</u>" has the meaning set forth in Section 3.2.

1.30 "<u>Lease Closing Conditions</u>" means, collectively, with respect to each Lease Closing, (i) the execution and delivery of the closing documents required to be executed and delivered pursuant to this Agreement, each in form and substance reasonably satisfactory to each of Purchaser and Seller; (ii) that, at the time of such Lease Closing, the representations of Seller contained in Article VI of this Agreement as to the applicable Lease are true and correct; (iii) the entry of a Lease Sale Order approving the assignment and assumption of such Lease, (iv) payment by Purchaser of the Arrearages Amount applicable to such Lease.

1.31 "<u>Lease Closing Date</u>" means, with respect to the assignment of any Lease, as soon as reasonably practicable on or after the first (1st) business day following the date that the Lease Sale Order approving such assignment has been entered; <u>provided</u> that the Lease Sale Order contains protections and findings under Section 363(m) of the Bankruptcy Code for the benefit of Designee(s) and shall be in full force and effect and shall not have been amended, reversed, vacated, modified or stayed, but not later than the fifth (5th) day following the entry of such Lease Sale Order (or such other date as Seller and Purchaser may agree).

1.32 "<u>Lease Dropout Notice</u>" has the meaning set forth in Section 2.2(c).

1.33 "<u>Leased Premises</u>" means the real property demised by each Lease including, without limitation, and along with, any improvements located thereon or forming a part thereof (notwithstanding whether Seller leases or owns such improvements).

1.34 "<u>Lease Marketing Period Termination Date</u>" means with respect to each Lease the earliest to occur of (a) the fifth (5th) day following the date upon which Purchaser delivers to the Seller a Lease Dropout Notice with respect to such Lease (the "<u>Dropout Effective Date</u>"), (b) if Purchaser has delivered to Seller a Lease Assumption Notice with respect to such Lease, the date upon which a Lease Sale Order has been entered with respect to such Lease, (c) the expiration of the Designation Period, (d) one business day (which period shall in no event be less than 24 hours) after Seller's delivery of a Vacate Notice if Purchaser does not deliver a Notice

Not to Reject, and (e) the effective date of rejection for such Lease to which the applicable landlord has agreed in writing.

1.35    "Leases" means the interest of Seller, as tenant, subtenant or otherwise, in, collectively, the Bulk Leases and Additional Lease.

1.36    "Lease Sale Order" means an order or orders of the Bankruptcy Court which may be entered from time to time approving the assumption and assignment of a Lease to a Designee containing terms mutually satisfactory to Purchaser and Seller.

1.37    "Letter of Intent" means the Letter of Intent dated May 18, 2011 delivered by Purchaser to Seller and agreed to and accepted by Seller.

1.38    "Liens" has the meaning set forth in Section 6.4.

1.39    "Non-Disturbance Agreement" means a recognition agreement, non-disturbance agreement, subordination, non-disturbance and attornment agreement or similar agreement.

1.40    "Notice Not to Reject" has the meaning set forth in Section 2.2(b).

1.41    "Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust, union, association, court, agency, government, tribunal, instrumentality, or other entity or authority.

1.42    "Purchaser Affiliate" means a Person controlling, controlled by, under common control with or affiliated with Purchaser or any member of Purchaser; "control," as so used, shall mean the ability to control the voting rights or management rights of such Person.

1.43    "REA" means a reciprocal easement agreement, an operating agreement, an agreement containing a first refusal or recapture right or a similar agreement (other than a Lease).

1.44    "Real Estate Occupancy Expenses" means, with respect to each Lease, the lesser of the per location, per diem costs related to the applicable Leased Premises set forth in Exhibit 2.2(c) and the obligations actually incurred by Seller relating to such Leased Premises with respect to the applicable period.

1.45    "Seller Party REAs" means any REA for or affecting any of the Leased Premises known to Seller and to which Seller is a party.

1.46    "Successful Bidder" shall have the meanings set forth in the Bid Protections Order.

1.47    "Vacate Notice" has the meaning set forth in Section 2.2(b).

**ARTICLE II**
**THE TRANSACTION**

2.1     Purchase and Sale of Designation Rights.

(a)     On the terms and subject to the conditions contained in this Agreement, on the Closing Date, Purchaser shall purchase from Seller, and Seller shall sell, convey, assign, transfer and deliver to Purchaser, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Designation Rights in respect of the Leases free and clear of all Liens to the fullest extent permissible pursuant to the Bankruptcy Code.

2.2     Designation Rights.

(a)     Designation Period. During the Designation Period, Purchaser shall have the sole, exclusive, and continuing right to select, identify and designate (on one or more occasions): (i) which Leases shall be assumed and assigned in connection with an assumption and assignment, and the Designee to whom such assignment shall be made (including an assignment to a landlord under a Lease which may, at Purchaser's election, involve a consensual agreement with the applicable landlord to waive prepetition rejection damages termination of a Lease in lieu of assigning the Lease to such landlord and, as to which, Seller shall, upon such election by Purchaser, take such actions as may be reasonably required to effectuate such termination) and (ii) which Leases shall become Dropout Leases as provided for in Section 2.2(c) (all of which rights are referred to herein as the "Designation Rights"). The parties agree that the sale of the Designation Rights provided for herein shall not effect a conveyance of the Leases to Purchaser except for those Leases that Purchaser will specifically designate for itself in accordance with Section 2.2(e) herein.  For the avoidance of doubt, subject to the terms and provisions of this Agreement, Purchaser shall have the right to designate as the Designee with respect to any particular Lease itself, any Purchaser Affiliate or any other party or Person. Purchaser's Designation Rights shall commence immediately upon entry of the Approval Order and shall terminate sixty (60) days thereafter, subject to earlier termination with respect to individual Lessees as provided for herein (the "Designation Period").  For the avoidance of doubt, the Designation Period shall continue past the Sale Termination Date under the Agency Agreement, and the Applicable Lease Marketing Period of any Lease may continue past the Vacate Date under the Agency Agreement applicable to the Leased Premises subject to such Lease, with Purchaser responsible for all Real Estate Occupancy Expenses with respect to such Leases for the duration of the Designation Period, as provided in paragraph 2.2(c) below.

(b)     Designation Procedure.  Promptly upon Seller's receipt of a notice to vacate any Lease pursuant to Section 6.2 of the Agency Agreement, Seller may provide written notice to Purchaser of its intention to reject such Lease (a "Vacate Notice").  Within one business day of receipt of a Vacate Notice, Purchaser shall provide Seller with written notice requesting that Seller not reject such Lease (a "Notice Not to Reject").  If Purchaser fails to provide a Notice Not to Reject to Seller, Purchaser shall be deemed to accept Seller's treatment of such Lease as a Dropout Lease, in accordance with subsection (d) below.

(c)     Parties Respective Obligations During Designation Period.

(i)     To the extent the Agent is not required to pay such expenses as an Occupancy Expense under the Agency Agreement, Purchaser shall reimburse

Seller for all actual Real Estate Occupancy Expenses paid by Seller under the Leases attributable to the period from the Closing Date through the applicable Lease Marketing Period Termination Date (as to each Lease, the "Applicable Lease Marketing Period"), on a per location, per diem basis limited to the categories and amounts set forth on Exhibit 2.2(c) hereto. Purchaser shall pay any such Real Estate Occupancy Expenses on each Wednesday of each week during the Applicable Lease Marketing Period. Except as expressly provided for in this Section 2.2(c)(i), Purchaser shall have no further obligation or liability with respect to any Lease (including any obligation to continue to pay any Real Estate Occupancy Expenses with respect thereto) upon the occurrence of the applicable Lease Marketing Period Termination Date.

(ii)     As security for the payment of obligations provided for in this Section 2.2(c)(i) (i.e., the payment of the Real Estate Occupancy Expenses), Purchaser shall deposit $150,000 (the "Security Deposit") by wire transfer of immediately available funds to Kelley, Drye & Warren LLP (the "Escrow Agent") on or before the Closing. The Escrow Agent shall hold the Security Deposit in a segregated account pursuant to an escrow agreement in form and substance mutually agreeable to the Purchaser and the Seller (the "Escrow Agreement"). Funds held pursuant to the Escrow Agreement shall be free and clear of all encumbrances, except for encumbrances pursuant to the Escrow Agreement and this Agreement.

(iii)     If Purchaser fails to pay Seller or any lessor on account of any payment obligations hereunder and such failure continues for five (5) days after written notice of such failure is given by Seller to Purchaser, then Seller may demand payment by the Escrow Agent of the Security Deposit in the amount due (and such draw shall immediately cure such failure) by delivering to the Escrow Agent and the Purchaser an officer's certificate stating that such amounts are due and payable and unpaid under this Agreement and that any required notice of default has been given and any applicable grace or cure periods have expired. Any amount so paid shall be immediately applied to the payment obligations hereunder. Purchaser shall immediately replenish the Security Deposit in the amount so paid. If Purchaser fails to replenish the Security Deposit within five (5) days after receipt of written demand to do so from Seller, then for so long as the Security Deposit remains unreplenished, Seller may immediately reject any and all Leases that have not been transferred pursuant to this Agreement, Purchaser waives any right to object to or contest any such rejections, and Purchaser shall have no further right in or to any such Lease that has been so rejected.

(iv)     During the Designation Period, Seller agrees to cooperate reasonably with Purchaser to arrange for the sale of Seller's interests in those Leases designated by Purchaser as provided for herein, and cooperate with Purchaser, its agents and any potential assignees of any of the Leases and provide reasonable access to Leased Premises subject thereto.

(d)     Dropout Rights.  At any time prior to the expiration of the Applicable Lease Marketing Period, Purchaser shall have the right, which right may be exercised at any time and from time to time in Purchaser's sole and absolute discretion, to provide written notice to the Seller (each such notice, a "Lease Dropout Notice") of Purchaser's election to discontinue its efforts to market and attempt to sell the subject Lease (a "Dropout Lease"). Upon delivery by Purchaser of a Lease Dropout Notice, upon the occurrence of the applicable Lease Marketing Period Termination Date, except as specifically provided for in Section 2.2(c)(i), Purchaser shall have no further obligation or liability with respect to the subject Dropout Lease (including any obligation to continue to pay any Real Estate Occupancy Expenses with respect thereto), and the Seller shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with the subject Leased Premises. Upon Purchaser's delivery of a Lease Dropout Notice, Seller may dispose of such Lease, and the Leased Premises subject thereto, in such manner as Seller may elect, and all proceeds realized upon a disposition of same shall be the exclusive property of Seller.  The legal costs and expenses of the rejection at any time of any one or more Leases subject to a Dropout Notice, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same, shall be borne solely by Seller and its bankruptcy estate.

(e)     Lease Assumptions.

(i)     As used in this Agreement, the term "commercially reasonable efforts" shall expressly require Seller or its bankruptcy estate to expend or incur fees, costs and expenses for the payment of attorneys and other professionals whose services may reasonably be required by Purchaser in connection with the prosecution of any motion seeking the entry of any order contemplated by this Agreement.

(ii)     A motion for approval of the Lease Assumption Procedures Order shall be filed by Seller as soon practicable following the execution of this Agreement, and Seller shall use all commercially reasonable efforts to obtain the entry of such an order.

(iii)     At any time during the Designation Period prior to the expiration of the Applicable Lease Marketing Period for each Lease, Purchaser shall have the right, which right may be exercised at any time and from time to time, to provide written notice to the Seller (each such notice, a "Lease Assumption Notice") of Purchaser's election to require the Seller to use all commercially reasonable efforts in accordance with the Lease Assumption Procedures Order to assume the Lease(s) identified in the subject Lease Assumption Notice(s) and assign same to Purchaser's Designee.  Following the date Purchaser delivers a Lease Assumption Notice to Seller, Seller shall, at no additional cost or expense to Purchaser, take all requisite actions (including, without limitation, actions required under section 365 of the Bankruptcy Code) to assume and assign the subject Lease(s) to the Designee identified by Purchaser in such Lease Assumption Notice(s) and obtain a Lease Sale Order.  Without limiting the generality of the foregoing, upon receipt of a Lease Assumption Notice, Seller

shall use all commercially reasonable efforts to obtain the entry of a Lease Sale Order approving the assumption of the subject Lease(s) and the assignment of such Lease(s) to the specified Designee within ten (10) days, subject to the availability of the Court.

(f)　　Designation Proceeds. The parties agree that Purchaser shall pay to Seller ten percent (10%) of the proceeds it receives on account of the assumption and assignment of Leases to any non-Purchaser Affiliate, and shall be entitled to retain any and all other proceeds it receives on account of the assumption and assignment of Leases; provided, however, that the amounts payable by landlords specified in Exhibit 2.2(f) shall remain the property of Seller.

2.3　　Alternative Designees. To the extent any of the Designees fail to close on the assignment of any Lease, for any reason, including, without limitation, because the Bankruptcy Court shall have sustained an objection to the assignment of a Lease as provided for herein, Purchaser shall have the right to direct Seller to use commercially reasonable efforts to assume and assign or sublease in connection with an assumption and assignment such Lease directly to an alternate Designee and Purchaser shall retain all of its respective Designation Rights under this Agreement.

2.4　　Arrearage Costs. In the event Purchaser exercises its right to cause the assumption and assignment of a Lease pursuant to Section 2.2(e), Purchaser shall pay the Arrearage Amount, if any, to the applicable landlord.

## ARTICLE III
## THE CLOSING

3.1　　Time and Place of Closing; Consideration.

(a)　　The consummation of the sale and transfer of the Designation Rights provided for in this Agreement (the "Closing") shall occur on the Closing Date, subject to satisfaction or waiver (by the party entitled to waive the conditions) of all the conditions to Closing set forth in Article IV and Article V of this Agreement.

(b)　　At the Closing, Purchaser shall deliver to Seller a payment in the amount of $525,000 (the "Initial Payment") allocated as follows (the "Initial Payment Allocation") (i) $350,000 with respect to the Bulk Leases and (ii) $175,000 with respect to the Additional Lease, less the Deposit, in immediately available funds.  The Initial Payment shall at all times remain severable and subject to the Initial Payment Allocation.  Seller shall be obligated to deliver the Initial Payment only with respect to the Leases for which it is determined to be the Successful Bidder at Auction, subject to Bankruptcy Court approval (e.g. if Purchaser is the Successful Bidder with respect only to the Bulk Leases, Purchaser's obligation hereunder shall be limited to $350,000, subject to increase at auction).  Further, any and all bid protection provided herein, is likewise subject to the Initial Payment Allocation (e.g. if Purchaser is entitled to the Breakup Fee and is not deemed the Successful Bidder with respect to only the Additional Lease, Purchaser will be entitled to a breakup fee in the amount of $17,500, subject to Bankruptcy Court approval).  The payments specified in this Section 3.1 and in Section 2.2(f) above shall be the sole payments due to Seller on account of the Designation Rights being

conveyed to Purchaser hereunder, excluding Real Estate Occupancy Expenses which may from time to time be reimbursed to the Debtor in lieu of direct payment to a particular lessor.

3.2     Time and Place of Lease Closings. The consummation of the sale and assignment of each Lease (each a "Lease Closing") shall occur on the applicable Lease Closing Date, provided, however, that such occurrence shall be subject to satisfaction of all the Lease Closing Conditions for such Lease unless any such Lease Closing Conditions are waived, in writing, by Purchaser.  Seller shall use commercially reasonable efforts to cause all of the Lease Closing Conditions with respect to each Lease Closing to be satisfied as of the applicable Lease Closing Date.  Each Lease Closing shall occur at such location as Seller and Purchaser shall agree.

