BLAKELEY & BLAKELEY LLP
100 Park Avenue, Suite 1600
New York, NY 10017
Telephone: (212) 984-1033
Facsimile: (212) 880-6499
Scott E. Blakeley (*Pro Hac Vice*)
Ronald A. Clifford (*Pro Hac Vice*)
David M. Mannion

Counsel to the Official Committee
of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>METROPARK USA, INC.,<br><br>                Debtor. | Chapter 11<br><br>Case No. 11-22866 (RDD) |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**FOR AUTHORITY TO COMMENCE AN ADVERSARY PROCEEDING**

TO THE HONORABLE ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:

    The Official Committee of Unsecured Creditors (the "Committee") of Metropark USA, Inc. (the "Debtor"), by and through its undersigned counsel, hereby moves this Court, pursuant to 11 U.S.C. §§ 105, 1103 and 1109, to grant it standing under chapter 5 of the Bankruptcy Code to initiate proceedings against Bricoleur Partners, L.P., Cynthia T. Harris, Orval D. Madden, as Trustee of the Madden Family Trust UTD 3/27/98, as amended, LeAnn Madden as Trustee of the Madden Family Trust UTD 3/27/98, as

1

amended, Jon E. Bortz, Ellen E. Bortz, Jay A. Johnson and Robert M. Poole (collectively, the "Second Lienholders"). Specifically, the Committee seeks to bring, *inter-alia*, an action of equitable subordination and recharacterization pursuant to 11 U.S.C. §§ 510(c) and 105(a) against the Second Lienholders requesting that this Court subordinate the purported secured liens of the Second Lienholders to the claims of the general unsecured non-priority creditors of the Debtor's estate or recharacterize the Second Lienholders' purported secured liens as equity.

This Motion is made on the grounds that a colorable basis exists for subordinating or recharacterizing the alleged claims of the Second Lienholders, that such relief would greatly benefit the estate, and the fact that the Debtor has refused to pursue the claim itself due to its inherent conflicts of interest with the Second Lienholders.

## FACTUAL BACKGROUND

1. The Committee is informed and believes, through documents informally produced by the Debtor, that on or around January 11, 2011, the Debtor began its initial round of discussions with Huntley, Mullaney, Spargo & Sullivan LLP, a turnaround firm.

2. The Committee is informed and believes, through documents produced informally by the Debtor, that on or around January 21, 2011 through March 14, 2011, the Debtor sought financing from no less than seven (7) banks and financial institutions.

3. All of the banks and financial institutions denied the Debtor financing.

4. The Committee is informed and believes, through documents informally produced by the Debtor, that on or about March 18, 2011, the Debtor received wire transfers in the amount of $825,000.00 from the Second Lienholders, broken down as follows:

| Entity | Amount |
|---|---|
| Bricoleur | $500,000 |
| Harriss | $100,000 |
| John and Ellen Bortz | $100,000 |
| Ovral and LeAnn Madden | $100,000 |
| Johnson | $25,000 |
| Total: | $825,000 |

5. The Debtor claims that it entered into that certain Note Purchase Agreement with the Second Lienholders on March 21, 2011. Interim Order, ¶ 8.

6. The Debtor claims the amount outstanding under that certain Note Purchase Agreement as of the petition date was $825,000. *Id*.

7. The Committee is informed and believes that the Debtor was in default of its loan agreement (the "Prepetition Senior Credit Agreement") with its purported prepetition senior secured lender because it has not maintained uncapped availability of at least $500,000.00 plus ten percent (10%) of any Commitment Increase from and after each Commitment Increase Date, as defined in and required by Section 6.20 of the Prepetition Senior Credit Agreement, which failure constituted an event of default pursuant to Section 8.01(b) of Prepetition Senior Credit Agreement.

8. The Committee is informed and believes that the Second Lienholders own no less than 70% of the shares of the Debtor as follows:

| Entity | Ownership Percentage |
|---|---|
| Bricoleur/Bricoleur Affiliates | 43.64% |
| Harriss | 0% |
| John and Ellen Bortz | .72% |
| Ovral and LeAnn Madden | 19.68% |
| Johnson | 4.61% |
| Total: | 68.65% |

9. Pursuant to § 101(31)(B) of the Bankruptcy Code, an insider is defined as

a director, officer, or person in control of the debtor. The Committee believes that beyond owning the controlling interest in the Debtor as equity holders, the Second Lienholders are also insiders due to their relationship to the Debtor or an insider of the Debtor as follows:

    a.    Bricoleur Partners, L.P. is comprised of Bricoleur Capital Management, LLC, as general partner, with Robert M. Poole as a managing member.

    b.    Robert M. Poole is a director of the Debtor.

    c.    Cynthia T. Harris is the chief executive officer of the Debtor.

    d.    Jon E. Bortz is a director of the Debtor.

    e.    Ellen E. Bortz is the spouse of Jon E. Bortz, a director of the Debtor.

    f.    Orval D. Madden and LeAnn Madden are the original founders of the Debtor.

    g.    Orval D. Madden is the Chairman of the Debtor's Board of Directors of the Debtor.

    h.    LeAnn Madden is the spouse of Orval D. Madden, Chairman of the Debtor's Board of Directors of the Debtor.

    i.    Jay Johnson is the chief financial officer of the Debtor.