3.3     Deliveries by Seller. At each Lease Closing, Seller shall deliver to Purchaser or its Designee(s) the following:

(a)     an executed assumption and assignment agreement for the applicable Lease being assigned;

(b)     an executed bill of sale conveying title to any personal property or fixtures owned by Seller that remains at the applicable Leased Premises as of the Lease Closing Date, and has not been otherwise transferred pursuant to the Agency Agreement;

(c)     a Lease Sale Order entered by the Bankruptcy Court with respect to such Lease; and

(d)     all other documents (including assignments of operating agreements affecting the applicable Leased Premises and closing statements), affidavits, instruments and writings reasonably required to be executed by Seller at or prior to the Lease Closing Date pursuant to this Agreement or otherwise required by law, or reasonably requested by Purchaser in connection herewith.

All such documents shall be, in form and substance, reasonably satisfactory to each of Seller and Purchaser. The provisions of this Section 3.3 shall survive the Closing.

3.4     Deliveries by Purchaser.  At each Lease Closing, Purchaser or Designee shall deliver to Seller:

(a)     executed counterparts of the instruments referred to in Section 3.3 which are to be executed by Designee;

(b)     all other documents (including assumptions of operating agreements affecting the applicable Leased Premises and closing statements), instruments and writings reasonably required to be delivered by Purchaser or its Designee(s) at or prior to the Lease Closing Date pursuant to this Agreement or otherwise required by law, or reasonably requested by Seller in connection herewith;

(c)     payment in full of the applicable Arrearage Amount, or waiver of any such amounts by the applicable landlord.

All such documents shall be, in form and substance, reasonably satisfactory to each of Seller and Purchaser.  The provisions of this Section 3.4 shall survive the Closing.

3.5     Closing Costs, Preparation of Documents.  Purchaser shall prepare and deliver to Seller for execution by Seller, the assignments, bills of sale, deeds, transfer tax declarations and other closing documents to be delivered in connection with each Lease Closing, all in a form reasonably acceptable to Seller, provided, however, that Seller shall, at Purchaser's sole cost and expense, reasonably cooperate with Purchaser in such preparation.

## ARTICLE IV
## CONDITIONS TO SELLER'S OBLIGATIONS

Seller's obligations to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing Date of the following conditions:

4.1     Representations and Warranties.  All representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date and Purchaser shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or on the Closing Date in all material respects.

4.2     No Injunction.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

4.3     Approval Order.  The Bankruptcy Court shall have entered the Approval Order, and the Approval Order shall be in full force and effect, and shall not have been amended, reversed, vacated, modified or stayed.

Each of the preceding conditions may be waived by Seller (except that Seller may not waive the condition requiring the entry of the Approval Order set forth in Section 4.3, above), but only if such waiver is set forth in a writing executed by Seller.

## ARTICLE V
## CONDITIONS TO PURCHASER'S OBLIGATIONS

Purchaser's obligation to consummate the transactions contemplated by this Agreement is subject, in the discretion of Purchaser, to the satisfaction at or prior to the Closing Date of each of the following conditions:

5.1     Representations and Warranties. All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date and Seller shall have performed all agreements and covenants required by this Agreement to be performed by it prior to or on the Closing Date in all material respects.

5.2     Approval Order.  The Bankruptcy Court shall have entered the Bid Protections Order and the Approval Order, and each of the Bid Protections Order and the Approval Order shall be in full force and effect, and shall not have been amended, reversed, vacated, modified or stayed.

5.3     No Injunction. No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

5.4     Agency Agreement. The Agency Agreement shall be in full force and effect.

**ARTICLE VI**
**REPRESENTATIONS, WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser as follows:

6.1     Due Incorporation, Etc.  Subject to any required approval of the Bankruptcy Court, Seller has the power and authority and all necessary governmental approvals to enter into this Agreement and all of the transactions contemplated thereby.

6.2     Authorization, No Conflicts Etc.  Subject to the entry and effectiveness of the Approval Order, this Agreement has been duly and validly executed and delivered by Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser and upon receipt of any required approval of the Bankruptcy Court) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditor's rights generally from time to time in effect and to general equitable principles.  To Seller's knowledge, subject to any required approval of the Bankruptcy Court, neither the execution and delivery of this Agreement and all documents contemplated hereunder to be executed by Seller, nor the performance of the obligations of Seller hereunder or thereunder will result in the violation of any law or any provision of the organizational documents of Seller or will conflict with any order or decree of any court or governmental instrumentality of any nature by which Seller is bound.

6.3     Consents and Approvals.  To Seller's knowledge, no consent, approval or authorization of, or declaration, filing, or registration with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except (a) for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) for consents, approvals, authorizations, declarations, filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the transactions contemplated by this Agreement.

6.4     Leases and Real Estate.

(a)     Subject to entry of the Approval Order by the Bankruptcy Court, to Seller's knowledge, Seller has with respect to the Leases, leasehold title, and valid leases as to all of the Leased Premises, free and clear of all liens, claims, mechanics liens and encumbrances to the extent permitted by the Bankruptcy Code (but excluding liens, claims,

mechanics liens and encumbrances that were created by order of the Bankruptcy Court or will be released at Closing or the applicable Lease Closing by (i) payment by Seller, (ii) to the extent authorized by order of the Bankruptcy Court, by establishment, by Seller, of an escrow for any cure thereof in an amount reasonably agreed upon between the applicable landlord and Seller or as otherwise ordered by the Bankruptcy Court, or (iii) otherwise pursuant to the Approval Order, a Lease Sale Order or any other order of the Bankruptcy Court) (collectively "Liens").

(b)     Complete and correct copies of the Leases have been made available for inspection by Purchaser and none of the Leases have been modified in any material respect except to the extent that such modifications are disclosed by the copies delivered to or made available for inspection by Purchaser.

6.5     Insurance.  To Seller's knowledge, Seller currently maintains fire and other casualty insurance upon each of the Leased Premises as required by the Leases (which Leases may permit self-insurance by Seller).

6.6     Litigation.  There is no action, suit, inquiry, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission pending, or, to the best knowledge of Seller, threatened against Seller which questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby; nor, to the best knowledge of Seller, is there any basis for any such action, proceeding or investigation.  To the best of Seller's knowledge, there are no circumstances or facts that would prevent Seller from engaging in the transactions contemplated in this Agreement.

6.7     Prepetition Rental Arrearages.  To the best of Seller's knowledge, Exhibit 6.7 correctly lists all known unpaid rent payments, tax payments and other payment obligations accrued prior to the Petition Date with respect to each Lease.  Exhibit 6.7 does not include any obligations accrued or due and owing subsequent to the Petition Date.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

7.1     Due Incorporation, Etc.  Each organization comprising Purchaser is duly organized, validly existing and in good standing under the laws of the State or Country of its formation.

7.2     Authorization, No Conflicts. Etc.  Purchaser has the power and authority, to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby have been duly authorized by all requisite (and to the extent applicable to Purchaser) corporate, partnership or limited liability company action.  This Agreement has been duly and validly executed and delivered by Purchaser and, subject to the entry and effectiveness of the Approval Order (assuming this Agreement constitutes a valid and binding obligation of Seller), this Agreement constitutes the valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable

bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditor's rights generally from time to time in effect and to general equitable principles. Neither the execution and delivery of this Agreement and all documents contemplated hereunder to be executed by Purchaser, nor the performance of the obligations of Purchaser hereunder or thereunder will result in the violation of any law or any provision of the organizational documents of Purchaser or will conflict with any order or decree of any court or governmental instrumentality of any nature by which Purchaser is bound.

7.3    <u>Consents and Approvals</u>. To Purchaser's knowledge, no consent, approval or authorization of, or declaration, filing, or registration with, any United States federal or state Governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except (a) for consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; and (b) for consents, approvals, authorizations, declarations, filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a material adverse effect on the transactions contemplated by this Agreement.

7.4    <u>Litigation</u>. There is no action, suit, inquiry, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission pending, or, to the best knowledge of Purchaser, threatened against Purchaser which questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby; nor., to the best knowledge of Purchaser, is there any basis for any such action, proceeding or investigation.  To the best of Purchaser's knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement.

## ARTICLE VIII
## COVENANTS

8.1    <u>Affirmative and Negative Covenants</u>.

(a)    Seller covenants and agrees that, after the date of this Agreement, it shall, unless otherwise agreed with Purchaser, do each of the following:

(i)    Affirmative Covenants Pending Lease Closing.

(A)    <u>Maintenance</u>. Until the applicable Vacate Date under the Agency Agreement, Seller shall, and shall cause the Agent to, maintain the subject Leased Premises in the same condition as it is today, subject only to ordinary wear and tear, and keep and perform all of its obligations under the applicable Lease, consistent with the terms of the Agency Agreement.

(B)    <u>Court Orders</u>. Seller shall use all commercially reasonable efforts to obtain the Approval Order.  Seller shall also use all commercially reasonable efforts to obtain the Lease Assumption Procedures Order and all Lease Sale Orders approving the

assumption and assignment of Leases to any Designees, as provided for in Section 2.2(e).

(ii) <u>Negative Covenants Pending Lease Closing</u>. Except as expressly permitted herein (including pursuant to this Section 8.1(a)), Seller shall not, from and after the date hereof, prior to the applicable Lease Marketing Period Termination Date, do any of the following with respect to the applicable Lease without the consent of Purchaser (whose consent shall not be unreasonably withheld or delayed):

(A) <u>Leases</u>. Renew, terminate or amend such Lease, enter into new leases or subleases or grant or voluntarily terminate any other interests in the subject Leased Premises.

(B) <u>REAs</u>. Renew, terminate or amend any existing REAs with respect to or affecting the subject Leased Premises or enter into new REAs with respect to or affecting the subject Leased Premises.

(C) <u>Non Disturbance Agreements</u>. Renew, terminate or amend any existing Non-Disturbance Agreements with respect to or affecting the subject Leased Premises or enter into new Non-Disturbance Agreements with respect to or affecting the subject Leased Premises.

(D) <u>Encumbrances</u>. Encumber, sublease or otherwise grant any Liens or other rights with respect to the subject Leased Premises.

(E) <u>Contracts</u>. Enter into any contracts or agreements affecting the Leased Premises which will be binding on Purchaser (or its Designee), in any case, from and after the execution of this Agreement.

(b) Purchaser covenants and agrees that it shall, from and after the date hereof (unless otherwise agreed with Seller), with respect to each Lease, use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance of the applicable Lease by Purchaser or its Designee. Purchaser agrees that it will promptly take, and/or cause its Designee to take, all actions reasonably required by Seller or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of the Approval Order and each additional Lease Sale Order, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to be interviewed by Seller's counsel and to testify before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Designees under the Leases.

(c)     Except as provided herein, until the applicable Lease Marketing Period Termination Date, Seller shall not, without the prior consent of Purchaser, file a lease rejection notice or motion with respect to any Lease.

8.2     <u>Title Insurance</u>.  Designees may obtain title insurance for any or all of the Leased Premises at their own discretion and at their sole cost and expense.

8.3     <u>Consents and Further Actions</u>.  Subject to the terms and conditions herein provided, Seller and Purchaser covenant and agree to use their good faith efforts to take, or cause to be taken, all reasonable action, or do, or cause to be done, all reasonable things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including without limitation, satisfying all Closing conditions and Lease Closing Conditions to be satisfied.

8.4     <u>Further Transfers and Assurances</u>.  Seller and Purchaser will execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the assignment to Designees of the Leases.

8.5     <u>Taxes, Recording Charges</u>.  If the disposition of any Lease is not found to be exempt under section 1146(a) of the Bankruptcy Code, then all transfer, documentary, sales, use, stamp, registration, conveyance, income, gains, value added or other taxes and fees arising out of the assignment of the Leases and all charges for or in connection with the recording of any document or instrument contemplated hereby shall be paid by Purchaser.  Seller and Purchaser or Designee, as required by local law, will file all necessary tax returns and other documentation in connection with the taxes and fees encompassed in this Section 8.5 relating to the assignment of Leases.

8.6     <u>Insurance</u>.  Without the prior written consent of Purchaser, Seller will not cancel any insurance policy relating to any Leased Premises or permit any such policy to expire prior to the applicable Lease Marketing Period Termination Date.

8.7     <u>Access and Cooperation</u>.  During the Designation Period, Seller shall provide Purchaser with reasonable access to such documents and information as Purchaser shall reasonably request related to the Leases, and the Leased Premises subject thereto, in connection with Purchaser's efforts to market the Leases.  Without limiting the generality of the foregoing, Seller shall provide Purchaser with (i) access to Seller's data room, (ii) all landlord and other relevant contact information for each Lease, and (iii) access to all correspondence, notices, reports and other communications concerning the Leases and the Leased Premises, currently and on a continuing basis.

8.8     <u>Extension Options</u>.  Between the date of the Closing and the applicable Lease Marketing Termination Date for each Lease, Seller shall give Purchaser at least ten business days advanced notice of the last date upon which any and all renewal and/or extension rights exercisable fur such Lease are exercisable, which notice shall indicate whether or not Seller is exercising the applicable option.

**ARTICLE IX**
**EVENTS OF DEFAULT, TERMINATION**

9.1     <u>Events of Default</u>.  The material breach of any representation, warranty or covenant herein shall constitute a breach of this Agreement.

9.2     <u>Termination; Other Remedies</u>.

(a)     This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(i)     by the mutual consent of Purchaser and Seller;

(ii)     by Purchaser, if the Bid Protections Order shall not have been approved by the Bankruptcy Court by no later than May 23, 2011;

(iii)     by Purchaser or Seller, provided such party is not in default hereunder, if either (A) the Approval Order shall not have been approved by the Bankruptcy Court by no later than May 31, 2011, or (B) the Closing does not occur within ten (10) day after the Closing Date;

(iv)     by Purchaser, if there has been a breach by Seller of any material representation, warranty or covenant in this Agreement that (a) is not curable or, if curable, has not been cured within five (5) business days following receipt by Seller of written notice of such breach from Purchaser, and (b) is not waived by Purchaser in its sole discretion;

(v)     by Seller, if there has been a breach by Purchaser of any material representation, warranty or covenant in this Agreement that (a) is not curable or, if curable, has not been cured within five (5) business days following receipt by Purchaser of written notice of such breach from Seller, and (b) is not waived by Seller in its sole discretion; or

(vi)     by Purchaser, upon the approval by the Bankruptcy Court of an Alternative Transaction for the Bulk Leases or the Additional Lease, as applicable, i.e., if the Bankruptcy Court approves an Alternative Transaction for the Bulk Leases, the Purchaser may terminate this Agreement and abandon the transaction contemplated for the Bulk Leases, and if the Bankruptcy Court approves an Alternative Transaction for the Additional Lease, the Purchaser may terminate this Agreement and abandon the transaction contemplated for the Additional Lease.

(b)     In the event that this Agreement is terminated pursuant to Section 9.2(a)(i-iv) above, Seller shall immediately return the Deposit (and all interest accrued thereon) to Purchaser, as Purchaser's sole remedy in the event of such termination.  In the event that this Agreement is terminated pursuant to Section 9.2(a)(v), Seller shall retain the Deposit, as Seller's sole remedy in the event of such termination.  In the event that this Agreement is terminated pursuant to Section 9.2(a)(vi), Seller shall immediately return the Deposit (and all

interest accrued thereon) to Purchaser and pay the applicable Break-Up Fee to Purchaser, as Purchaser's sole remedy in the event of such termination.