## JURISDICTION

10. The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (K) and (O). Venue is proper in the Southern District of New York, White Plains Division.

## ARGUMENT

11. Although the Bankruptcy Code does not expressly authorize a creditors' committee to prosecute claims on behalf of the estate, an implied right exists under sections§§ 1103(c)(5) and 1109(b) of the Bankruptcy Code. Section 1103(c)(5) of the

Bankruptcy Code provides that a committee may "perform such other services as are in the interests of those represented."  Similarly, § 1109(b) of the Bankruptcy Code provides that a creditors' committee is among the interested parties that "may appear and be heard on any issue in a [chapter 11] case."  "Sections 1109(b) and 1103(c)(5), taken together, evince a Congressional intent for committees to play a robust and flexible role representing the bankruptcy estate, even in adversarial proceedings." *Official Comm. Of Unsec. Cred. Of Cybergenies Corp.* v. *Chinery,* 330 F.3d 548, 566 (3d Cir. 2003).

12.     Courts may generally grant derivative standing in cases where: (i) there is alleged a colorable claim that would benefit the estate; (ii) the debtor has unjustifiably refused to pursue the claim itself; and (iii) the creditors committee has obtained permission from the court to initiate the action on behalf of the estate. *Infinity Inv. Ltd.* v. *Kingsborough (In re YES! Entm't. Corp.),* 316 B.R. 141, 145 (D. Del. 2004) *(citing In re Valley Media, Inc.,* 2003 WL 21956410, *2 (Bankr. D. Del. Aug. 14, 2003); *In re Commodore Intl. Ltd.,* 262 F.3d 96,100 (2d Cir. 2001); *Fogel* v. *Zell,* 221 F.3d 955, 966 (7th Cir. 2000)).

*Equitable Subordination*

13.     The general elements of an equitable subordination claim are set forth in a three-pronged test as follows: a) The claimant engaged in some type of inequitable conduct; b) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and c) equitable subordination of the claim is consistent with bankruptcy law.  *See ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (U.S.B.C. SDNY 1997) (citing *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977).  Where the allegedly inequitable conduct was committed by an "insider" of the debtor, that conduct will be "rigorously scrutinized" by the courts.  *See Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1995).

/ / /

5

A. **The Second Lienholders Engaged in Inequitable Conduct**

14. Courts have consistently held that there are three (3) generally recognized categories of misconduct that may constitute inequitable conduct: (1) fraud, illegality and breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego. *Id.* at 1467.

15. The Committee is informed and believes that at the time the Note Purchase Agreement was executed, the Debtor was, or nearly was, insolvent. As officers and directors of the Debtor, the Second Lienholders owed a fiduciary duty to the Debtor to exercise a high degree of loyalty and care in the performance of their duties and responsibilities. Likewise, as officers and directors of the Debtor, the Second Lienholders owed fiduciary duties to the Debtor's creditors.

16. The Second Lienholders engaged in inequitable conduct by, among other things, layering secured debt on the Debtor's already undercapitalized capital structure; causing the Debtor to execute the Note Purchase Agreement; charging interest on the Notes issues under the Note Purchase Agreement that they knew or reasonably should have known could never be repaid; failing to act as reasonably prudent business persons in considering all the information available and acting on an informed basis; failing to consider the interests of the unsecured creditors in committing the assets of the Debtors; and denying the Debtor to incur any financing from third parties without consent from the Second Lienholders under the Notes issued pursuant to the Note Purchase Agreement, thereby preventing any third party financing which would have benefited the Debtor and its creditors.

17. Further, the Second Lienholders had a special relationship of trust with the Debtor, and were prohibited from acting in their own best interests. The Second Lienholders acted in their own best interests by, among other things, by causing the Debtor to enter into the Note Purchase Agreement, to incur the obligations under the Junior Notes, and to provide liens associated therewith, all of which were incurred, made

or effectuated to obtain security for prior unsecured loans; reap the benefits of interest payments under the Junior Notes; and keep control of the Debtor and value of its collateral by preventing any third party financing without the Second Lienholders' consent.

**B.      The Second Lienholders' Inequitable Conduct Caused Injury to the Debtor's Creditors and Conferred an Unfair Advantage on the Claimant**

18.     The Second Lienholders' inequitable conduct resulted in injury to the creditors of the Debtor by increasing the Second Lienholders' claims against the Debtor, shifting the risk of loss on the Debtor's other creditors, and proportionately decreasing the amount of funds available to pay the Debtor's other creditors.

19.      The Second Lienhoders' misconduct conferred an unfair advantage on them, including, but not limited to, the Second Lienholders' putative secured position relative to the Debtor's assets, the Second Lienholders' benefit in receiving interest payments under the Junior Notes, and protection of the value of the Junior Notes by preventing any third party financing without the Second Lienholders' consent, which would have benefited the Debtor and its creditors but diluted the value of the Junior Notes.