(c)  Upon the termination of this Agreement pursuant to Section 9.2(a), other than as set forth in Section 9.2(b), neither Seller nor Purchaser shall have any further liability to the other hereunder.  This Section 9.2(c) shall survive the termination of this Agreement.

## ARTICLE X
## LEASE ASSIGNMENT

10.1  <u>Post-Closing Lease Expenses</u>.  Except as otherwise provided in this Agreement, all obligations with respect to each Lease assigned to Designees shall be the sole responsibility of Designee from and after the Lease Closing Date with respect to such Lease.  Notwithstanding anything to the contrary in the foregoing sentence, or in any other provision of this Agreement, Designees shall not be liable for any monetary obligations or monetary liabilities relating to the Leased Premises which are attributable in any way to, or were incurred during, the period prior to the applicable Lease Closing Date, unless such Designee agrees with the Purchaser to pay the applicable Arrearage Amounts, <u>provided</u> <u>however</u>, that Designee shall be liable for any and all year-end adjustments relating to the Leased Premises whether incurred prior to or after the Lease Closing Date.

10.2  <u>Conditions to Assignment</u>.  It shall be a condition to assignment of any Lease to any Designee that Purchaser shall have paid the applicable Arrearage Amount; <u>provided</u>, <u>however</u>, that Purchaser shall not be obligated to pay any portion of the Arrearage Amount that is in dispute as of the Lease Closing Date if an escrow or other commercially reasonable arrangement with respect thereto shall have been established at or following the applicable Lease Closing pursuant to an order of the Bankruptcy Court.

## ARTICLE XI
## MISCELLANEOUS

11.1  <u>Successors and Assigns</u>.  This Agreement is made solely and specifically by and for the benefit of the parties hereto, and their respective successors and assigns.

11.2  <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission, or mailed, by certified or registered mail, return receipt requested, first class postage prepaid, or by Federal Express or some other nationally reputable overnight carrier (or when delivery is rejected or refused), to the parties at the following addresses and facsimile numbers:

If to Purchaser:

Michael Hardwick
The Cotton On Group
Tel: 61 35277 7022
E-mail: michael.hardwick@cottonon.com.au

With a copy to:

Robert L. LeHane, Esq
Kelley Drye & Warren LLP
Tel: 212-808-7573
E-mail: rlehane@kelleydrye.com

With copies to:

If to Seller:

Richard Hicks
Metropark USA
Tel: 323-622-3620
E-mail: rhicks@metroparkusa.com

with copies to:

Cathy Hershcopf, Esq.
Jeffrey L. Cohen, Esq.
Cooley LLP
Tel: (212) 479-6000
email address: chershcopf@cooley.com
               jcohen@cooley.com

or to such other place and with such other copies as any party may designate by written notice to all of the other parties provided in the manner set forth herein.

11.3   Expenses. Each party shall bear its own legal, appraisal and title costs with respect to the drafting of the agreements involved in these transactions and the closing of such transactions.

11.4   Brokerage Commissions and Fees.  Purchaser warrants and represents that no brokerage commissions or fees are due any real estate broker(s) as a result of Purchaser's acts or omissions in connection with the transactions contemplated by this Agreement, and Purchaser agrees that should any claim be made for commissions or fees by any broker(s) against Seller, Purchaser will indemnify and hold Seller free and harmless from and against any and all such claims in connection therewith to the extent the same are based upon any acts or omissions of Purchaser or its agents.  Seller warrants and represents that no brokerage commissions or fees are due any real estate broker(s) as a result of Seller's acts or omissions in connection with the transactions contemplated by this Agreement and Seller agrees that should any claim be made for commissions or fees by any broker(s) against Purchaser, unless otherwise authorized by prior order of the Bankruptcy Court, Seller will indemnify and bold Purchaser free and harmless from and against any and all such claims in connection therewith to the extent the same are based upon any acts or omissions of Seller or its agents.

11.5     Casualty and Condemnation.  If any particular Leased Premises is materially destroyed or materially damaged, or if condemnation proceedings are commenced against all or substantially all of such particular Leased Premises, all proceeds of insurance or condemnation awards shall be paid to, and retained by, Seller and such affected Leased Premises shall be excluded from this Agreement.  In the event of non-material damage or non-material condemnation to any particular Leased Premises, which damage Seller is unwilling to repair prior to the applicable Lease Closing, the applicable Lease Closing shall be unaffected thereby and any proceeds of insurance or condemnation awards shall be used to repair the Leased Premises to the same condition that the Leased Premises was in immediately prior to such casualty or condemnation.

11.6     Entire Agreement.  This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and this Agreement, including the schedules and exhibits hereto, and other documents to be delivered in connection herewith (together with such confidentiality letter), contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

11.7     Waiver.  Except as otherwise specifically provided for in this Agreement, any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an Authorized Officer of such party.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach on a future occasion.  A waiver hereunder shall be effective without an order of the Bankruptcy Court, or notice to the Bankruptcy Court or any third party, in relation to such waiver.

11.8     Amendment.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of each of the parties hereto.

11.9     Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

11.10    Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof.  The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

11.11    Headings, Gender, Etc.  The headings used in this Agreement have been inserted for convenience, do not modify the terms of this Agreement and do not constitute matter to be

construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement, and (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation." The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent and no rule of strict construction shall be applied against any Person.

11.12   Continuing Jurisdiction.  The parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

11.13   Choice of Law.  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of New York without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation or limited liability company which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction of incorporation or organization of such entity shall govern.  In the event of any litigation concerning this Agreement, proper venue shall be the Bankruptcy Court and the parties hereto consent to the jurisdiction of such court.

11.14   No Partnership or Joint Venture.  Nothing contained in this paragraph or elsewhere in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of Seller and Purchaser between the parties hereto.

11.15   No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, firm or corporation, other than the parties hereto, their affiliates and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

11.16   Employees.  Purchaser and its Designees shall not be deemed an employer with Seller or any of its affiliates or subsidiaries and Purchaser and its Designees shall have no obligation to pay wages or benefits (or to fund any pension plan) or to employ any employee of Seller or any affiliates or subsidiaries other than as part of the Real Estate Occupancy Expenses. All WARN Act or similar obligation shall be Seller's sole obligation.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK)**

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be duly executed as of the date first above written.

**SELLER:**

**METROPARK USA, INC.**

By:_____
          Name: Richard Hicks
          Title: Chief Financial Officer

**PURCHASER:**

**THE COTTON ON GROUP**

By:_____
          Name: Ashley Harwick
          Title: Director

**Schedule 1.1**
**Additional Lease**

| Store No. | Location | Street | City | State | Zip |
|---|---|---|---|---|---|
| 52 | Aventura Mall | 19575 Biscayne Blvd. Space 1019 | Aventura | FL | 33180 |

# Schedule 1.16
## Bulk Leases

| Store No. | Location | Street | City | State | Zip |
|---|---|---|---|---|---|
| 13 | Washington Square | 9681 SW Washington Square Road | Tigard | OR | 97223 |
| 45 | Danbury Fair Mall | 7 Backus Avenue, Space G207 | Danbury | CT | 6810 |
| 53 | Smith Haven Mall | 142 Smith Haven Mall | Lake Grove | NY | 11755 |
| 3 | Oakridge Mall | 925 Blossom Hill Road, Space V22 | San Jose | CA | 95123 |
| 6 | Mall of America | 108 N Garden, Bloomington | Bloomington | MN | 55425 |
| 7 | Galleria at Tyler | 2045 Galleria at Tyler | Riverside | CA | 92503 |
| 8 | Irvine Spectrum | 83 Fortune Drive, Suite 233 | Irvine | CA | 92618 |
| 9 | Fresno Fashion Fair | 639 E Shaw Avenue, Suite 173 | Fresno | CA | 93710 |
| 10 | Fashion Show | 3200 Las Vegas Blvd S, Suite 2290 | Las Vegas | NV | 89109 |
| 11 | Northpark Center | 8687 N Central Expy, Suite 2120 | Dallas | TX | 75225 |
| 12 | Beachwood Place | 26300 Cedar Road, Space 2250 | Beachwood | OH | 44122 |
| 16 | Del Amo Fashion Center | 3525 Carson Street, Suite 82 | Torrance | CA | 90503 |
| 20 | Freehold Raceway Mall | 3710 Route 9, Space G214 | Freehold | NJ | 07728 |
| 22 | San Francisco Centre | 845 Market Street, Space 309 | San Francisco | CA | 94103 |
| 24 | Baybrook Mall | 500 Baybrook Mall, Space 1192 | Friendswood | TX | 77546 |
| 25 | Walden Galleria | One Walden Galleria, Space TH150 | Buffalo | NY | 14225 |
| 27 | Town Square | 6551 Las Vegas Bvld., | Las Vegas | NV | 89119 |
| 34 | The Shops at Willow Bend | 6121 W Park Blvd, Space B105 | Plano | TX | 75093 |
| 38 | Stonestown Galleria | 3251 20th Avenue, Space 212 | San Francisco | CA | 94132 |
| 39 | Westfarms | 500 Westfarms Mall, Space E107 | Farmington | CT | 6032 |
| 40 | South Center | 657 Southcenter Mall, Space 1525 | Seattle | WA | 98188 |
| 43 | Burlington Mall | 75 Middlesex Turnpike, Space 1303 | Burlington | MA | 1803 |
| 44 | Alderwood Mall | 3000 184th Street SW, Space 592 | Lynwood | WA | 98037 |
| 46 | Scottsdale Fashion Square | 7014 E Camelback Road | Scottsdale | AZ | 85251 |
| 47 | Ala Moana Center | 1450 Ala Moana Blvd, Space 2316 | Honolulu | HI | 96814 |
| 49 | Victoria Gardens | 7825 Kew Avenue, Space 5010 | Rancho Cucamonga | CA | 91739 |
| 50 | Menlo Park | 55 Parsonage Road, Space 2415 | Edison | NJ | 8837 |
| 55 | Willowbrook Mall, NJ | 1830 Willowbrook Mall | Wayne | NJ | 7470 |
| 60 | Garden State | One Garden State Plaza Space I-5 | Paramus | NJ | 7652 |
| 63 | Roosevelt Field | 630 Old Country Rd. Space 1073A | Garden City | NY | 11530 |
| 65 | Santa Anita | 400 S. Baldwin Ave | Arcadia | CA | 91007 |
| 67 | Memorial City | 303 Memorial City Space 255 | Houston | TX | 77024 |

# Schedule 2.2(c)
## Occupancy Per Diem

| Store No. | Location | Street | City | State | Zip | Per Diem |
|---|---|---|---|---|---|---|
| 13 | Washington Square | 9681 SW Washington Square Road | Tigard | OR | 97223 | $ 857.09 |
| 45 | Danbury Fair Mall | 7 Backus Avenue, Space G207 | Danbury | CT | 6810 | 744.62 |
| 53 | Smith Haven Mall | 142 Smith Haven Mall | Lake Grove | NY | 11755 | 879.90 |
| 3 | Oakridge Mall | 925 Blossom Hill Road, Space V22 | San Jose | CA | 95123 | 677.20 |
| 6 | Mall of America | 108 N Garden, Bloomington | Bloomington | MN | 55425 | 1,159.63 |
| 7 | Galleria at Tyler | 2045 Galleria at Tyler | Riverside | CA | 92503 | 618.89 |
| 8 | Irvine Spectrum | 83 Fortune Drive, Suite 233 | Irvine | CA | 92618 | 577.44 |
| 9 | Fresno Fashion Fair | 639 E Shaw Avenue, Suite 173 | Fresno | CA | 93710 | 636.63 |
| 10 | Fashion Show | 3200 Las Vegas Blvd S, Suite 2290 | Las Vegas | NV | 89109 | 1,101.04 |
| 11 | Northpark Center | 8687 N Central Expy, Suite 2120 | Dallas | TX | 75225 | 726.75 |
| 12 | Beachwood Place | 26300 Cedar Road, Space 2250 | Beachwood | OH | 44122 | 707.35 |
| 16 | Del Amo Fashion Center | 3525 Carson Street, Suite 82 | Torrance | CA | 90503 | 592.64 |
| 20 | Freehold Raceway Mall | 3710 Route 9, Space G214 | Freehold | NJ | 07728 | 769.51 |
| 22 | San Francisco Centre | 845 Market Street, Space 309 | San Francisco | CA | 94103 | 1,264.61 |
| 24 | Baybrook Mall | 500 Baybrook Mall, Space 1192 | Friendswood | TX | 77546 | 662.33 |
| 25 | Walden Galleria | One Walden Galleria, Space TH150 | Buffalo | NY | 14225 | 600.48 |
| 27 | Town Square | 6551 Las Vegas Bvld., | Las Vegas | NV | 89119 | 631.84 |
| 34 | The Shops at Willow Bend | 6121 W Park Blvd, Space B105 | Plano | TX | 75093 | 629.37 |
| 38 | Stonestown Galleria | 3251 20th Avenue, Space 212 | San Francisco | CA | 94132 | 677.58 |
| 39 | Westfarms | 500 Westfarms Mall, Space E107 | Farmington | CT | 6032 | 806.69 |
| 40 | South Center | 657 Southcenter Mall, Space 1525 | Seattle | WA | 98188 | 712.94 |
| 43 | Burlington Mall | 75 Middlesex Turnpike, Space 1303 | Burlington | MA | 1803 | 914.96 |
| 44 | Alderwood Mall | 3000 184th Street SW, Space 592 | Lynwood | WA | 98037 | 626.23 |
| 46 | Scottsdale Fashion Square | 7014 E Camelback Road | Scottsdale | AZ | 85251 | 1,054.19 |
| 47 | Ala Moana Center | 1450 Ala Moana Blvd, Space 2316 | Honolulu | HI | 96814 | 1,279.12 |
| 49 | Victoria Gardens | 7825 Kew Avenue, Space 5010 | Rancho Cucamonga | CA | 91739 | 609.74 |
| 50 | Menlo Park | 55 Parsonage Road, Space 2415 | Edison | NJ | 8837 | 918.00 |
| 55 | Willowbrook Mall, NJ | 1830 Willowbrook Mall | Wayne | NJ | 7470 | 778.28 |
| 60 | Garden State | One Garden State Plaza Space I-5 | Paramus | NJ | 7652 | 1,383.67 |
| 63 | Roosevelt Field | 630 Old Country Rd. Space 1073A | Garden City | NY | 11530 | 1,385.18 |
| 65 | Santa Anita | 400 S. Baldwin Ave | Arcadia | CA | 91007 | 727.59 |
| 67 | Memorial City | 303 Memorial City Space 255 | Houston | TX | 77024 | 586.64 |
| 52 | Aventura Mall | 19575 Biscayne Blvd., Space 1019 | Aventura | FL | 33180 | 1,204.33 |

## EXHIBIT C

## Perry Ellis Agreement

ASSIGNOR MAY HAVE CLAIMS UNDER THE LEASES
FOR CHARGES PAID BY THE ASSIGNOR,
WHICH CLAIMS MAY BE DISPUTED.
THESE CLAIMS WILL BE RETAINED BY ASSIGNOR.

## AGREEMENT OF ASSUMPTION AND ASSIGNMENT OF LEASES
### (Stalking Horse)

THIS ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Agreement") is made as of this 20th day of May, 2011, by and among Metropark USA, Inc., a Delaware corporation ("Assignor"), and Perry Ellis Menswear, LLC, a Delaware corporation ("Assignee").