**C.      Application of Equitable Subordination on the Instant Facts Is Not Inconsistent With Provisions of the Bankruptcy Code**

20.     Subordinating amounts owed under the Prepetition Subordinated Credit Agreement is not inconsistent with the other provisions of the Bankruptcy Code, especially when the facts supra are taken into account.

*Recharacterization*

21.     The Bankruptcy Code authorizes a bankruptcy court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of Title 11. *See In re Dornier Aviation (North America), Inc.*, 453 F.3d 225 (4th Cir. 2006). Recharacterization is well within the broad powers afforded a bankruptcy court in 11

U.S.C. § 105(a) and facilitates the application of the priority scheme laid out in 11 U.S.C. § 726. *Id*. Among the factors looked to by courts in determining if recharacterization is appropriate are the following: (1) The adequacy or inadequacy of capitalization, and (2) the security for the advances. *Id*.

22. In the instant case, immediately prior to the execution of the Note Purchase Agreement and the Junior Notes, the Debtor was undercapitalized and lacked liquidity to increase the amount of financing under the Senior Prepetition Credit Agreement. Immediately prior to the execution of the Prepetition Subordinated Credit Agreement and the Junior Notes, the Second Lienholders knew or reasonably should have know that the Debtor was undercapitalized and lacked liquidity to increase the amount of financing under the Senior Prepetition Credit Agreement.

23. Within the three (3) months prior to the execution of the Note Purchase Agreement and the Junior Notes, the Debtor sought proposals to obtain financing from no less than seven (7) banks and financial institutions, all of which declined to provide such financing with some expressing doubts as to the viability and financial stability of the Debtor's operations.

24. Immediately prior to the execution of the Note Purchase Agreement and the Junior Notes, the Second Lienholders knew or reasonably should have know that certain banks or financial institutions declined to provide such financing to the Debtor and that several such parties expressed doubts as to the viability and financial stability of the Debtor's operations.

25. The Second Lienholders thus knew that no prudent lender would extend credit to the Debtor under these circumstances beyond the amount of the Senior Prepetition Credit Agreement.

26. Immediately prior to the execution of the Prepetition Subordinated Credit Agreement and the Junior Notes, the Second Note Holders were insiders and/or shareholders of the Debtor. As insiders of the Debtor, and as a result of the Second

Lienholders' dominion and control over the Debtor, the Second Lienholders caused the execution of the Note Purchase Agreement and Junior Notes.

27. Identity of interest/Correlation

| Entity | Percentage of Ownership | Amount Advanced | Percent of Total Amount Advanced | Percent of Ownership in Proportion to Total Ownership held by Entities |
|---|---|---|---|---|
| Bricoleur & Affiliates | 43.64% | $500,000 | 60.61% | 63.57% |
| Harriss | 0.00% | $100,000 | 12.12% | 0.00% |
| John and Ellen Bortz | 0.72% | $100,000 | 12.12% | 1.05% |
| Orval and LeAnn Madden | 19.68% | $100,000 | 12.12% | 28.67% |
| Johnson | 4.61% | $25,000 | 3.03% | 6.72% |
| Totals: | 68.65% | $825,000 | 100.00% | 100.00% |

28. The Second Lienholders' primary motivation for providing the Junior Notes was to protect their investments, reap the benefits of interest payments under the Junior Notes, and maintain control of the Debtor and value of its collateral by preventing any third party financing without The Second Lienholders' consent. The Second Lienholders structured the Note Purchase Agreement to ensure minimal devaluation of their other interests in the Debtors and, therefore, extended debt knowing it could never be repaid by the Debtors. To secure the Junior Notes, Defendants accepted second priority liens on substantially all of the Debtors assets. Moreover, since the Second Lienholders knew that nobody else would issue financing to the Debtor, by structuring the Junior Notes as they did, the Second Lienholders assured that nobody else would enter Debtor's capital or secured debt structure, and potentially threaten the Second Lienholders' security interests.

29. Based on the real nature of the Note Purchase Agreement and Junior Notes and the Second Lienholders' ulterior motives in providing that financing, the Junior Notes should be recharacterized as equity.

*Debtor's Refusal to File Action*

30. Although in possession of all the facts contained supra, the Debtor has failed to file any actions against the Second Lienholders based thereupon. Indeed, given the close relationship to the Second Lienholders, it would be logically inappropriate for

the Debtor to pursue these types of actions.

**WHEREFORE**, based on the foregoing, the Committee respectfully requests that this Court grant it standing to initiate an adversary action against the Second Lienholders under chapter 5 of the Bankruptcy Code.

Dated: June 22, 2011    BLAKELEY & BLAKELEY LLP

By:____/s/Ronald A. Clifford_____
    Scott E. Blakeley
    Ronald A. Clifford
    David Mannion
Counsel for the Official Committee of Unsecured Creditors of Metropark USA, Inc.