I.  The Leases

Assignor, a debtor in possession, is a tenant under certain leases for certain premises (the "Premises") identified on the schedule (the "Lease Schedule") annexed as Exhibit A hereto (the "Leases"), more specifically described in the Leases.  The landlords under the Leases are identified on Exhibit A (the "Landlords").  True copies of the Leases are as posted by the Assignor as of the date hereof at http://www.greatamerican.com/real_estate/properties/metropark /metropark_documents.html.

II.  Assignor's Bankruptcy Case

On May 2, 2011, Assignor filed a voluntary petition for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  Assignor continues to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed in Assignor's Chapter 11 case.

III.  Assignor's Assignment of the Leases

Assignee is desirous of having Assignor assign to it, pursuant to § 365(f) of the Bankruptcy Code, on the terms and conditions set forth herein, all of Assignor's right, title and interest of any kind or nature in and to the Leases including, without limitation, the right to possession.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

Pursuant to the terms and for the consideration set forth below, Assignor hereby assigns to Assignee all of its right, title, and interest in and to the Leases for the remainder of the respective Lease terms (the "Assignments") and Assignee hereby accepts the Assignments; provided, however, that any security deposit presently on account with any Landlord will either be refunded by Assignee to Assignor, or utilized by Assignor to reduce arrearages, if any, under the respective Lease and replaced to Landlords by Assignee. Assignee hereby recognizes and acknowledges that each Landlord's right to full performance of all terms, conditions, and

covenants of each Lease remains in effect on and after the effective date of the Assignment. Except to the extent otherwise agreed in writing by Assignee and any Landlord, Assignee assumes all of the terms, conditions, and covenants of each Lease as tenant under the Lease, including without limitation the benefits and burdens of the 2010 and 2011 year end adjustments, except as expressly modified hereby. Further, pursuant to § 365(f) of the Bankruptcy Code, on and after the effective date of the Assignment, Assignor and its estate shall be relieved from any liability for any breach of the Leases occurring after the effective date of the Assignment, and Assignee agrees to indemnify and hold Assignor harmless from any default in the performance of such terms, conditions and covenants occurring after the effective date of the Assignment. To the extent any Landlord and Assignor have agreed to the Cure Costs as full satisfaction of Landlord's claim for monies owed under any Lease by Assignor, payment of such amount by Assignor to Landlord together with the assumption and assignment of the respective Lease to Assignee pursuant to this Agreement shall relieve Assignee of all liability arising under the respective Lease on account of any and all claims or defaults accruing prior to the effective date of the Assignment.

     A.    <u>Consideration</u>. The total consideration to be paid by Assignee (the "<u>Purchase Price</u>") is up to $926,083.98, as follows:

     (i)    $800,000.00 in cash, payable at the Closing (as defined herein), and

     (ii)    Assignee shall pay Cure Costs to the Landlords, in an amount up to $126,083.98, based upon the Lease Schedule as set forth in paragraph C below.

Assignee has paid to Assignor a deposit equal to $138,912.59, representing fifteen percent (15%) of the Purchase Price (the "<u>Deposit</u>"). At the Closing, Assignee shall pay the balance of the Purchase Price to Assignor. The Deposit shall be paid by certified or bank check made payable to Assignor, or by wire transfer to the account of Assignor, pursuant to written wire instructions to be provided by Assignor. The Deposit shall be released and paid as directed by an order of the Bankruptcy Court approving the Assignment of the Lease to Assignee on the terms and conditions set forth herein.

     B.    <u>Closing and Effective Date of Assignment</u>. The closing of the Assignment shall take place within one (1) business day following approval by the Bankruptcy Court and the entry of the order approving the assumption and assignment and sale of the Leases to Assignee, at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036, or at such other time and place as may be designated by Assignor at its sole discretion (the "Closing"). The effective date of the Assignment shall be the date of the Closing.

     C.    <u>Bankruptcy Court Approval</u>. This Agreement is contingent upon an order of the Bankruptcy Court:

     (i)    authorizing (1) Assignor to enter into the Agreement, and (2) the assumption and assignment of the Leases pursuant hereto,

(ii)    determining any Cure Costs due to Landlords consistent herewith, and

(iii)   with no stay of any such order being in effect.

If the Bankruptcy Court does not approve this Assignment for any reason, other than a material breach of this Agreement by Assignee, or if, notwithstanding such an order of the Bankruptcy Court, Assignor fails to close within forty-five (45) days after entry of such order, then all escrowed funds shall be released to Assignee, and Assignee shall have no further claims against Assignor.

"Cure Costs" shall be determined by agreement of the Assignor, the Assignee and the respective Landlord or by order of the Bankruptcy Court in connection with and as a condition to the approval of the assumption and assignment of any Lease; Cure Costs aggregate up to $126,083.98 for the Leases as stated by the Assignor in the Lease Schedule annexed as Exhibit C; in the event of any discrepancy between the Assignor's and any Landlord's representation of the total Cure Costs, Assignee shall pay up to a 5% variance on a Lease by Lease basis as may ultimately be substantiated and approved by the Bankruptcy Court; to the extent the Cure Costs are ultimately established in an amount in excess of 5% (on a Lease by Lease basis) of the Cure Costs as stated in the Lease Schedule annexed as Exhibit C, such excess shall be paid by Assignor.

Assignor shall obtain the entry by the Bankruptcy Court of the Sale Order in form and substance reasonably satisfactory to Assignee which shall, among other things, (a) determine that (i) this Agreement was entered into by Assignor and Assignee in good faith and represents the highest or otherwise best offer for the Leases and should be approved, and (ii) Assignee is a good faith purchaser under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated; (b) authorize and direct Assignor to assign the Leases to Assignee pursuant to this Agreement and Section 363 of the Bankruptcy Code, free and clear of any liens, claims, encumbrances, security interests, pledges or other interests ("Liens") (including any and all "interests" in the Leases within the meaning of Section 363(f) of the Bankruptcy Code); (c) authorize and direct Assignor to execute, deliver, perform under, consummate and implement, the documents necessary to carry out the transactions contemplated hereby, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (d) provide that Assignee will not assume or be liable for any liabilities of Assignor; and (e) contain such other provisions as may be necessary or reasonably desirable or appropriate to give effect to the documents necessary to carry out the transactions contemplated hereby. Assignee will promptly take such actions as are reasonably requested by Assignor to obtain entry of a Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Assignee is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the purchase price was not controlled by an agreement in violation of Section 363(n) or any other section of the Bankruptcy Code.

If Assignee fails to close for any reason other than a material breach of this Agreement by Assignor, then Assignee's deposit shall become non-refundable and shall be forfeited to Assignor as liquidated damages. Assignor shall have forty-five (45) days, subject to a

Bankruptcy Court ordered extension, from the date that this Agreement is fully executed, to obtain an order from the Bankruptcy Court authorizing Assignor to enter into this Agreement and to close. If the aforesaid order is not obtained and the Closing does not occur within the aforesaid time period, all escrowed funds shall be released to Assignee and Assignee and Assignor shall have no further claims against one another.

D.     <u>Free and Clear of Liens and Encumbrances</u>. Upon entry of an order approving the assumption and assignment contemplated by this Agreement, the Leases shall be free and clear of any and all Liens, with all such Liens to attach to the proceeds paid to Assignor by Assignee.

E.     <u>Break-up Fee</u>. The parties contemplate that Assignor will seek Bankruptcy Court approval for Assignor to enter into this Agreement which will be presented as a "Stalking Horse" sale, subject to any third party's competitive bid as a higher or otherwise better offer. However, in the event that the Bankruptcy Court should approve any third party's competitive bid as a higher and better offer and Assignor thereafter closes an assignment of any Lease to such third party, then, subject to the Bankruptcy Court's approval, Assignee shall be entitled to a break-up fee in the amount of 5% of the Purchase Price ($46,304.20) plus reimbursement of Assignee's reasonable and substantiated out-of-pocket expenses incurred in connection therewith up to $40,000.00. Any Bankruptcy Court approved break-up fee shall be paid by Assignor (with the return of the Deposit) within three (3) business days after Assignor's closing with the successful third party competing bidder.

F.     <u>Adequate Assurance Data</u>. As a condition of the bidding procedures approved by the Bankruptcy Court (the "<u>Bidding Procedures</u>") and in compliance with said Bidding Procedures prior to or with the execution of this Agreement, Assignee has supplied Assignor with: (i) the full name and identity of the proposed Assignee of the Leases; (ii) a current financial statement or such other proof of financial condition of the proposed Assignee or guarantor, if any; (iii) a written statement of the proposed Assignee's expected use of the respective Premises (see paragraph G below), (iv) such other information relating to the proposed business to be conducted at the respective Premises and retail experience of the proposed Assignee, and (v) a projection of gross sales, if the respective Lease contains a percentage rent provision.

G.     <u>Use</u>. Assignee shall use the respective Premises for the retail sale of men's, women's and/or children's apparel including, but not limited to, woven and knit tops, sweaters, outerwear, t-shirts, dresses, skirts, jeans, casual pants; women's, men's and/or children's accessories including, but not limited to, jewelry, watches, hair accessories, sunglasses, hats, scarves, handbags, footwear, belts; women's and men's personal care including, but not limited to, cosmetics, fragrance, bath & body products, hair care; women's, men's and children's intimate apparel including, but not limited to, socks, panties, boxers, pajamas; miscellaneous gift items including magazines, books, novelty items, games, home décor, artwork and a limited selection of CD's and DVD's. Assignee shall not use more than 5% of the sales floor area for the sale, rental, display of books, magazines, periodicals and newspapers on tape, disk, CD-ROM and/or any other media (the "<u>Ancillary Items</u>"), and not more than 10% of the sales floor area for the sale of children's wear or footwear. The merchandise for sale at the stores, other than the Ancillary Items, shall bear the Perry Ellis, Original Penguin, and/or any other labels owned or licensed to Perry Ellis International, Inc. or any of its affiliates.

H.     Possession. Assignor agrees to provide Assignee with possession of the Premises on the Closing, subject only to an extension ordered by the Bankruptcy Court and only for good cause shown.

I.     Initial Rent. Upon the Closing, Assignee shall be responsible for, and shall pay, rent and other obligations and charges due under the Leases to the Landlords in accordance with the terms of the Leases from and after the Closing and Assignee's possession of the respective Premises.

J.     Reimbursement by Assignee. Assignee shall reimburse Assignor for any rent or other charges due under the Lease for any period subsequent to the Closing that are paid by Assignor to the respective Landlord. Any such amounts shall be reimbursed by Assignee to Assignor within two (2) days of the Closing.

K.     Commission. Any commission due and payable as a result of this Agreement shall be paid by Assignee, unless otherwise provided by prior order of the Bankruptcy Court.

L.     Miscellaneous

(1)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York and to the extent permissible and not inconsistent with the laws of the State of New York, under the laws of the state where the Premises is located. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction over any disputes hereunder, and they each hereby consent to such jurisdiction.

(2)     This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes any prior instruments, arrangements and understandings relating to the subject matter hereof, except the Leases and all amendments thereto.

(3)     Assignor may assign its rights and obligations hereunder to any trustee appointed by the Bankruptcy Court. Assignee may not assign its rights and obligations hereunder to any party without Assignor's consent and, following Bankruptcy Court approval, any assignment of this Agreement by Assignee must also be permitted by the terms of the Leases or agreed to by Landlords.

(4)     This Agreement may be executed with counterpart signature pages or in more than one counterpart, all of which shall be deemed one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to all the parties.

(5)     Assignee shall be deemed to be a party in interest for all purposes contemplated by the Bankruptcy Court and the Federal Rules of Bankruptcy Procedure in connection with the assumption and assignment of the Leases and this Agreement.  Assignor shall serve upon Assignee all notices given, or required to be given, and all papers served, or required to be served, pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure in Assignor's Chapter 11 case.

5

(6)     Assignor and Assignee shall take all reasonable efforts pending and following Closing to consummate and effectuate this Agreement and assist the other in effectuating the terms hereof, including by supplying information and documentation upon reasonable request therefor at Assignee's cost and expense.

(7)     Any notice, demand, request or other communication that any party hereto may be required or may desire to give hereunder ("Notice" or "Notices") shall be in writing and shall be given as follows: (a) by hand delivery; (b) by overnight mail via Federal Express or other reputable express courier service; (c) by facsimile transmission; or (d) email (other than for notices of default):

If to Assignor:

> Metropark USA, Inc.
> 5750 Grace Place
> Los Angeles, CA 90022
> Attention: Rick Hicks
> Email: Rick.hicks@metroparkusa.com

With a copy to:

> Cooley LLP
> 1114 Avenue of the Americas
> New York, NY 10036
> Facsimile: 212.479.6275
> Attn: Cathy Hershcopf, Esq. and Alex Velinsky, Esq.
> Email: chershcopf@cooley.com
> Email: avelinsky@cooley.com

If to Assignee:

> Perry Ellis Menswear, LLC
> c/o Perry Ellis International, Inc.
> 3000 Northwest 107th Avenue
> Miami, Florida  33172
> Facsimile:  (786) 221-8245
> Attn:  Cory Shade, Esq., General Counsel
> Email:  cory.shade@perry.com

With a copy to:

> Greenberg Traurig, LLP
> 200 Park Avenue
> New York, New York  10166
> Facsimile:  (212) 805-5546
> Attn:  Allen G. Kadish, Esq.
> Email:  kadisha@gtlaw.com

or at such other address or to such other addressee or to such other facsimile number as the party to be served with Notice shall have furnished in writing to the party seeking or desiring to serve Notice as a place for the service of Notice. Notices shall be deemed to have been received (a) on the next business day if given by overnight mail, or (b) on the same day, if given by facsimile transmission, upon receipt of successful transmission.

[Signature page follows]

IN WITNESS WHEREOF, this Assignment has been duly executed this 20th day of May, 2011.

ASSIGNOR: Metropark USA, Inc., Debtor-in-Possession

By:_____
Name: Rick Hicks
Title: Chief Financial Officer and Secretary


ASSIGNEE: Perry Ellis International, Inc. on behalf of
Perry Ellis Menswear, LLC

By:_____
Name: Cory Shade
Title: SVP & General Counsel

## **Index to Exhibits**

Exhibit A - Lease Schedule

*NY241,225,527-6*

**<u>EXHIBIT A</u>**

**Perry Ellis International, Inc.**

**SCHEDULE OF LEASES TO BE ASSUMED AND ASSIGNED, AND CURE COSTS**

| Store No. | Mall | Landlord | Cure Costs |
|---|---|---|---|
| 1 | Glendale Galleria<br>Glendale, CA | General Growth Properties | $64,839.00 |
| 4 | Valley Fair Mall<br>Santa Clara, CA | Westfield | $4,108.05 |
| 14 | Los Cerritos Center<br>Cerritos, CA | Macerich | $2,859.86 |
| 15 | Miracle Mile Shops<br>Las Vegas, NV | Related Urban Management | $3,204.89 |
| 17 | Houston Galleria<br>Houston, TX | Simon Property Group | $4,043.00 |
| 18 | Lenox Square<br>Atlanta, GA | Simon Property Group | $4,831.00 |
| 21 | Willowbrook Mall<br>Houston, TX | General Growth Properties | $37,931.18 |
| 31 | Brea Mall<br>Brea, CA | Simon Property Group | $4,267.00 |
| | | **TOTAL** | $126,083.98 |

## Exhibit ~~B~~D

## Bidding Procedures

**BIDDING PROCEDURES**

A.       Bid Deadline

1.       Metropark USA, Inc. (the "Debtor"), seeks to solicit bids for the sale of its interests in the leases (each a "Lease" and collectively, the "Leases") identified in the schedule of Leases attached as Exhibit A to the Order (the "Order") approving the Motion for Order: (A) Setting (1) Date to Conduct Auction of Debtor's Interests in Certain Real Property Leases and Intellectual Property, and (2) Hearing Date for Approval of Auction; (B) Approving Bidding Procedures and Terms of Auction; (C) Establishing Cure Amounts; (D) Authorizing Debtor to Enter into Lease Termination Agreements; (E) Approving and Authorizing Sale of Leases and Intellectual Property to Highest or Best Bidder Free and Clear of All Liens, Interests, Claims, and Encumbrances Pursuant to §§ 363(b), 363(d), and 363(m) of the Bankruptcy Code; (F) Waiving the Requirements of Federal Rules of Bankruptcy Procedure 6004(h) And 6006(d); and (G) Granting Related Relief (the "Motion") and intellectual property related to the Metropark trade name, trade dress, and other rights (the "Intellectual Property").  Pursuant to the Order, the Debtor has been authorized to enter into the Designation Rights Agreement (the "Cotton On Agreement") with The Cotton On Group ("Cotton On") attached as Exhibit C to the Order, whereby it will sell to Cotton On the right to designate which Leases shall be assumed and assigned, and to whom (collectively, and as more fully described in the Cotton On Agreement, the "Designation Rights").  The sale of the Designation Rights is subject to competitive bidding as set forth herein and final approval by the U.S Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Also pursuant to the Order, the Debtor has been authorized to enter into the Agreement of Assumption and Assignment of Leases between the Debtor and Perry Ellis Menswear, LLC ("Perry Ellis," together with Cotton on the "Stalking Horse Bidders") annexed to the Order as Exhibit C (the "Perry Ellis Agreement," together with the Cotton On Agreement, the "Stalking Horse Agreements"), pursuant to which the Debtor proposes to

assume and assign to Perry Ellis certain of the Leases (as set forth on Exhibit A to the Perry Ellis Agreement), subject to competitive bidding as set forth herein and final approval by the Bankruptcy Court.

2.    If the Debtor receives ~~more than one offer~~a Qualified Bid (as defined below) for a Lease or for some or all of the Intellectual Property, an auction (the "Auction") shall be conducted as set forth below.  In order to bid at the Auction, a bidder (the "Bidder" and collectively, the "Bidders") must submit a written bid in the form of the Required Bid Documents (as defined below) for the Designation Rights, the Leases or Intellectual Property which the bidder desires to purchase by no later than May 25, 2011 at 3:00 PM (ET) (the "Bid Deadline"). The original Required Bid Documents (defined below) must be submitted to: (i) counsel for the Debtor, Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036, Attn: Cathy Hershcopf, Esq. and Jeffrey L. Cohen, Esq.; (ii) the Debtor, Metropark USA, Inc., 5750 Grace Place, Los Angeles, CA 90022, Attn: Rick Hicks; (iii) CRG Partners Group, 7625 Wisconsin Ave. Bethesda, MD 20814, Attn: Craig Boucher; (iv) counsel to the Official Committee of Unsecured Creditors, Blakeley & Blakely LLP, 444 South Flower Street, Suite 1750, Los Angeles, CA 90017, Attn: Ronald A. Clifford, Esq.; (iv) counsel to Wells Fargo Bank, N.A., the Prepetition Senior Secured Lender: Riemer & Braunstein, LLP, Three Center Plaza, Boston, Massachusetts 02108 (Attn: Donald E. Rothman, Esq., Fax: (617) 880-3456); (v) counsel to the Second Lien Agent, Solomon Ward Seidenwurm & Smith, LLP, 401 B Street, Ste. 1200, San Diego, CA 32101 (Attn: Michael D. Breslauer, Esq.); ~~and (vi~~(vi) counsel to Cotton On, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: Robert L. LeHane, Esq.; (vi) counsel to Perry Ellis, Greenberg Traurig LLP, 200 Park Avenue, New York, New York 10166, Attn: Allen G. Kadish, Esq and (vii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Susan Golden, Esq.).

3.      Each Bidder shall be deemed to acknowledge: (a) that it had an opportunity to inspect and examine the leased premises and to review the Lease(s) and all other pertinent documents with respect to the Lease(s) and/or Intellectual Property prior to making its offer and that each such Bidder relied solely on that review and upon its own investigation and inspection of the leased premises and documentation in making its offer, (b) that it is not relying upon any written or oral statements, representations, or warranties of the Debtor, its agents or representatives; and (c) that the occupancy of the premises set forth in the Leases may not be available until July 1, 2011, or such earlier or later date as determined in the Debtor's sole discretion, based upon the length of going out of business sales in each location. The Lease(s) and Intellectual Property and other pertinent documents related to the Lease(s) and Intellectual Property will be available for inspection prior to the Auction during regular business hours at the offices of the Debtor, or alternatively, arrangements can be made with the Debtor prior to the Auction for access and data with respect to the Leases by contacting Matthew Bordwin of GA Keen Realty Advisors at 646.381.9222 or at mbordwin@greatamerican.com, and with respect to the Intellectual Property by contacting Alex R. Velinsky, Esq. at 212.479.6125 or at avelinsky@cooley.com.

B.      <u>Reservation of Rights</u>

4.      <u>Private Sale(s)</u>.  In order to maximize the value of the Leases and Intellectual Property to the Debtor's estate, the Debtor, subject in each case to the applicable Stalking Horse Agreement and the right to a Break-Up Fee thereunder, reserves the right prior to the Auction to enter into (i) an agreement of assumption and assignment of Lease(s) (the "<u>Agreement of Assumption and Assignment of Lease(s)</u>"), subject to the approval of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), for one or more of the Lease(s) with a prospective assignee(s), or in the case of a landlord bidding on a Lease to which such landlord is a party ("<u>Landlord</u>"), a reasonable short form of lease

termination agreement (the "Lease Termination Agreement") or (ii) an agreement for the sale of Intellectual Property (the "IP Sale Agreement").  The entry into such agreement shall be without further notice to any party, other than those parties required to be noticed pursuant to the Motion and the agreements.  ~~In order to maximize the value of the Intellectual Property and Leases to the estate, the Debtor reserves the right prior to the Auction to enter into either an IP Sale Agreement or an Agreement for Assumption and Assignment of Lease(s), for one or more of the Lease(s) with a prospective assignee(s), each being subject to Bankruptcy Court approval.  The entry into such agreement(s) shall be without further notice to any party, other than those parties required to be noticed pursuant to the Motion and the agreements.  As consideration for the value of a "stalking horse" bid(s), in the event that the Bankruptcy Court should determine any third party's competitive bid as a higher or otherwise better offer and the Debtor thereafter closes an IP Sale Agreement or Agreement of Assumption and Assignment of Lease(s) with an alternative third party, then, subject to the Bankruptcy Court's approval, the Debtor proposes to pay to the proposed "stalking horse" a break-up fee in an amount calculated as a percentage of its aggregate bid ("aggregate" being defined as the total consideration offered in its bid for all of the Debtor's assets subject to the bid, whether one or more Leases or Intellectual Property) in an amount customary for transactions of this size.~~

5.     In order to maximize the value of the Leases and Intellectual Property, the Debtor, subject in each case to the applicable Stalking Horse Agreement, may, after consultation with the Committee and its Prepetition Senior Secured Lender, withdraw from sale any of the Lease(s) prior to or during the Auction.  The Debtor reserves the right, after consultation with the Committee and the Prepetition Senior Secured Lender to reject any and all bids for a particular Lease and/or Intellectual Property.

C.    Required Bid Documents

     6.    All bids must include the following documents (the "Required Bid Documents"):

        a.    a written offer, on Bidder's corporate letterhead, or, if on behalf of Bidder by Bidder's legal counsel, then on Bidder's legal counsel's letterhead, for the purchase of Intellectual Property or one or more of the Leases, and if for one or more of the Leases, such offer must include the full name and identity of the proposed assignee of each individual Lease, the amount being offered for each individual Lease (if more than one Lease) in the form of an allocation schedule, the intended use of each premises covered by a Lease in Bidder's offer, evidence of adequate assurance of future performance, and any proposed changes to, as may be applicable, the Stalking Horse Agreement pertaining to such Leases or Intellectual Property, or the proposed Agreement of Assumption and Assignment of Lease, Lease Termination Agreement or an IP Sale Agreement. Such written offer for Lease(s) and/or Intellectual Property must expressly state that the Bidder's offer is irrevocable until the earlier to occur of (i) the Closing (as defined herein) or (ii) forty-five days following the Auction (unless such bid is sooner expressly rejected in writing by the Debtor) and that if it is the sSuccessful Bidder, Bidder is ready, willing and able to execute applicable Stalking Horse Agreement as so amended, or the individual Agreement of Assumption and Assignment of Lease(s) or IP Sale Agreement, if applicable, the form of which is attached hereto as Schedules 1, 2 and 3;

        b.    in the case of a real estate broker bidding on a Lease(s), as agent for a Bidder, the broker must submit the Required Bid Documents together with a letter of authorization on Bidder's corporate letterhead, executed by an authorized officer of the Bidder, stating that (i) Bidder exclusively authorizes broker to submit such offer on behalf of Bidder and that any commission or fee of any type due and payable to such broker as a result of an assignment of Lease(s) shall be paid solely by Bidder and Bidder shall indemnify Debtor, its estate, the Committee, and the Debtor's professionals in this regard, and (ii) Bidder acknowledges that it will comply with these Bid Procedures;

        c.    in the case of a Landlord bidding on a Lease(s) to which such Landlord is a party, a written offer on Landlord's corporate letterhead, or, if on behalf of Landlord by Landlord's legal counsel, then on Landlord's legal counsel's letterhead, for the purchase of one or more of the Leases that must include the gross amount offered for each individual Lease (if more than one Lease) including a breakdown identifying that portion which is payable in cash to the Debtor and that portion, if any, which is "credit bid" (in an amount not less than the total outstanding documented and verifiable pre-petition lease arrears); such written offer must expressly state that the Landlord's offer is irrevocable until the earlier to occur of (i) the Closing (as defined herein), and (ii) forty-five days following the Auction; and, that if it is the successful Bidder, Landlord is ready, willing and able to execute a reasonable short form of Lease Termination Agreement(s), and the extent to which, if any, it agrees to waive and release any and all claims it may have against the Debtor, including claims pursuant to § 502(b)(6) of the Bankruptcy Code;

> d.     a certified check for the Deposit (as defined herein);
>
> e.     in the case of "private sale" or "stalking horse" sale for Lease(s), an executed and fully completed copy, for each Lease, of the Agreement of Assumption and Assignment of Lease, the form of which is attached hereto as Schedule 1, or with respect to the Intellectual Property an executed and fully completed copy of the IP Sale Agreement, the form of which is attached hereto as Schedule 3;
>
> f.     with the exception of a Landlord bidding on its own Lease(s), written evidence of Bidder's ability to consummate the transaction and evidence of adequate assurance of future performance: (i) including, but not limited to, federal tax returns for two years and/or a current audited or review financial statement and/or bank account statements; (ii) a description of intended use; and (iii) any information that the Debtor may reasonably request. A Landlord will be deemed to have satisfied this requirement with respect to a Landlord bidding on its own Leases. The Debtor shall provide copies of such documentation to each Landlord of a Lease that the Debtor intends to assume and assign within one business day after the Auction.

7.     All bids shall remain open and irrevocable until the earlier to occur of: (i) the Closing (as defined herein) or (ii) forty-five days following the completion of the Auction.

D.     <u>Qualified Bids</u>

8.     Unless such requirement is waived by the Debtor, in consultation with the Committee and the Prepetition Secured Lenders, only Bidders that have submitted qualified bids ("<u>Qualified Bids</u>") shall be eligible to participate in the Auction. In order to be a Qualified Bid, a bid shall:

> a.     include each of the Required Bid Documents;
>
> b.     be an offer to purchase one or more of the Leases and/or Intellectual Property for cash only, except that a Landlord can "credit bid" on a Lease to which it is a party, in an amount not less than the total outstanding documented and verifiable pre- or post-petition lease arrears ("<u>Cure Amount</u>") together with the balance for cash only;
>
> c.     not be contingent on obtaining financing; and
>
> d.     be received by the Bid Deadline.

9.     In addition, to be a Qualified Bid, each Bidder must be prepared to demonstrate to the Debtor its ability to consummate the purchase of the <u>Designation Rights,</u> Lease(s) and/or

Intellectual Property, and with respect to a purchase of the Lease(s) only, demonstrate adequate assurance of future performance under the Lease(s) and otherwise fulfill its obligations under the Lease(s).

E.    Deposit Requirement

10.    Each Bidder shall tender a deposit as set forth below:

a.    Regular Bid—the deposit shall be equal to the greater of (i) ten percent (10%) of the bid amount or (ii) $7,500, for each Lease or for the Intellectual Property on which the Bidder submits a bid (the "Deposit").  In the case of a Landlord bidding on its leased premises, such Landlord shall tender a deposit equal to ten percent (10%) of the cash portion of any bid over and above Cure Amounts and any claims waiver(s).

10.    b. Private Sale Agreement or "Stalking Horse" Agreement—the deposit shall be equal to the greater of (i) fifteen percent (15%) of the bid amount, or (ii) $10,000, for each Lease or Intellectual Property on which the Bidder submits a bid (the "Deposit"Each Bidder shall tender a deposit which shall be equal to the greater of (i) ten percent (10%) of the bid amount or (ii) $7,500, for each Lease or for the Intellectual Property on which the Bidder submits a bid (the "Deposit").  In the case of a Landlord bidding on its leased premises, such Landlord shall tender a deposit equal to ten percent (10%) of the cash portion of any bid over and above Cure Amounts and any claims waiver(s).   The Deposit shall be by cashier's check payable to "Metropark USA, Inc. Debtor-in-Possession."  The Deposit of the first highest or otherwise best Bidder and the Deposit of the second highest or otherwise best Bidder for each asset shall be held in escrow (without interest) until the earlier to occur of (i) the Closing, and (ii) forty-five days after the Auction.  The Debtor shall return the Deposits of all other Bidders within ten business days of the Auction.  In the case of a Landlord bidding on a Lease(s) to which such Landlord is a party, the respective Cure Amount, if any, shall be deemed part of the Deposit.   In the event that such Cure Amount is approximately equal to or greater than the Deposit required, then such Cure Amount shall be deemed the Deposit, and no other deposit shall be required.

7

11.    ~~In~~Except as set forth in the Stalking Horse Agreements with respect to the Break-Up Fees, in the event the Debtor does not consummate a sale of its interest in a Lease and/or the Intellectual Property for any reason (other than the Bidder's failure to consummate a sale of the Lease), the Debtor's sole obligation and liability to the Bidder shall be to refund the Deposit to the Bidder with respect to such Lease and/or Intellectual Property.

12.    No Lease shall be deemed to have been assumed and assigned by the Debtor pursuant to the procedures described herein unless (a) the Bankruptcy Court has approved such assumption and assignment at a hearing (the "Sale Hearing") to consider the approval of the identified assignees for the Leases to be assumed and assigned, and (b) such proposed transaction is in fact consummated.

13.    No Intellectual Property shall be deemed sold pursuant to the procedures described herein unless (a) the Bankruptcy Court has approved such sale at the Sale Hearing to consider the approval of the sale of the Intellectual Property, and (b) such proposed transaction is in fact consummated.

F.    The Auction

14.    The Auction shall occur on May 26, 2011 at 10:00 AM (ET), at the offices of Debtor's counsel, Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036, on the terms and conditions set forth in these Bidding Procedures.   Only Qualified Bids will be considered at the Auction. **ALL SALES, WHETHER AT THE AUCTION OR A PRIVATE SALE, SHALL BE SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT**.

15.    The terms and procedures governing the Auction are as follows:

a.    In the event the Debtor receives only a single Qualified Bid for Intellectual Property or a particular Lease(s), such Intellectual Property or Lease(s) may not be subject to bidding at the Auction, and the Debtor may seek to sell such Intellectual Property or assume and assign such Lease(s) at the Sale Hearing, if such Qualified Bid is otherwise acceptable to the Debtor, after consultation with the Committee and the Prepetition Senior Secured Lender.   In the event the Debtor receives multiple Qualified Bids for Intellectual Property or a particular Lease, such Intellectual Property or Lease, unless previously sold, otherwise

disposed of, or withdrawn, will be offered for sale at the Auction, either in bulk or separately.

b.      A minimum Qualified Bid amount for, the Designation Rights, Intellectual Property or each Lease may be announced and/or posted prior to the Auction. Such minimum Qualified Bid amounts may be established based upon a variety of factors, including: the highest bids received prior to the Auction, the amounts allocated to a Lease(s) that is the subject of a ~~"stalking horse" agreement(s)~~Stalking Horse Agreement, the impact on the estate if a Lease(s) that is the subject of a ~~"stalking horse" agreement(s)~~Stalking Horse Agreement were sold to a third party (including the payment of any Break-Up Fee), the establishment of appropriate Cure Amounts, if any, arising under § 365 of the Bankruptcy Code, as they pertain to a Lease(s) together with the estimated related assignment transaction costs so as to make an assignment of a Lease(s) economically viable, negotiations and communications with prospective purchasers during the marketing process, and the Debtor's professionals' general experience in auctioning real estate assets so as to maximize value.  All bidding shall be in increments determined by the Debtor, after consultation with the Committee and the Prepetition Senior Secured Lender.

c.      The Debtor intends to sell its ~~interest~~Leases and Intellectual Property to the Bidder(s) making the highest or best Qualified Bid at the Auction for the Designation Rights, Intellectual Property ~~and~~or each Lease.  Formal acceptance of a bid will not occur unless and until the Bankruptcy Court enters ~~an order~~one or more orders approving and authorizing the Debtor to consummate the sale of Designation Rights, Intellectual Property or assumption and assignment of the Lease(s) to such Bidder or its designated assignee.

d.      At the conclusion of the Auction, the Debtor, after consultation with the Committee and the Prepetition Senior Secured Lender, will announce for Intellectual Property and each Lease which bid is the highest or otherwise best bid (the "Successful Bidder") and which bid is the second highest or otherwise best bid.  The Successful Bidder shall supplement its Deposit within one business day so that, to the extent necessary, such Deposit equals fifteen percent (15%) of its bid.

e.      The Debtor reserves the right, following consultation with the Committee and the Prepetition Senior Secured Lender, to (i) determine which Bid, if any, for any or all of the Designation Rights, Intellectual Property ~~and~~or Leases is the highest or otherwise best Bid and (ii) reject at any time prior to entry of an order of the Bankruptcy Court approving a Bid, any offer which the Debtor, at its sole discretion, deems to be (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules or the terms and conditions of sale set forth herein, or (iii) contrary to the best interests of the Debtor, its estate, and its creditors. The Debtor will have no obligation to accept or submit for Bankruptcy Court approval any offer presented at the Auction except such written offers as may have been accepted by the Debtor.

9

G.     The Closing

16.     Except as otherwise expressly approved by the Debtor, the closing of the sale of Designation Rights, Intellectual Property and/or a Lease and thepursuant to any of the Stalking Horse Agreements or an Assumption and Assignment Agreement shall take place at the offices of Debtor's counsel within one business day following the entry of an order by the Bankruptcy Court approving the sale of the Designation Rights or the assumption and assignment of the Lease to the Successful Bidder (the "Closing").  The Sale Hearing before the Bankruptcy Court to approve the sale of Designation Rights, Intellectual Property andor the assumption and assignment of the Leases under § 365 of the Bankruptcy Code is scheduled for May 31, 2011 __:00 _M (ET).  With respect to the Closing, time of performance by the Successful Bidder(s) is of the essence.  Upon failure to consummate a sale of some or all of the Designation Rights, Intellectual Property and/or the Lease(s) because of a breach or failure on the part of the Successful Bidder(s) with respect to such Lease(s), the Debtor shall retain the Deposit as liquidated damages, and the next highest or otherwise best Qualified Bidder, as disclosed at the Sale Hearing with respect to some or all of such Designation Rights, Intellectual Property and/or Lease(s), shall be deemed the Successful Bidder and shall consummate the sale of the Lease(s) without further order of the Bankruptcy Court.

17.     The balance of the purchase price shall be paid by theeach Successful Bidder by wire transfer or an endorsed bank or certified check at the Closing.

18.     All adjustments to be made in connection with the Closing including, without limitation, adjustments, if any, for rent under a Lease, shall be made as of midnight of the date immediately prior to the date of Closing (the "Adjustment Date").  Any adjustments attributable to escalation or pass-through charges which would be billed after the Adjustment Date shall be made based upon the most recent billing received by the Debtor for such charges.  The Successful Bidder shall be liable for all obligations with respect to a Lease from the Adjustment

Date forward including, but not limited to, any year-end adjustments, and shall indemnify the Debtor with respect thereto and unless otherwise agreed the Debtor shall be liable for all obligations accrued prior to the Adjustment Date.

H.    <u>Miscellaneous Terms of Sale</u>

19.    Any sale, assignment or other disposition of each of the Designation Rights, Leases and/or Intellectual Property shall be without representations or warranties of any kind, nature, or description by the Debtor, its agents, or representatives.  The Designation Rights, Intellectual Property and each of the Leases shall be transferred "as is" and "where is."

20.    All of the Debtor's rights, title, and interest in and to the ~~Leases and~~Designation Rights, Intellectual Property and/or Leases shall be assigned and sold pursuant to §sections 363 and/or 365~~(f)~~ of the Bankruptcy Code free and clear of all liens, claims, encumbrances and security interests, subject to the rights granted to the Agent under the Agency Agreement to use certain Intellectual Property, which shall attach to the net proceeds received by the Debtor as a result of the sale with the same force and effect that they now have, subject to further order of the Bankruptcy Court.

21.    Unless otherwise indicated by the Debtor at the Auction, or as expressly set forth in the Stalking Horse Agreements, sales of the Designation Rights or Leases shall not include personal property, inventory, fixtures, trade fixtures, or other furnishings or equipment located in the premises whether or not owned by the Debtor.  The Debtor reserves the right either to sell such personal property to ~~the~~a Successful Bidder or to any other party, to abandon any or all of the personal property located at each of the locations, or to make such other arrangements as may be appropriate in accordance with the Order signed on May 9, 2011 Pursuant to Sections 105(a), 365 and 554(a) of the Bankruptcy Code for Authorization to Establish Procedures for the Rejection of Executory Contracts and Unexpired Leases and Abandonment of Related Personal Property (Doc. No. 63) or the order approving the Emergency Motion of the Debtor for Entry of

an Order Pursuant to Sections 105, 363, 364, 365 and 554 (I) Approving Assumption of Agency Agreement, (II) Approving Store Closing Sales, (III) Approving Break-up Fee (IV) Authorizing the Debtor to Abandon Property and (V) Granting Related Relief (the "Sale Order") (Doc. No. 59).

22.     All sales, transfer and recording taxes, stamp taxes or similar taxes, if any, relating to the sale of Designation Rights, Intellectual Property or the assignment of the Leases or the sale of personal property of the Debtor in connection therewith shall be the sole responsibility of the applicable Successful Bidder and shall be paid to the Debtor at the Closing of each transaction.

23.     The Debtor, after consultation with the Committee and the Prepetition Senior Secured Lender, at or before the Auction, may, subject in each case to the applicable Stalking Horse Agreement, impose or modify the terms and conditions herein as they determine to be in the best interests of the Debtor, its estate, creditors, and other parties in interest.  The Debtor, after consultation with the Committee and the Prepetition Senior Secured Lender, may, subject in each case to the applicable Stalking Horse Agreement, revise the procedures herein without Bankruptcy Court approval to maximize the value of the assets.

**Schedule 1**

ASSIGNOR MAY HAVE CLAIMS UNDER THE LEASE
FOR CHARGES PAID BY THE ASSIGNOR,
WHICH CLAIMS MAY BE DISPUTED.
THESE CLAIMS WILL BE RETAINED BY ASSIGNOR.

## AGREEMENT OF ASSUMPTION AND ASSIGNMENT OF LEASE
### (Stalking Horse)

THIS ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Agreement") is made as of this _____ day of _____, 2011, by and among Metropark USA, Inc., a Delaware corporation ("Assignor"), and _____ ("Assignee").

I.    The Lease

Assignor, a debtor in possession, is a tenant under a lease dated as of _____ (the "Lease") for the premises located at _____ and more specifically described in the Lease (the "Premises"). A copy of the Lease is attached hereto as Exhibit A. The landlord under the Lease is _____ ("Landlord").

II.    Assignor's Bankruptcy Case

On May 2, 2011, Assignor filed a voluntary petition for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Assignor continues to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed in Assignor's Chapter 11 case.

III.    Assignor's Assignment of the Lease

Assignee is desirous of having Assignor assign to it, pursuant to § 365(f) of the Bankruptcy Code, on the terms and conditions set forth herein, all of Assignor's right, title and interest of any kind or nature in and to the Lease including, without limitation, the right to possession.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

Pursuant to the terms and for the consideration set forth below, Assignor hereby assigns to Assignee all of its right, title, and interest in and to the Lease for the remainder of the Lease term (the "Assignment") and Assignee hereby accepts the Assignment; provided, however, that any security deposit presently on account with Landlord will either be refunded by Assignee to Assignor, or utilized by Assignor to reduce arrearages, if any, under the Lease and replaced to Landlord by Assignee. Assignee hereby recognizes and acknowledges that Landlord's right to full performance of all terms, conditions, and covenants of the Lease remains in effect on and after the effective date of the Assignment. Except to the extent otherwise agreed in writing by Landlord, Assignee assumes all of the terms, conditions, and covenants of the Lease as tenant under the Lease. Further, pursuant to § 365(f) of the Bankruptcy Code, on and after the effective date of the Assignment, Assignor and its estate shall be relieved from any liability for any breach of the Lease occurring after the effective date of the Assignment, and Assignee

agrees to indemnify and hold Assignor harmless from any default in the performance of such terms, conditions and covenants occurring after the effective date of the Assignment. To the extent Landlord and Assignor have agreed to the cure amount as full satisfaction of Landlord's claim for monies owed under the Lease by Assignor, payment of such amount by Assignor to Landlord together with the assumption and assignment of the Lease to Assignee pursuant to this Agreement shall relieve Assignee of all liability arising under the Lease on account of any and all claims or defaults accruing prior to the effective date of the Assignment.

     A.    <u>Consideration</u>. The total consideration to be paid by Assignee to Assignor (the "<u>Purchase Price</u>") is _____ payable at the Closing (as defined herein). Upon execution of this Agreement, Assignee shall pay to Assignor a deposit equal to the greater of fifteen percent (15%) of the Purchase Price or $10,000. At the Closing, Assignee shall pay the balance of the Purchase Price to Assignor. Said deposit and balance shall be paid by certified or bank check made payable to Assignor, or by wire transfer to the account of Assignor, pursuant to written wire instructions to be provided by Assignor. Said funds are to be released and paid as directed by an order of the Bankruptcy Court approving the Assignment of the Lease to Assignee on the terms and conditions set forth herein.

     B.    <u>Closing and Effective Date of Assignment</u>. The closing of an Assignment shall take place within one (1) business day following approval by the Bankruptcy Court and the entry of the order approving the assumption and assignment and sale of the Lease to Assignee, at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036, or at such other time and place as may be designated by Assignor at its sole discretion (the "<u>Closing</u>"). The effective date of the Assignment shall be the date of the Closing.

     C.    <u>Bankruptcy Court Approval</u>. This Agreement is contingent upon Assignor obtaining an order of the Bankruptcy Court authorizing: (1) Assignor to enter into the Agreement and, (2) the assumption and assignment of the Lease pursuant hereto. If the Bankruptcy Court does not approve this Assignment for any reason, other than a material breach of this Agreement by Assignee, then all escrowed funds shall be released to Assignee, and Assignee shall have no further claims against Assignor.

     If Assignee fails to close for any reason other than a material breach of this Agreement by Assignor, then Assignee's deposit shall become non-refundable and shall be forfeited to Assignor as liquidated damages. Assignor shall have forty-five (45) days, subject to a Bankruptcy Court ordered extension, from the date that this Agreement is fully executed to obtain an order from the Bankruptcy Court authorizing Assignor to enter into this Agreement. If the aforesaid order is not obtained within the aforesaid time period, all escrowed funds shall be released to Assignee and Assignee and Assignor shall have no further claims against one another.

     D.    <u>Free and Clear of Liens and Encumbrances</u>. Upon entry of an order approving the assumption and assignment contemplated by this Agreement, the Lease shall be free and clear of any liens, security interests, pledges or other interests, all such interests to attach to the proceeds paid to Assignor by Assignee.

     E.    <u>Break-up Fee</u>. The parties contemplate that Assignor will seek Bankruptcy Court approval for Assignor to enter into this Agreement which will be presented as a "Stalking Horse" sale, subject to any third party's competitive bid as a higher or otherwise better offer. However, in the event that the Bankruptcy Court should approve any third party's competitive bid as a higher and better offer and Assignor thereafter closes an assignment of the Lease to such third

party, then, subject to the Bankruptcy Court's approval, Assignee shall be entitled to a break-up fee in the amount of $_____ hereunder. Any Bankruptcy Court approved break-up fee shall be paid by Assignor within three (3) business days after Assignor's closing with the successful third party competing bidder.

F.     Adequate Assurance Data.  As a condition of the bidding procedures approved by the Bankruptcy Court (the "Bidding Procedures") and in compliance with said Bidding Procedures, prior to or with the execution of this Agreement, Assignee has supplied Assignor with: (i) the full name and identity of the proposed Assignee of the Lease; (ii) a current financial statement or such other proof of financial condition of the proposed Assignee or guarantor, if any; (iii) a written statement of the proposed Assignee's expected use of the Premises, (iv) such other information relating to the proposed business to be conducted at the Premises and retail experience of the proposed Assignee, and (v) a projection of gross sales, if the Lease contains a percentage rent provision.

G.     Use.  Assignee shall use the Premises for such purposes as are authorized under the Lease or applicable law. More specifically, Assignee's intended use is _____ _____ ___.

H.     Possession.  Assignor agrees to provide Assignee with possession of the Premises on the Closing, subject only to an extension ordered by the Bankruptcy Court.

I.     Initial Rent.  Upon the Closing, Assignee shall be responsible for, and shall pay, rent and other obligations and charges due under the Lease to Landlord in accordance with the terms of the Lease from and after the Closing.

J.     Reimbursement by Assignee.  Assignee shall reimburse Assignor for any rent or other charges due under the Lease for any period subsequent to the Closing that are paid by Assignor to Landlord. Any such amounts shall be reimbursed by Assignee to Assignor within two (2) days of the Closing.

K.     Commission.  Any commission due and payable as a result of this Agreement shall be paid by Assignee, unless otherwise provided by prior order of the Bankruptcy Court.

L.     Miscellaneous

(1)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York and to the extent permissible and not inconsistent with the laws of the State of New York, under the laws of the state where the Premises is located.  The parties agree that the Bankruptcy Court shall have exclusive jurisdiction over any disputes hereunder, and they each hereby consent to such jurisdiction.

(2)     This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes any prior instruments, arrangements and understandings relating to the subject matter hereof, except the Lease and all amendments thereto.

(3)     Assignor may assign its rights and obligations hereunder to any trustee appointed by the Bankruptcy Court.  Assignee may not assign its rights and obligations

hereunder to any party without Assignor's consent and, following Bankruptcy Court approval, any assignment of this Agreement by Assignee must also be permitted by the terms of the Lease or agreed to by Landlord.

(4)    This Agreement may be executed with counterpart signature pages or in more than one counterpart, all of which shall be deemed one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to all the parties.

(5)    Any notice, demand, request or other communication that any party hereto may be required or may desire to give hereunder ("Notice" or "Notices") shall be in writing and shall be given as follows: (a) by hand delivery; (b) by overnight mail via Federal Express or other reputable express courier service; (c) by facsimile transmission; or (d) email (other than for notices of default):

If to Assignor:

        Metropark USA, Inc.
        5750 Grace Place
        Los Angeles, CA 90022
        Attention: Rick Hicks
        Email. Rick.hicks@metroparkusa.com

With a copy to:

        Cooley LLP
        1114 Avenue of the Americas
        New York, NY 10036
        Facsimile: 212.479.6275
        Attn: Cathy Hershcopf, Esq.
        Email: chershcopf@cooley.com

If to Assignee:

        _____
        _____
        _____

With a copy to:

        _____
        _____
        _____

or at such other address or to such other addressee or to such other facsimile number as the party to be served with Notice shall have furnished in writing to the party seeking or desiring to serve Notice as a place for the service of Notice.  Notices shall be deemed to have been received (a) on the next business day if given by overnight mail, or (b) on the same day, if given by facsimile transmission, upon receipt of successful transmission.

IN WITNESS WHEREOF, this Assignment has been duly executed this _____ day of _____, 2011.

ASSIGNOR:   Metropark USA, Inc., Debtor-in-Possession

By:_____
Name: Rick Hicks
Title:   Chief Financial Officer and Secretary

ASSIGNEE:   _____

By:_____
Name:
Title:

1719900_1724298_ v31/NY

**Schedule 2**

```
┌─────────────────────────────────────────────────┐
│   ASSIGNOR MAY HAVE CLAIMS UNDER THE LEASE       │
│      FOR CHARGES PAID BY THE ASSIGNOR,           │
│        WHICH CLAIMS MAY BE DISPUTED.             │
│   THESE CLAIMS WILL BE RETAINED BY ASSIGNOR.     │
└─────────────────────────────────────────────────┘
```

## AGREEMENT OF ASSUMPTION AND ASSIGNMENT OF LEASE
### (Non Stalking Horse)

THIS ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Agreement") is made as of this ____ day of _____, 2011, by and among Metropark USA, Inc., a Delaware corporation ("Assignor"), and _____ ("Assignee").

### I.     The Lease

Assignor, a debtor in possession, is a tenant under a lease dated as of _____ (the "Lease") for the premises located at _____ and more specifically described in the Lease (the "Premises"). A copy of the Lease is attached hereto as Exhibit A. The landlord under the Lease is _____ ("Landlord").

### II.    Assignor's Bankruptcy Case

On May 2, 2011, Assignor filed a voluntary petition for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Assignor continues to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed in Assignor's Chapter 11 case.

### III.   Assignor's Assignment of the Lease

Assignee is desirous of having Assignor assign to it, pursuant to § 365(f) of the Bankruptcy Code, on the terms and conditions set forth herein, all of Assignor's right, title and interest of any kind or nature in and to the Lease including, without limitation, the right to possession.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

Pursuant to the terms and for the consideration set forth below, Assignor hereby assigns to Assignee all of its right, title, and interest in and to the Lease for the remainder of the Lease term (the "Assignment") and Assignee hereby accepts the Assignment; provided, however, that any security deposit presently on account with Landlord will either be refunded by Assignee to Assignor, or utilized by Assignor to reduce arrearages, if any, under the Lease and replaced to Landlord by Assignee. Assignee hereby recognizes and acknowledges that Landlord's right to full performance of all terms, conditions, and covenants of the Lease remains in effect on and after the effective date of the Assignment. Except to the extent otherwise agreed in writing by Landlord, Assignee assumes all of the terms, conditions, and covenants of the Lease as tenant under the Lease. Further, pursuant to § 365(f) of the Bankruptcy Code, on and after the effective date of the Assignment, Assignor and its estate shall be relieved from any liability for any breach of the Lease occurring after the effective date of the Assignment, and Assignee

agrees to indemnify and hold Assignor harmless from any default in the performance of such terms, conditions and covenants occurring after the effective date of the Assignment.

To the extent Landlord and Assignor have agreed to the cure amount as full satisfaction of Landlord's claim for monies owed under the Lease by Assignor, payment of such amount by Assignor to Landlord together with the assumption and assignment of the Lease to Assignee pursuant to this Agreement shall relieve Assignee of all liability arising under the Lease on account of any and all claims or defaults accruing prior to the effective date of the Assignment.

A. <u>Consideration</u>. The total consideration to be paid by Assignee to Assignor (the "<u>Purchase Price</u>") is _____ payable at the Closing (as defined herein). Upon execution of this Agreement, Assignee shall pay to Assignor a deposit equal to the greater of (i) ten percent (10%) of the Purchase Price or (ii) $7,500. At the Closing, Assignee shall pay the balance of the Purchase Price to Assignor. Said deposit and balance shall be paid by certified or bank check made payable to Assignor, or by wire transfer to the account of Assignor, pursuant to written wire instructions to be provided by Assignor. Said funds are to be released and paid as directed by an order of the Bankruptcy Court approving the Assignment of the Lease to Assignee on the terms and conditions set forth herein.

B. <u>Closing and Effective Date of Assignment</u>. The closing of the Assignment shall take place within one (1) business day following approval by the Bankruptcy Court and the entry of the order approving the assumption and assignment and sale of the Lease to Assignee, at the offices of Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 or at such other time and place as may be designated by Assignor at its sole discretion (the "<u>Closing</u>"). The effective date of the Assignment shall be the date of the Closing.

C. <u>Bankruptcy Court Approval</u>. This Agreement is contingent upon Assignor obtaining an order of the Bankruptcy Court authorizing: (1) Assignor to enter into the Agreement and, (2) the assumption and assignment of the Lease pursuant hereto. If the Bankruptcy Court does not approve this Assignment for any reason, other than a material breach of this Agreement by Assignee, then all escrowed funds shall be released to Assignee, and Assignee shall have no further claims against Assignor.

If Assignee fails to close for any reason other than a material breach of this Agreement by Assignor, then Assignee's deposit shall become non-refundable and shall be forfeited to Assignor as liquidated damages. Assignor shall have forty-five (45) days, subject to a Bankruptcy Court ordered extension, from the date that this Agreement is fully executed to obtain an order from the Bankruptcy Court authorizing Assignor to enter into this Agreement. If the aforesaid order is not obtained within the aforesaid time period, all escrowed funds shall be released to Assignee and Assignee and Assignor shall have no further claims against one another.

D. <u>Free and Clear of Liens and Encumbrances</u>. Upon entry of an order approving the assumption and assignment contemplated by this Agreement, the Lease shall be free and clear of any liens, security interests, pledges or other interests, all such interests to attach to the proceeds paid to Assignor by Assignee.

E. <u>Adequate Assurance Data</u>. As a condition of the bidding procedures approved by the Bankruptcy Court (the "<u>Bidding Procedures</u>") and in compliance with said Bidding Procedures, prior to or with the execution of this Agreement, Assignee has supplied Assignor with: (i) the full name and identity of the proposed Assignee of the Lease; (ii) a current financial

statement or such other proof of financial condition of the proposed Assignee or guarantor, if any; (iii) a written statement of the proposed Assignee's expected use of the Premises, (iv) such other information relating to the proposed business to be conducted at the Premises and retail experience of the proposed Assignee, and (v) a projection of gross sales, if the Lease contains a percentage rent provision.

F.    Use.  Assignee shall use the Premises for such purposes as are authorized under the Lease or applicable law. More specifically, Assignee's intended use is: _____ _____ ____.

G.    Possession.   Assignor agrees to provide Assignee with possession of the Premises on the Closing, subject only to an extension ordered by the Bankruptcy Court.

H.    Initial Rent.  Upon the Closing, Assignee shall be responsible for, and shall pay, rent and other obligations and charges due under the Lease to Landlord in accordance with the terms of the Lease from and after the Closing.

I.    Reimbursement by Assignee.  Assignee shall reimburse Assignor for any rent or other charges due under the Lease for any period subsequent to the Closing that are paid by Assignor to Landlord. Any such amounts shall be reimbursed by Assignee to Assignor within two (2) days of the Closing.

J.    Commission.  Any commission due and payable as a result of this Agreement shall be paid by Assignee, unless otherwise provided by prior order of the Bankruptcy Court.

K.    Miscellaneous

(1)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York and to the extent permissible and not inconsistent with the laws of the State of New York, under the laws of the state where the Premises is located. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction over any disputes hereunder, and they each hereby consent to such jurisdiction.

(2)    This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes any prior instruments, arrangements and understandings relating to the subject matter hereof, except the Lease and all amendments thereto.

(3)    Assignor may assign its rights and obligations hereunder to any trustee appointed by the Bankruptcy Court. Assignee may not assign its rights and obligations hereunder to any party without Assignor's consent and, following Bankruptcy Court approval, any assignment of this Agreement by Assignee must also be permitted by the terms of the Lease or agreed to by Landlord.

(4)    This Agreement may be executed with counterpart signature pages or in more than one counterpart, all of which shall be deemed one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to all the parties.

(5)     Any notice, demand, request or other communication that any party hereto may be required or may desire to give hereunder ("Notice" or "Notices") shall be in writing and shall be given as follows: (a) by hand delivery; (b) by overnight mail via Federal Express or other reputable express courier service; (c) by facsimile transmission; or (d) email (other than for notices of default):

If to Assignor:

     Metropark USA, Inc.
     5750 Grace Place
     Los Angeles, CA 90022
     Attention: Rick Hicks

With a copy to:

     Cooley LLP
     1114 Avenue of the Americas
     New York, NY 10036
     Facsimile: 212.479.6275
     Attn: Cathy Hershcopf, Esq.

If to Assignee:

     _____
     _____
     _____

With a copy to:

     _____
     _____
     _____

or at such other address or to such other addressee or to such other facsimile number as the party to be served with Notice shall have furnished in writing to the party seeking or desiring to serve Notice as a place for the service of Notice.  Notices shall be deemed to have been received (a) on the next business day if given by overnight mail, or (b) on the same day, if given by facsimile transmission, upon receipt of successful transmission.

IN WITNESS WHEREOF, this Assignment has been duly executed this _____ day of _____, 2011.

        ASSIGNOR:   Metropark USA, Inc., Debtor-in-Possession


        By:_____
        Name: Rick Hicks
        Title:   Chief Financial Officer and Secretary

ASSIGNEE: _____

       By:_____
       Name:
       Title:

**Schedule 3**

IP Sale Agreement

**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT (the "Agreement") is entered into by and between METROPARK USA, INC., a Delaware Corporation, as debtor in possession in that certain Bankruptcy Case pending in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court"), entitled In re: Metropark USA, Inc., Case No. 11-22866 (RDD) (the "Seller") and _____ (the "Buyer"), this __th day of _____, 2011, in contemplation of the following facts.

RECITALS

A.      The Seller filed a Voluntary Petition for Relief under Chapter 11, Title 11, United States Code (the "Bankruptcy Code") on May 2, 2011. The Seller is the Debtor In Possession in the Bankruptcy Case commenced by the filing of the Voluntary Petition, In re: Metropark USA, Inc., Case No. 11-22866 (RDD) (the "Bankruptcy Case").

B.      Pursuant to order of the Bankruptcy Court, the Seller is conducting liquidation or going out of business sales in its retail locations (the "GOB Sales").

C.      Buyer wishes to purchase and Seller wishes to sell the Seller's right, title and interest in certain intellectual property and related personal property specifically identified on **Exhibit "1"** attached hereto (the "Intellectual Property"), upon the terms and conditions set forth in this Agreement.

WHEREFORE in consideration of the foregoing and the mutual covenants and promises exchanged herein, the parties agree as follows:

1.      Recitals: The Recitals set forth above are true and correct and they are incorporated into the operative provisions of this Agreement.

2.      Purchase and Sale: At Closing, in consideration of Buyer's payment to Seller of the cash sum of $[_____], plus Buyer's performance of the obligations imposed pursuant to Paragraph 8 below (collectively, the "Purchase Price"), Seller shall sell, transfer,

assign and convey to Buyer and Buyer shall purchase, the Seller's right title and interest in the Intellectual Property.

3.    <u>Deposit</u>.  Contemporaneously with the execution and delivery of this Agreement, Buyer shall deliver to Seller a deposit in the amount of the greater of 15% of the Purchase Price or $7500 (the "<u>Deposit</u>") to be held in escrow in the trust account of Seller's counsel and (a) to be applied toward the Purchase Price at Closing, (b) to be delivered to the Seller as damages in the event Buyer is selected as the Successful Bidder (as defined in the Bidding Procedures Order (defined below)) or second highest or otherwise best Bidder (the "<u>Back-Up Bidder</u>") and Buyer breaches this Agreement by failing to close, or (c) to be returned to Buyer only if Buyer is not selected as the Successful Bidder or the Back-Up Bidder.

4.    <u>Sale Free and Clear</u>.  Pursuant to Section 363(f) of the Bankruptcy Code, the sale of the Intellectual Property to Buyer shall be free and clear of all liens, mortgages, security interests, charges, easements, leases, sub-leases, covenants, rights of way, options, claims, restrictions and encumbrances of any kind, debts, liabilities, commitments, responsibilities and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, matured or unmatured, whether accrued, vested or otherwise, known or unknown, foreseen or unseen (collectively, the "<u>Liens</u>").

5.    <u>No Representation</u>.  Buyer acknowledges that Buyer has had the opportunity to independently and personally inspect and conduct its due diligence with respect to the Intellectual Property and that Buyer has entered into this Agreement based upon its ability to conduct such due diligence and to make such examination and inspection. The Intellectual Property is to be accepted by Buyer at Closing in its then present condition, "AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED." Seller, Seller's agents, attorneys, financial advisors, brokers, directors, officers or employees have not made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, past, present or future,

with respect to the Intellectual Property. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) OF ANY KIND TO BUYER, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL CONDITION OF THE INTELLECTUAL PROPERTY OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE OR OF MERCHANTABILITY AND BUYER HAS RELIED ON ITS OWN DUE DILIGENCE AND INVESTIGATIONS OF THE INTELLECTUAL PROPERTY IN DETERMINING WHETHER TO ACQUIRE THE INTELLECTUAL PROPERTY.

6. <u>Waiver of Stay</u>. The parties agree that the value of the Intellectual Property is subject to rapid decline in view of the pending GOB Sales. Accordingly, pursuant to Bankruptcy Rule 6004(h) the Seller shall request a waiver of the 14-day stay as provided in said Rule so that, subject to Bankruptcy Court approval, Buyer may close immediately on the purchase of the Intellectual Property.

7. <u>Protections Under Section 363(m) and Section 363(n)</u>. The parties acknowledge and agree that the Buyer is a good faith purchaser as contemplated by Section 363(m) of the Bankruptcy Code. Accordingly, the Seller will seek the entry of an order by the Bankruptcy Court finding that the Buyer is a purchaser of the Intellectual Property in good faith so that any reversal or modification on appeal of the order authorizing this sale will not affect the validity of the sale unless such order authorizing the sale is stayed pending appeal. Furthermore, the parties acknowledge that they have not engaged in any activity which would support the avoidance of the sale pursuant to Section 363(n) of the Bankruptcy Code or which would support any other remedy as provided in said subsection. Accordingly, the Seller shall seek the entry of an order by the Court in the Bankruptcy Case finding that this Agreement is not avoidable under Section 363(n) and that no other remedy may be sought as provided in said sub-section.

8. <u>Consumer Privacy Ombudsman</u>. The parties believe that the proposed sale of the Intellectual Property to Buyer is consistent with the policies of the Seller, attached hereto as

3.

**Exhibit "2,"** prohibiting the transfer of personally identifiable information about individuals to any Person[1] that is not affiliated with the Debtor (the "<u>Privacy Policy</u>"). Buyer agrees:

    (a)    to adopt and comply with the Privacy Policy;

    (b)    to use information covered by the Privacy Policy for the same purposes as are specified in the Privacy Policy;

    (c)    that prior to making any material change to the Privacy Policy or to use or disclosure of any information protected by the Privacy Policy, the Buyer will notify the persons affected, by mail or e-mail, and afford such persons the opportunity to opt-out of the changes to the Privacy Policy or the new uses of their data;

    (d)    to employ appropriate information security controls and procedures to protect the data covered by the Privacy Policy;

    (e)    to abide by all applicable U.S. laws and regulations.

The Seller shall seek approval of the sale of the Intellectual Property without the necessity for the appointment of a consumer privacy ombudsman as contemplated by Section 363(b)(1)(A); provided, however, that if the Bankruptcy Court orders the appointment of a consumer privacy ombudsman pursuant to Section 363(b)(1)(B), the Buyer shall pay the fees and expenses of such consumer privacy ombudsman in such amounts as allowed by the Bankruptcy Court.

    9.    <u>Conditions Precedent</u>.  Buyer's Obligation to Purchase the Intellectual Property is subject to the following conditions precedent:

    (a)    The Bankruptcy Court shall have entered an order confirming the sale of the Intellectual Property to the Buyer (the "<u>Approval Order</u>") pursuant to this Agreement, which order shall provide for a waiver of the 14-day stay provided by Bankruptcy Rule 6004; and which order shall find that the

---

[1] "Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code; and which shall further find that the transactions contemplated by this Agreement are not avoidable or subject to any other remedies under Section 363(n) of the Bankruptcy Code.

Buyer, but not Seller, may waive any conditions precedent in this paragraph in its sole discretion.

10.    Closing.   The closing shall take place at the offices of Cooley LLP located at 1114 Avenue of the Americas, New York, NY 10036 at 10:00 a.m. within one business day following the entry of the Approval Order.

11.    Certain Deliveries of Seller.   At the Closing, the Seller shall, at its expense, deliver the following to the Buyer:

(a)    an executed Bill of Sale;

(b)    a certified copy of the Approval Order;

(c)    duly executed and acknowledged (as applicable) assignments of the U.S. trademark registrations and applications and U.S. patents and patent applications, included in the Intellectual Property contemplated to be acquired pursuant to the terms hereof, in a form reasonably acceptable to Buyer and suitable for recording in the U.S. Patent and Trademark Office, as well as assignment documents for trademark and/or patent rights in other jurisdictions as reasonably requested by Buyer.

(d)    such other documents of assumption and adequate assurances as may be required by the Approval Order; and

(e)    such other documents as Buyer may reasonably require, including, without limitation, as needed to convey to Buyer the Intellectual Property.

12.    Certain Deliveries of Buyer. At the Closing, (i) Seller's counsel shall deliver the Deposit to Seller, and (ii) Buyer shall, at Buyer's expense, deliver to the Seller:

1720065 v2/NY

(a)  By wire transfer of immediately available funds to the accounts designated by the Buyer the sum of $[_____];

(b)  such other documents of assumption and adequate assurances as may be required by the Approval Order; and

(c)  such other documents as Seller may reasonably require.

13.  <u>Transfer of Software and/or Electronically Stored Data</u>.  Commencing as of the Closing, Seller shall take all actions reasonably necessary to deliver possession of the Intellectual Property to the Buyer, including, without limitation, enabling Buyer to:

(a)  take possession of servers and related equipment which Seller no longer requires for its continuing operation;

(b)  obtain the transfer of applicable software and software licenses; and

(c)  transfer to Buyer by appropriate means all electronically stored software and data.

The parties will cooperate to enable Seller such continued use of the Intellectual Property as is necessary for its operation as debtor in possession in the Bankruptcy Case.

14.  <u>Agreement Subject to Higher Bid</u>.  The parties acknowledge and understand that this Agreement is subject to the Seller soliciting and receiving higher or better offers for the purchase of the Intellectual Property pursuant to the bidding procedures approved by the Bankruptcy Court.

15.  <u>Assignability</u>.  Buyer may assign its rights and obligations under this Agreement to an affiliate (as defined in Section 101(2) of the Bankruptcy Code).

16.  <u>Binding Effect</u>.  This Agreement is binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.  Specifically, but without limitation, upon the entry of the Approval Order, this Agreement and the Approval Order shall be binding upon the Seller and its bankruptcy estate even if:

(a)  the Bankruptcy Case is dismissed;

6.

(b)    a trustee is appointed in the Bankruptcy Case;

(c)    the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code.

17.    <u>Access to Records and Information</u>.    Between the Closing Date and the fifth anniversary of the Closing Date, Seller shall have reasonable access to all of the books and records relating to the Intellectual Property to the extent that such access may reasonably be required by Seller in connection with the completion of the GOB Sales or the administration of the Bankruptcy Case.    Such access shall be afforded by Buyer upon receipt of reasonable advance notice and during normal business hours; provided, however, that any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of Buyer.

18.    <u>General Provisions</u>.

(a)    <u>Expenses</u>.    Except as set forth in this Agreement and whether or not the transactions are consummated, each party shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the Transactions.

(b)    <u>No Survival of Representations and Warranties</u>.    The parties agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.

(c)    <u>No Third Party Beneficiaries</u>:  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such assigns, and legal or equitable rights hereunder.

(d)    <u>Remedies</u>.    Except as otherwise expressly provided in this Agreement, any and all remedies expressly conferred upon a party to this Agreement

shall be cumulative with, and not exclusive of, any other remedy contained in this Agreement, at law or in equity and the exercise by a party to this Agreement of any one remedy shall not preclude the exercise by it of any other remedy. In addition, the parties agree that irreparable damage would occur in the event that the parties fail to perform their obligations in accordance with the terms of this Agreement and each party shall be entitled to specific performance in such event, in addition to any other remedy at law or in equity.

(e)     <u>Interpretation; Exhibits and Schedules; Certain Definitions</u>.  The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

(f)     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.

(g)     <u>Entire Agreement</u>.  This Agreement, along with the Schedules and Exhibits thereto, contain the entire agreement and understanding among

the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. None of the parties shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein.

(h)     <u>Severability</u>. If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

(i)     <u>Exclusive Jurisdiction</u>. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions. Any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.

(j)     <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

9.

(k)  <u>Waiver of Jury Trial</u>.  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

SELLER:                                                    BUYER:


METROPARK USA, INC.,                          [_____]
A Delaware Corporation


By:_____            By:_____

Its:_____            Its:_____

<u>**EXHIBIT "1"**</u>

(Intellectual Property)


<u>**U.S. Trademarks (the "Marks"):**</u>

| Registered Owner | Trademark | Country | Registration No. | Reg. Date |
|---|---|---|---|---|
| Metropark USA, Inc. | METROPARK | USA | 2,984,190 | August 9, 2005 |
| Metropark USA, Inc. | METROPARK | USA | 2,984,191 | August 9, 2005 |

For the avoidance of doubt, the transfer of the Marks includes, without limitation, any and all goodwill symbolized by and in any manner associated with the Marks.

<u>**Domain names**</u>:

metropark.net
metroparksuppliers.com
metroparkusa.com
metroparkusa.net
shopmetropark.com
shopmetropark.net

<u>**Customer Data**</u>:

A database containing approximately 700,000 email addresses.

<u>**Social Media**</u>:

http://www.facebook.com/MetroparkUSA
twitter: @metroparkusa

<u>**Miscellaneous**</u>:

- Website content and graphics
- Advertising and promotional materials
- Any and all copyrights associated with the Marks or any of the other foregoing items of property.

EXHIBIT "2"

(Privacy Policy)

12.

# Metroparkusa.com Privacy and Security

**Metroparkusa.com is committed to your privacy**

Your privacy is important, so we have created the following Privacy and Security Policy to let you know what information we collect when you visit our web site, Metroparkusa.com, why we collect it, and how it is used. This Privacy and Security Policy also addresses our data security practices, the options you have to access and control any personally identifiable information you provide to us, and other matters. This Privacy and Security Policy is governed by our Terms and Conditions. We may periodically make changes to this Privacy and Security Policy which will be included on this page. It is your responsibility to review this Privacy and Security Policy frequently and remain informed about any changes to it, so we encourage you to visit this page often.

**Special note about children**

This Site is not intended for or directed to persons under the age of 18. Metroparkusa.com does not sell products for purchase by children. Metroparkusa.com sells children's products for purchase by adults. By registering with this web site, purchasing products from Metroparkusa.com or providing Metroparkusa.com with any information, you represent to Metroparkusa.com that you are 18 years of age or older and that any information you provide to Metroparkusa.com about a third party is for a third party that is 18 years of age or older.

**What information do we collect from you? Why?**

We May Collect Information Needed to Contact You Later. If we collect personal contact information (as described below), you may later access and modify it, and remove it from our system. You may also choose simply not to provide your personal contact information at the point of collection.

**We may collect your name, address and phone number**

When you use our web Site, we may request your first and last name, home or other physical address, including your street name and address and name of your city or town, your telephone number or other "real world" contact information.

We use this information to complete, support and analyze your purchases from Metroparkusa.com and use of the Metroparkusa.com web site, for internal purposes and to comply with any requirements of law. This information may be disclosed to our staff and to third parties involved in the completion of your transaction, the delivery of your order or the analysis and support of your use of the Metroparkusa.com web site.

**We may collect your email address**

We may request your email address, or other information needed to contact you online. We use it to complete, support and analyze your purchases from Metroparkusa.com and use of the Metroparkusa.com web site, and to comply with any requirements of law. We use it to respond to any questions you might have and to provide you with information about specials occurring on the Metroparkusa.com web site if you have chosen this service on the Account Login page. This information may be disclosed to our staff and to third parties involved in the completion of your transaction, the delivery of your order or the analysis and support of your use of the Metroparkusa.com website.

**We may collect other kinds of information from you**

When you use our web site, we may collect personal information about you described below. You may later access and modify the information, or have it removed. You may also simply choose not to provide your personal contact information at the point of collection; however, if you do not provide such information, we will be unable to complete your purchase.

**We may collect purchase information**

We may collect information actively generated by the purchase of a product or service, such as a payment method. We use this information to process your order and analyze and support your use of the Metroparkusa.com web site. This information may be disclosed only to our staff and to third parties involved in the completion of your transaction, the delivery of your order or the analysis and support of your use of the Metroparkusa.com web site.

**We may collect navigation and clickstream data**

As you browse our web site, we may gather navigational and clickstream data that shows what pages are visited and how long various features are used. This information will not reveal your identity or be linked to you personally. We use this information to complete, analyze and support your purchases from Metroparkusa.com and use of the Metroparkusa.com web site to comply with any requirements of law and to determine the commissions for our Affiliates. This information may be disclosed only to our staff and to third parties involved in the completion of your transaction, the delivery of your order, and the analysis and support of your use of the Metroparkusa.com web site.

**We may use third-party advertising companies to serve ads on our behalf**

These companies may employ cookies and action tags (also known as single pixel gifs or web beacons) to measure advertising effectiveness. Any information that these third parties collect via cookies and action tags is completely anonymous. If you would like more information about this practice and your choices, **click here**.

**Certain exception disclosures**

We may disclose your information if necessary to protect our legal rights, if the information relates to actual or threatened harmful conduct, or Metroparkusa.com has good faith belief that such action is necessary to (1) conform to the requirements of law or comply with governmental orders, court orders, or legal process served on Metroparkusa.com or (2) to protect and defend the property or rights of

Metroparkusa.com, the users of its website or the public. This includes exchanging information with other companies and organizations for fraud protection and credit risk protection. If Metroparkusa.com should ever file for bankruptcy or merge with another company, we may sell the information you provide to us on the Metroparkusa.com website to a third party or share your personal information with the company we merge with.

**What are cookies? Why do we use them?**

Cookies are very tiny text files that are stored on your computer when you visit certain web pages that record your preferences. Metroparkusa.com uses cookies to keep track of what you have in your shopping cart and to remember you when you return to our store. They cannot harm your computer and they do not contain any personal or private information. You must accept cookies to shop at Metroparkusa.com.

**How do we protect information we collect?**

We offer secure web pages to collect certain kinds of user information and we store certain kinds of data in encrypted form. We follow reasonable technical and management practices to help protect the confidentiality, security and integrity of data stored on our system. While no computer system is completely secure, we believe the measures implemented by our web site reduce the likelihood of security problems to a level appropriate to the type of data involved. Metroparkusa.com's servers use Secure Sockets Layer (SSL), an encryption technology that works with Netscape Navigator, Microsoft Internet Explorer, Firefox, Safari, and AOL's browser, so that only Metroparkusa.com can read a customer's personal information.

**How long do we keep user information?**

We generally keep user data on our server or in our archives for as long as we reasonably need it. We may alter this practice according to changing requirements. For example, we may delete some data if needed to free up storage space. We may keep other data for longer periods if the law requires it. In addition, information posted in a public forum could stay in the public domain indefinitely.

Data management requests are administered in an orderly manner to the extent feasible and within our direct control. Note: we have greater control over recently collected data than for archived data. Once data is removed from the system and archived, it may not be feasible to accommodate specific requests. In those cases, our general data retention policy applies.

**Third party sites**

This Site contains links to third party websites, including sites of Travel providers that post last-minute content on this Site. Metroparkusa.com is not responsible for the privacy practices or the content of such websites. Your use of these third party websites is entirely at your own risk. When you click on a link in an Offer Detail, you are essentially taken to the originating Travel Provider's site. Any log in, booking or reservation you perform there are done directly with the Travel Provider.

**Your consent to this policy**

By using the Metroparkusa.com web site, you agree to this Privacy and Security Policy. This is our entire and exclusive Privacy and Security Policy and it supersedes any earlier version. Our Terms and Conditions take precedence over any conflicting Policy provision. We may change our Privacy and Security Policy by posting a new version of the policy on this page which it is your responsibility to review frequently.

**Legal disclaimer**

This Site operates AS-IS and AS-AVAILABLE, without liability of any kind. We are not responsible for events beyond our direct control. This Privacy and Security Policy is governed by California law, excluding conflicts of law principles. Any legal actions against us must be commenced in California within one year after the claim arose, or be barred.

**If you have a privacy question**

If you have a privacy question about the Metroparkusa.com web site, please email: Customer Service at info@Metroparkusa.com. Or write:

Metropark USA, Inc.,
Attn: Customer Security Department
532 Coral Ridge Pl
City of Industry, CA. 91746

Effective as of October 26, 2005